EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Recurridos

v.

Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Peticionarios
_____

Certiorari

2024 TSPR 60

2013 DPR ___

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Peticionarios

v.

Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Recurridos

Número del Caso:  CC-2024-0266 cons. con CC-204-0267

Fecha:  10 de junio de 2024


Tribunal de Apelaciones:

    Panel III

Representantes legales de los peticionarios:

    **CC-2024-0266:**
    Lcdo. Ramón L. Rosario Cortés
    Lcdo. Miguel A. Rodríguez Ramos

    **CC-2024-0267:**
    Lcdo. Iván A. Rivera Reyes
    Lcdo. Yuseph L. Lamboy López
    Lcdo. Nelson J. Torres Yordán

Representantes legales de los recurridos:

    Lcdo. Frank Torres Viada
    Lcda. Alessandra N. Torres García
    Lcda. Brenda Berríos Morales
    Lcdo. Carlos Iván Gorrín Peralta
    Lcdo. Juan M. Mercado Nieves
    Lcdo. José L. Lamas Rivera
    Lcdo. Guillermo Ramos Luiña
    Lcdo. Efraín Guzmán Mollet
    Lcda. Tamara Sosa Pascual
    Lcdo. Jorge Farinacci Fernós
    Lcda. Chery M. Negrón Rosario
    Lcdo. Francisco J. González Magaz
    Lcdo. Gerardo De Jesús Annoni
    Lcdo. Edgardo L. Rivera Rivera
    Lcda. Wilmarie Santoni Cruz

Representantes legales de los *Amicii Curiae*:

    **Unión Americana de Libertades Civiles de Puerto Rico (ACLU Puerto Rico):**
    Lcdo. Fermín L. Arraiza Navas
    Lcda. Lolimar Escudero Rodríguez

    **Comisión Estatal de Elecciones:**
    Lcdo. Jason Caraballo Oquendo
    Lcdo. José A. Feliciano Ramos
    Lcdo. Manuel Fernández Mejías

Materia:  Derecho Electoral – Legitimación activa para presentar la causa de acción que establece el Art. 7.5 del Código Electoral de 2020; requisito del recogido de endosos por aspirantes de un partido político que no son candidatos únicos a la fecha del cierre de radicación de candidaturas.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación<br><br>Recurridos<br><br>v.<br><br>Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo | CC-2024-0266<br><br>cons. con<br><br>CC-2024-0267 | Certiorari |

Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Peticionarios

_____

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Peticionarios

v.

Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty

Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico , a 10 de junio de 2024.

**Justicia es aplicar la ley de la misma forma a todos aquellos que se encuentren en las mismas circunstancias.** Nuestra democracia nace y pende de la existencia de un sistema de orden. Fue así como, cuando nos organizamos como Pueblo y establecimos un orden, nos fue posible instituir democráticamente nuestra forma de gobierno y aquellos que la dirigen. Si no protegemos y

seguimos ese orden, nos arriesgamos a un deterioro o retroceso en los avances democráticos alcanzados.

Ahora bien, no corresponde a este Tribunal establecer ese orden, sino servir de garante para que este se siga. Es el Pueblo a través de sus representantes, esto es, la Asamblea Legislativa, quienes establecen ese orden, en este caso, con relación a los procesos electorales.

Solo cuando la Asamblea Legislativa ha fallado en establecer ese orden en un momento dado, y con relación a alguna circunstancia en particular, nuestro sistema constitucional le permite a esta Curia llenar ese vacío. Esa no es la situación en este caso, por lo que no tenemos espacio sino para implementar la norma conforme se ha establecido. Esto es así, aunque a alguno pudiera no agradarle el resultado.

Al fin y al cabo, no se trata de si agrada o no el resultado de nuestro análisis y las consecuencias de nuestras determinaciones. Se trata de resolver la controversia con honestidad intelectual, apegados a la letra del orden establecido. Todo lo demás son consideraciones que, aunque pesan, no nos mueven a alejarnos de nuestro deber.

En el caso de marras, los peticionarios (querellantes e interventores) son (o pretendieron ser) candidatos a posiciones electivas dentro de la papeleta del Partido Popular Democrático (PPD) y del Partido Nuevo Progresista (PNP). Estos comparecen ante nos para impugnar la determinación del Tribunal de Apelaciones que revocó al Tribunal de Primera Instancia en cuanto a la descalificación de los recurridos, quienes son aspirantes

a puestos electivos bajo la insignia del partido Movimiento Victoria Ciudadana (MVC).

Tanto los recurridos como los peticionarios participaron en **una competencia** que determinó las personas cuyo nombre y rostro aparecerán en la papeleta legislativa o a la comisaría residente en los próximos comicios de noviembre 2024 bajo la insignia de sus respectivos partidos. Los primeros **compitieron** y fueron seleccionados como parte del método alterno escogido por el partido MVC y los segundos **compitieron** por el método escogido por el PNP y PPD, esto es, las primarias que se celebraron el 2 de junio de 2024.

Así, nos corresponde determinar si, fundamentado en el Art. 7.5 del Código Electoral de 2020, *infra*, procede descalificar a los recurridos de sus aspiraciones a distintos puestos electivos para las elecciones de 2024. Esto se da, por no cumplir con el requisito de presentación de peticiones de endosos en vista de que el Partido MVC no los certificó como candidatos únicos a los puestos políticos que aspiraban al mediodía del 30 de diciembre de 2023, según lo exige el Art. 7.15 del Código Electoral 2020, *infra*, y la Sec. 3.1 del *Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes*, infra.

Adelantamos que los peticionarios tienen razón, por lo que ordenamos la descalificación como aspirantes a las elecciones de 2024 de los siguientes recurridos: la Hon. Mariana Nogales Molinelli y la Sra. Gladys Myrna Conty como aspirantes a representantes por acumulación por el MVC y al Hon Rafael Bernabe

Riefkohl y al Sr. Alejandro Santiago Calderón como aspirantes a senadores por acumulación por el MVC.[1]

## I

El 1 de febrero de 2024, el Hon. Jorge Alfredo Rivera Segarra, Representante del Distrito 22; el Hon. Héctor Santiago Torres, Senador del Distrito de Guayama; la Lcda. Yulixa Paredes Albarrán, aspirante a Representante del Distrito 13; y el Sr. Jorge Quiles Gordillo, aspirante a Representante por Acumulación (querellantes-peticionarios) presentaron una *Demanda* en la que al amparo del Art. 7.5 de la Ley Núm. 58-2020, conocida como Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4615 solicitaron la descalificación de los siguientes aspirantes: la Hon. Ana Irma Rivera Lassén, Aspirante a Comisionada Residente del Partido Movimiento Victoria Ciudadana (MVC); el Sr. Edgardo Cruz Vélez, Aspirante a Comisionado Residente de MVC; Luis Alejandro Santiago Calderón, Aspirante a Senador por Acumulación del MVC; el Sr. Edwin Marrero Martínez, Aspirante a Senador por Acumulación del MVC; el Hon. Rafael Bernabe Riefkohl, Aspirante a Senador por Acumulación del MVC; la Hon. Mariana Nogales Molinelli, Aspirante a Representante por Acumulación del MVC; el Lcdo. Olvin A. Valentín, Aspirante a Representante por Acumulación del MVC; la Sra. Gladys Myrna Conty Hernández, Aspirante a Representante por Acumulación del MVC; el Sr. Anthony

---

[1] En cuanto a la Hon. Ana Irma Rivera Lassén, como explicaremos al final de la Opinión, la Sentencia del Tribunal de Apelaciones advino final y firme, toda vez que la Dra. Marigdalia Ramírez Fort no recurrió de esa determinación ante este Tribunal. Por lo tanto, el referido dictamen que favoreció a la senadora Rivera Lassén prevalece. Asimismo, con relación a los otros querellados acumulados en el pleito que resultaron descalificados con la *Sentencia* del Tribunal de Primera Instancia, dicho dictamen advino final y firme. Sin embargo, aclaramos que la descalificación de este grupo de querellados trajo consigo otras consecuencias colaterales al proceso electoral que se discuten al final de esta *Opinión*.

Sánchez Aponte, Aspirante a Representante del Distrito 38 del Partido Proyecto Dignidad (PD); el Sr. Stephen Gil Álamo, Aspirante a Representante del Distrito 38 del PD; y el Sr. Wilfredo Pérez Torres, Aspirante a Representante del Distrito 38 del PD (recurridos o querellados). Asimismo, acumularon como querellados a la Hon. Jessika Padilla Rivera, Presidenta Alterna de la Comisión Estatal de Elecciones (CEE) y a los Comisionados Electorales del MVC, PNP, PPD, PD y del Partido Independentista Puertorriqueño (PIP).

En síntesis, los querellantes alegaron que los recurridos, aspirantes a puestos electivos para las elecciones generales que se celebrarán en el presente año, incumplieron con el requisito de presentación de los endosos que exige el Art. 7.15(3) del Código Electoral de 2020, 16 LPRA sec. 4625(3). Esto surge, toda vez que los partidos MVC y PD se acogieron al método alterno para la nominación de sus candidatos y presentaron ante la CEE los expedientes con los documentos de los aspirantes sin certificarlos como candidatos únicos de estas colectividades después de la fecha que el Código Electoral de 2020 estableció, a saber, el 30 de diciembre de 2023 hasta el mediodía. Igualmente, señalaron que los recurridos son del mismo partido político y aspiran al mismo cargo, por lo que se requiere que presenten los endosos en el término correspondiente.

Conforme a lo anterior, los querellantes arguyeron que los recurridos estaban obligados a recoger y entregar las peticiones de endosos necesarias en la fecha establecida estatutariamente para poder participar en las elecciones generales como lo exigen los Arts. 7.11 y 7.15(3) del Código

Electoral de 2020, 16 LPRA sec. 4621 y 4625 y la Sec. 3.1 del *Reglamento para la radicación de candidaturas de la Comisión Estatal de Elecciones* que esta entidad aprobó el 15 de junio de 2023 (*Reglamento para la radicación de candidaturas*). De esta forma, adujeron que el incumplimiento se concretó el 31 de enero de 2024 que era la fecha límite para entregar el 50% de los endosos requeridos por ley y que, a esa fecha, ningún aspirante del MCV presentó los endosos para los puestos mencionados.

El 11 de febrero de 2024, los interventores, Hon. José "Pichy" Torres Zamora, aspirante a un nuevo término como senador por acumulación; Hon. Keren Riquelme Cabrera, aspirante a un nuevo término como senadora por acumulación; Hon. Wanda Del Valle Correa, aspirante a un nuevo término representante por el Distrito 38, el Sr. Eddie Manso Fuentes, aspirante a representante por acumulación[2] y la Sra. Leyda Cruz Berríos aspirante a senadora por acumulación presentaron una *Demanda de Intervención*.

En esa misma fecha, la Hon. Ana Irma Rivera Lassén presentó una *Moción de desestimación por falta de jurisdicción* mediante la cual adujo que procedía la desestimación, entre otras cosas, por la falta de legitimación activa para incoar la acción por parte de los querellantes. Por su parte, los querellantes presentaron su *Moción en oposición a solicitud de desestimación por la Senadora Honorable Ana Irma Rivera Lassén*. Allí reclamaron que poseían legitimación activa en virtud del Art. 5.1 del Código Electoral de 2020, *infra*, porque, en síntesis, antes de ser

---

[2] A pesar de que el Sr. Eddie Manso Fuentes comparece en la *Demanda de Intervención*, no se realiza alegación alguna respecto al referido aspirante.

aspirantes o candidatos, son electores. Adujeron que el inciso (3) del referido artículo le reconoce a los electores la capacidad para vindicar la violación de la aplicación uniforme de las disposiciones en ley.

Por otro lado, días después, la Dra. Marigdalia Ramírez Fort, quien aspiraba al puesto de Comisionada Residente por el PNP, presentó una *Demanda de Intervención* (segunda interventora) en la que alegó que la CEE la descalificó por no haber presentado el 50% de los endosos al mediodía del 31 de enero de 2024. Así, reclamó que una resolución favorable para los recurridos implicaría una aplicación dispar de los requisitos legales entre competidores para el mismo cargo en un proceso primarista. Desde su punto de vista, la CEE mantuvo a los recurridos en el ruedo como aspirantes a pesar de que, en esa fecha, ninguno de estos había presentado endoso alguno. Específicamente, sostuvo que eximir a los aspirantes demandados del recogido de endosos constituyó una ventaja indebida y una violación a la ley electoral y sus reglamentos, ya que se está aplicando el estatuto de forma selectiva y acomodaticia para unos candidatos en particular.[3]

A su vez, planteó que tiene derecho a que a "todas las personas que aspiran luego de cerrado el período de candidaturas el 2 de enero de 2024, [fecha límite de este ciclo electoral] se le requiera la misma cantidad de endosos establecidos en el Art. 7.15, no importando si aspiran para un método alterno o a un proceso de primarias de ley" y, por ello, reconoció que solamente

---

[3] *Demanda de Intervención*, Apéndice, pág. 222.

están excluidos de entregar endosos los aspirantes bajo un método alterno presentados como candidatos únicos antes del 30 de diciembre de 2023.[4] Cónsono con lo anterior, solicitó que si el foro primario eximía a los recurridos de presentar endosos, debían aplicarle tal exención.[5]

Luego de varios trámites procesales e intercambio de mociones de desestimación y solicitudes de sentencias sumarias y réplicas o dúplicas a estas, el Tribunal de Primera Instancia celebró una **vista argumentativa en la que dio por sometida la controversia.** Mientras el foro primario dilucidaba el caso, el 19 de marzo de 2024 la Comisionada Electoral del Partido MVC presentó una *Moción informativa*. En esta señaló que **el 16 de marzo de 2024** MVC celebró el proceso de método alterno de selección de candidatos y, para notificar los resultados, **presentó la certificación de los candidatos únicos siguientes:** Hon. Ana Irma Rivera Lassén, candidata única al cargo de Comisionada Residente; a la Hon. Mariana Nogales Molinelli, Sra. Gladys Myrna Conty, Hon. Rafael Bernabe Riefkohl y Sr. Alejandro Santiago Calderón candidatos únicos a representantes y senadores por acumulación, respectivamente.

El 21 de marzo de 2024, el Tribunal de Primera Instancia emitió una *Sentencia* mediante la cual declaró *Ha Lugar* a la *Querella* presentada y descalificó a la Hon. Ana Irma Rivera Lassén, al Sr. Edgardo Cruz Vélez, al Sr. Alejandro Santiago Calderón, al Sr. Ramón Cruz Díaz, al Sr. Edwin Marrero Martínez, al Hon. Rafael Bernabe Riefkohl, a la Hon. Mariana Nogales

---

[4] *Íd.*, págs. 223-224.

[5] *Íd.*

Molinelli, al Lcdo. Olvin Valentín Rivera, a la Sra. Gladys Myrna Conty Hernández, al Sr. Anthony Sánchez Aponte, al Sr. Stephen Gil Álamo y al Sr. Wilfredo Pérez Torres.

En primer lugar, el foro primario descartó que el Hon. Jorge Alfredo Rivera Segarra, Representante del Distrito 22, el Hon. Héctor Santiago Torres, Senador del Distrito de Guayama, y la Lcda. Yulixa Paredes Albarrán, Aspirante a Representante del Distrito 13 tuvieran legitimación activa, por entender que no sufrieron un daño claro y palpable ni están en desventaja para la elección general. Además, indicó que sería distinto si personas que estaban obligadas a cumplir con la presentación de peticiones de endosos y no lo hicieron estén corriendo contra una persona que tuvo que pasar por el complicado proceso del recogido de peticiones de endosos.

Por otro lado, en cuanto a los interventores, concluyó que estos sí tienen legitimación activa para presentar la *Querella*, ya que se enfrentarán como contrincantes en los comicios de noviembre. Determinó esto porque, el querellante, Sr. Jorge Quiles Gordillo y los interventores aspiran a los cargos a representantes y senadores por acumulación, estarán participando en las próximas elecciones como candidatos en la papeleta y cumplieron con el requisito de presentar las peticiones de endosos que les requiere la ley.

Como resultado, razonó que lo anterior no se afecta por el hecho de que el proceso de método alterno que se vaya a celebrar sea uno interno del partido, pues los requisitos que establece la ley son aplicables a todos los partidos y los procesos internos no pueden ser contrarios a lo establecido por

el Código Electoral de 2020, *supra*, y sus reglamentos. Asimismo, estableció que la segunda interventora sufrió daños de igual forma que los demás interventores. Explicó que el hecho de permitir la participación de un elector que incumplió los mismos requisitos de ley que impidieron que la doctora Ramírez Fort pudiera participar en la contienda electoral al puesto de Comisionada Residente resultó ser contrario a la uniformidad de los procesos.

En cuanto a la controversia sobre la obligación de presentar endosos por parte de los recurridos, determinó que estos debieron llevar a cabo el método alterno de selección antes de la fecha límite para notificar los candidatos únicos para los puestos electivos -en o antes de las 12:00 del mediodía del 30 de diciembre de 2023-, ya que al incumplir con este plazo estaban obligados al recogido y entrega de las peticiones de endosos que, según el puesto al que aspiraban, exigen el Código Electoral de 2020 y la Sec. 3.1 del *Reglamento para la radicación de candidaturas*, supra.

En desacuerdo, los recurridos apelaron la decisión ante el Tribunal de Apelaciones el cual, luego de celebrar una vista oral, emitió una *Sentencia Per Curiam* en la que, debido a que los peticionarios supuestamente incumplieron con el requisito de establecer un daño real, revocó el dictamen del Tribunal de Primera Instancia por falta de legitimación activa.[6]

---

[6] El Panel del Tribunal de Apelaciones estaba integrado por su presidente el Juez Figueroa Cabán, el Juez Bonilla Ortiz, la Jueza Mateu Meléndez y la Jueza Prats Palerm. Cabe resaltar que el Presidente del Panel, el Hon. Figueroa Cabán, emitió una *Opinión disidente* en la que reconoció la legitimación activa de todos los querellantes y, así modificada, hubiese confirmado el resto de la Sentencia. A su vez, es meritorio señalar que el Tribunal de Apelaciones desestimó por falta de jurisdicción el recurso de los aspirantes de Proyecto

En resumen, el foro apelativo intermedio expuso que el ordenamiento jurídico y reglamentario advierten sobre la naturaleza hipotética del daño alegado por los peticionarios. En particular, adujo que el reconocimiento de la legitimación activa del foro primario sobre uno de los querellantes y los interventores descansó en un supuesto de una contienda electoral que no era certera al momento en que se presentó la *Querella*. Cónsono con esto, añadió que no se podía ignorar que se desconocía si, ante el evento interno primarista de los respectivos partidos, el querellante y los interventores figurarían en la papeleta de las Elecciones Generales. Por último, con relación a la doctora Ramírez Fort, resaltó que ya se conoce con certeza que no participará en los comicios y, por ello, no existe un daño que reparar.

Aun en desacuerdo, a excepción de la doctora Ramírez Fort -aspirante primarista por el puesto de Comisionada Residente por el PNP-, el querellante y los interventores (Peticionarios) impugnaron ante nos la determinación del Tribunal de Apelaciones. Expedimos el auto de *certiorari* solicitado, y mediante orden, señalamos una vista oral y le ordenamos a las partes que sometieran sus respectivos alegatos. En cumplimiento con la orden, las partes presentaron sus respectivos alegatos. Luego de celebrada la vista oral y de considerar todos los argumentos de las partes y de los amigos de la corte respecto a la controversia ante nuestra consideración, este Tribunal está listo para

---

Dignidad por acudir fuera del término provisto por el Código Electoral de 2020, *infra*.

resolver sin trámite ulterior conforme nos permite la Regla 50 del Reglamento de este Tribunal, 4 LPRA Ap. XXI-B.

No obstante, como cuestión de umbral, debemos atender un aspecto jurisdiccional. El Tribunal de Apelaciones resolvió que los peticionarios no cumplen con el requisito de caso o controversia porque su reclamo concerniente al trato desigual se fundamentó en un daño puramente imaginativo e hipotético que descansa en supuestos sobre la contienda electoral que, al momento en que presentaron la *Querella*, no eran certeros. En otras palabras, a juicio del foro apelativo intermedio, los peticionarios debían esperar a ver si finalmente los recurridos se convierten en candidatos y no meramente aspirantes para tener legitimación activa para defender su causa. Por lo tanto, debemos determinar si el alegado efecto de trato desigual constituyó un daño concreto, claro, palpable, real, inmediato y preciso que nos permita considerar, además, si la controversia está madura y, por ende, podamos asumir jurisdicción para entender sobre los méritos de la controversia.

## II

### A.    Legitimación activa

La doctrina de justiciabilidad requiere la existencia de un caso o controversia real para que los tribunales puedan ejercer válidamente su jurisdicción.[7] Al evaluar si es o no apropiado entender en un caso debemos analizar los factores y circunstancias que lo rodean para, entonces, determinar si

---

[7] *Hernández Montañez v. Parés Alicea*, 208 DPR 727, 738 (2022); *Ramos, Méndez v. García García*, 203 DPR 379, 393-394 (2019); *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 60 (2009); *Com. de la Mujer v. Srio. de Justicia*, 109 DPR 715, 720 (1980).

podemos ejercer nuestra discreción en cuanto al límite de nuestro poder constitucional.[8] Sabemos que no hay una controversia real cuando "(1) se procura resolver una cuestión política; (2) una de las partes carece de legitimación activa; (3) hechos posteriores al comienzo del pleito han tornado la controversia en académica; (4) las partes están tratando de obtener una opinión consultiva, o (5) se intenta promover un pleito que no está maduro. Estas son las doctrinas de autolimitación judicial" que impiden nuestra intervención.[9]

El elemento principal de la existencia de un caso o controversia se encuentra situado en la doctrina de legitimación activa. La legitimación activa o *standing* se define como "'la capacidad que se le requiere a la parte [querellante o demandante] de una acción para comparecer como litigante ante el tribunal, realizar con eficiencia actos procesales y, de esta forma, obtener una sentencia vinculante'".[10] No obstante, al momento de evaluar la existencia de legitimación activa debemos auscultar inicialmente si la Asamblea Legislativa la ha otorgado por la vía estatutaria. En otras palabras, debemos determinar primero si existe legitimación estatutaria.

**B. Legitimación activa estatutaria**

---

[8] *Hernández Montañez v. Parés Alicea*, supra, (citando a *Com. de la Mujer v. Srio. de Justicia*, supra, pág. 720). Véase *Torres Montalvo v. Gobernador ELA*, 194 DPR 760, 766 (2016).

[9] *Ramos, Méndez v. García García*, 203 DPR 379, 393-394 (2019); *Bhatia Gautier v. Gobernador*, 199 DPR 59, 68-69 (2017)(citando a *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 932 (2011) y a *Noriega v. Hernández Colón*, 135 DPR 406, 421-422 (1994)).

[10] *Hernández Montañez v. Parés Alicea*, supra, pág. 739; *Ramos, Méndez v. García García*, supra, pág. 394 (citando a *Bhatia Gautier v. Gobernador*, supra, pág. 69). Destacamos que "es requisito poseer legitimación activa para poder ser demandante y legitimación pasiva para ser demandado". *Mapfre v. E.L.A.*, 188 DPR 517, 533 (2013); *Alvareztorre Muñiz v. Sorani Jiménez*, 175 DPR 398, 420 (2009).

La legitimación estatutaria surge "cuando una ley, ya sea de manera expresa o implícita, otorga a una persona legitimación activa para instar una acción judicial, independientemente de que esta haya sufrido un daño particular, más allá del mero hecho de la violación de la ley".[11]

En Puerto Rico la figura de la legitimación activa estatutaria se interpretó inicialmente en *Salas Soler v. Srio. de Agricultura*, 102 DPR 716 (1974).[12] En cuanto a la jurisprudencia, el Profesor Jorge M. Farinacci Fernós nos comenta lo siguiente:

> La figura de la legitimación activa estatutaria comenzó su desarrollo normativo en Salas Soler v. Srio. de Agricultura. **Si bien el lenguaje del estatuto implicado en dicho caso hacía referencia a la existencia de un agravio o daño, el Tribunal Supremo de Puerto Rico reconoció que el elemento decisivo era la intención legislativa en cuanto a qué persona o entidad podría presentar una acción en el foro judicial. Es decir, se partió de la premisa de que la Asamblea Legislativa tenía facultad plena para otorgar legitimación activa en cualquier circunstancia.** Por tanto, lo que correspondía era analizar el lenguaje estatutario para determinar el nivel de legitimación efectivamente otorgado por la legislatura. **Este acercamiento fue fortalecido en Fund. Arqueológica v. Depto. de la Vivienda[, 109 DPR 387 (1980)].** (Énfasis nuestro).[13]

Cónsono con lo anterior, la interpretación realizada en la mencionada jurisprudencia reconoció que la Asamblea Legislativa posee la facultad de otorgar legitimación activa por la vía

---

[11] J. M. Farinacci Fernós, *Cualquier persona: La facultad plenaria de la Asamblea Legislativa para otorgar legitimación activa por la vía estatutaria*, 84 Rev. Jur. UPR 359, 360 (2015).

[12] En *Salas Soler v. Srio. de Agricultura*, 102 DPR 716 (1974), este Tribunal interpretó la *Ley sobre política pública ambiental*, Ley Núm. 9 de 18 de junio de 1970, al momento de evaluar la facultad de una organización de asuntos ambientales y uno de sus miembros para solicitar un *mandamus* contra el Secretario de Agricultura por haber aprobado un reglamento sobre venenos y pesticidas sin antes someter la declaración de impacto ambiental ante la Junta de Calidad Ambiental.

[13] J.M. Farinacci Fernós, *La justiciabilidad en Puerto Rico,* 1era ed., San Juan, InterJuris, pág. 139.

estatutaria.[14] Ello es distinto a lo ocurrido en la esfera federal.

En el foro federal tenemos el requisito de caso o controversia establecido en el Artículo III de la Constitución de los Estados Unidos.[15] Así, este requisito le impide al Congreso crear una legitimación por la vía estatutaria que, de ordinario, no existiría.[16] Sin embargo, las legislaturas estatales, como parte de su poder de razón de estado -que no existe a nivel federal-, son las que deciden si crear o no una causa de acción y sus propias normas de justiciabilidad según lo requieran sus respectivas constituciones.[17]

En cuanto a la aplicación de lo anterior, obviamente corresponde a los tribunales ejercer la evaluación de la existencia y el alcance de la legitimación activa estatutaria que se reclama. Por tanto, cuando la legitimación sea reconocida estatutariamente, el tribunal, al momento de evaluarla, deberá interpretar la intención de la ley para determinar: si la acción fue delegada por la misma; el alcance de la autorización para impugnar la ley; y los límites al considerar si la ley condiciona o limita dicha autorización.

**C. La legitimación activa del Art. 5.1 del Código Electoral de 2020**

---

[14] A manera de ejemplo, en *Hernández Torres v. Gobernador*, 129 DPR 824, 835-836 (1992) citando a *Salas Soler v. Srio. de Agricultura*, *supra*, en la pág. 723 expresamos que "[c]orresponde a cada litigante demostrar que tiene acción legitimada para acudir al foro judicial. Al amparo de esta doctrina, **y en ausencia de un estatuto que expresamente confiera legitimación activa a ciertas personas** […]". Véase *Centro Unido de Detallistas v. Com. de Serv. Púb.,* 174 DPR 174 (2008).

[15] Art. III, Const. EE.UU.

[16] Farinacci Fernós, *Cualquier persona: La facultad plenaria de la Asamblea Legislativa para otorgar legitimación activa por la vía estatutaria*, op. cit., pág. 364.

[17] Farinacci Fernós, *La justiciabilidad en Puerto Rico, op. cit.*, pág. 138.

Tanto los querellantes como los interventores reclaman la existencia de legitimación activa estatutaria basada en el Art. 5.1 del Código Electoral de 2020, 16 LPRA sec. 4561. Este artículo contiene diecisiete incisos que establecen los derechos y prerrogativas de los Electores. Expresamente, el referido articulado dispone lo siguiente: "Se concede a los electores la legitimación activa para iniciar o promover cualesquiera acciones legales **al amparo de <u>este</u> Artículo**, ante el Tribunal de Primera Instancia […]".[18]

Notemos, en primer lugar, que es claro que el legislador ató o redujo el ámbito o alcance de la legitimación activa estatutaria que provee el artículo exclusivamente a las diecisiete instancias que se enumeran.

Ahora bien, los peticionarios aseguraron que el listado de ese artículo atiende todos los procesos y las regulaciones que deben cumplirse en el Código Electoral de 2020 y sus reglamentos. De manera que el Art. 5.1 del Código Electoral de 2020, supra, reconoce una acción estatutaria para cualquier elector que le hayan violado alguno de los derechos y prerrogativas allí establecidos. Aducen que, antes de ser aspirantes o candidatos, los peticionarios son electores. En ese sentido, estos reclaman que se les aplique la garantía que surge del inciso (3), en el sentido de la uniformidad de la ley y los reglamentos que la CEE está obligada a ejecutar. Esto es, reclaman la uniformidad de la administración de los organismos electorales de Puerto Rico dentro de un marco de estricta imparcialidad, uniformidad,

---

[18] (Énfasis suplido).

pureza, transparencia y justicia. Los peticionarios interpretaron que el alcance de la uniformidad allí establecido es un derecho reconocido a todos los electores que, a su vez, los incluye, por lo que aducen tener legitimación activa para presentar la causa de acción al amparo del Art. 7.5 del Código Electoral de 2020, *supra*. Es decir, según los peticionarios, como electores, la Legislatura expresamente les confirió el *standing* para vindicar cualquier violación al derecho de uniformidad que describe el Art. 5.1(3) del Código Electoral de 2020, supra.

Sin embargo, el problema con el argumento de los peticionarios no es el que estos sean o no electores en las circunstancias de este caso, sino el contenido o a lo que se refiere el inciso (3) del Art. 5.1 cuando establece la referida garantía de uniformidad. El inciso (3) del Art. 5.1 del Código Electoral de 2020, *supra*, del cual descansan los peticionarios para invocar la legitimación activa estatutaria lo que garantiza es que la CEE administrará **los organismos electorales de Puerto Rico** dentro de un marco de estricta imparcialidad, uniformidad, pureza, transparencia y justicia.

Según el Art. 2.3(67) del Código Electoral de 2020, 16 LPRA sec. 4502, un o los **organismos electorales u oficinas electorales** se definen como "[c]ualquier unidad operacional de la Comisión dedicada a trabajo de naturaleza específicamente electoral". Algunos de estos son: la Junta Administrativa de Voto Ausente y Adelantado (JAVAA); Junta de Colegio; Junta de

Inscripción Permanente (JIP); Junta de Unidad Electoral.[19] A su vez, el Código Electoral de 2020, *supra*, dedica el Capítulo IV a otros organismos electorales identificados por el legislador. A esto se añade que el Art. 2.5 del Código Electoral de 2020, 16 LPRA sec. 4505, expresamente abunda sobre la uniformidad que deben ejercer los organismos electorales, al expresar que "[l]a facultad de reglamentación concedida por esta Ley a los organismos electorales deberá ser ejercida garantizando la realización de **los procesos relacionados con toda Votación bajo normas de uniformidad**, al máximo posible, de nuestro ordenamiento constitucional y legal".[20]

En definitiva, los argumentos de la uniformidad que alegan los peticionarios para invocar la legitimación activa estatutaria del elector al amparo del Art. 5.1(3) del Código Electoral de 2020, distan del alcance que estos procuran al solicitar la descalificación de los recurridos. Sin embargo, corresponde analizar si al palio del Art. 7.5 del Código Electoral del 2020, *supra*, los peticionarios tienen legitimación activa en su vertiente ordinaria.

**D. Legitimación activa ordinaria**

A menos que la ley expresamente le confiera legitimación a ciertas personas,[21] "[l]a parte que solicita un remedio judicial debe demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto

---

[19] Véase Art. 2.3 (47), (48), (49) y (50) de la Ley Núm. 58-2020, conocida como Código Electoral de Puerto Rico de 2020 (Código Electoral de 2020), 16 LPRA sec. 4503.

[20] (Énfasis suplido).

[21] *Lozada Sánchez v. JCA*, 184 DPR 898, 962 (2012).

o hipotético; (3) existe una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) la causa de acción surge al palio de la Constitución o de una ley".[22]

La doctrina de legitimación activa presupone, en primer lugar, la existencia de una causa de acción reconocida por ley a quien resulte agraviado por la conducta de otro; la "capacidad para realizar con eficacia actos procesales como litigante"[23] y; "[la] capacidad para demandar y la tenencia de un interés legítimo en la controversia". [24]

En este caso el Tribunal de Apelaciones resolvió que los peticionarios no poseían legitimación activa porque "fundamentaron su reclamo en un daño puramente imaginativo e hipotético que descansa en supuestos sobre la contienda electoral que al momento en que instaron la acción no eran certeros".[25] En otras palabras, que los recurridos debían esperar para ver si finalmente se convertían en candidatos y no meramente aspirantes; entonces tendrían la legitimación activa para defender su causa.

Sin embargo, lo cierto es que en este caso los peticionarios lo que reclaman es un trato desigual o no uniforme en los requisitos de **una competencia** que ya estaba (y está) ocurriendo al momento de ellos presentar su reclamo. O sea, no se trata de lo que ocurrirá a partir del 2 de junio de 2024,

---

[22] *Hernández Montañez v. Parés Alicea*, supra; *Bhatia Gautier v. Gobernador*, supra, pág. 69; *Fund. Surfrider y otros v. A.R.Pe.*, 178 DPR 563, 572 (2010); *Sánchez et al. v. Srio. de Justicia et al.*, 157 DPR 360, 371 (2002); *Hernández Torres v. Gobernador*, supra, págs. 835-836.

[23] *Pérez Rodríguez v. López Rodríguez*, 210 DPR 163, 178 (2022); *Lozada Tirado et al. v. Testigos de Jehová*, supra.

[24] *Pérez Rodríguez v. López Rodríguez*, supra; *Ópticos de P.R. v. Vani Visual Center*, 124 DPR 559, 563 (1989).

[25] *Sentencia* del Tribunal de Apelaciones, págs. 45-46.

sino de la alegada inexistencia de igualdad o uniformidad en los requisitos para **tal competencia.**

En ese sentido por la presente determinamos, no solo que el caso estaba maduro, sino que es claro que tal desigualdad o falta de uniformidad en el trato hacia los peticionarios ya les ha producido un daño concreto, claro, palpable, real, inmediato y preciso. Así pues, como bien determinó el Juez Figueroa Cabán en su voto disidente, **la gestión de obtener endosos conllevó para los aquí peticionarios una inversión económica, de tiempo, esfuerzos y recursos humanos que los recurridos no tuvieron que invertir y que, por lo tanto, podrán emplear para cubrir otros gastos del proceso electoral.**[26]

Por otro lado, en su *Alegato*, la recurrida MVC reclama la ausencia de un daño claro y palpable, esto es, "la existencia de un interés jurídico protegido perteneciente a [los demandantes] que le[s] genere un agravio".[27] Además, señala que para poder tener legitimación activa, los peticionarios deben demostrar "que el remedio solicitado subsanará o reparará el alegado daño sufrido por la parte demandante a causa de la conducta de la parte demandada. Tal elemento [señalan estos] está totalmente ausente en los casos de epígrafe".[28] Según expuso MVC,

> "El descalificar a un aspirante de otro partido en nada cambia el hecho de que los peticionarios tuvieron que recoger endosos para poder participar de la primaria de sus partidos (PPD y PNP). Lo único que lograría la descalificación solicitada, con el evidente efecto neto de dejar al MVC sin poder nominar a persona alguna a la Comisaría Residente y a la Cámara de Representantes y

---

[26] *Opinión disidente* emitida por el Hon. Félix Figueroa Cabán, Presidente del Panel Especial III del Tribunal de Apelaciones, pág. 7.

[27] *Alegato* de Movimiento Victoria Ciudadana (MVC), pág. 11.

[28] *Íd.*, pág. 22.

> Senado por acumulación, sería otorgar una ventaja indebida a los peticionarios al poder sacar de la papeleta a sus contrincantes del MVC, incluyendo una Representante incumbente, electa con el favor de más de 87,000 electores y un Senador incumbente, electo con el favor de más de 64,000 electores. De igual forma, privaría injustificadamente al MVC de su derecho estatutario a nominar personas para estos cargos".[29]

Ante tales argumentos, nos es necesario señalar lo siguiente.

**E. El Art. 7.5 del Código Electoral de 2020**

Según mencionamos, la *Querella* que dio inicio al caso que nos ocupa se instó al palio del Art. 7.5 del Código Electoral de 2020, *supra*, el cual establece lo siguiente:

> Cualquier Aspirante o Candidato nominado podrá ser descalificado como tal, por el Tribunal de Primera Instancia, cuando medie querella porque **no cumple con los requisitos impuestos por** la Constitución o **la ley**, o **cuando se demostrare que ha violado cualesquiera de las disposiciones de esta Ley o de sus reglamentos.**

> El Aspirante o Candidato impugnado deberá contestar bajo juramento dicha querella, dentro de los diez (10) días siguientes de haber sido notificada.

> **Si el Tribunal de Primera Instancia,** designado de conformidad con el Capítulo XIII de esta Ley, **encontrare que de las alegaciones surge una controversia real,** deberá citar a vista a ser realizada dentro de los diez (10) días de haber el querellado presentado su contestación. Dicho término podrá ser reducido por el Tribunal de Primera Instancia, según lo requieran las circunstancias del caso.[30]

No hay duda de que las interpretaciones concernientes al ordenamiento jurídico electoral que realice la CEE merecen deferencia, pues lo aprobó la agencia con el *expertise* en la referida materia.[31] Ello es así, siempre y cuando sean cónsonas con la intención legislativa como cuerpo constitucionalmente facultado para regular los asuntos del proceso electoral.

---

[29] *Íd*, págs. 22-23.

[30] (Énfasis suplido).

[31] *Suárez v. C.E.E. V*, 163 DPR 541, 543 (2004).

En ese contexto, en la Sec. 4.5 del *Reglamento para la radicación de candidaturas,* supra, la CEE interpretó la operación del trámite sustantivo y procesal respecto a la descalificación de un aspirante o candidato que regula este Art. 7.5 del Código Electoral de 2020, *supra*, mediante la cual se dispuso lo siguiente:

> Cualquier aspirante o candidato(a) nominado(a) podrá ser descalificado(a) **mediante la presentación de una Querella en el Tribunal de Primera Instancia, donde quede demostrado el incumplimiento con los requisitos impuestos por la Constitución, el Código Electoral, <u>este Reglamento</u>** o los reglamentos internos del partido político correspondiente.
>
> La Querella presentada contra el(la) aspirante o candidato(a) impugnado(a) deberá ser contestada bajo juramento, dentro de los diez (10) días siguientes de haber sido notificada.
>
> Si el Tribunal de Primera Instancia, designado de conformidad con el Capítulo XIII del Código Electoral, **encontrare que de las alegaciones surge una controversia real**, deberá citar a vista pública a ser celebrada dentro de los diez (10) días a partir del querellado haber presentado su contestación. Este término podrá ser reducido por el Tribunal de Primera Instancia, según lo requieran las circunstancias del caso.

Obsérvese que en el Art. 7.5 el legislador expresamente reconoció una causa de acción para solicitar la descalificación de un aspirante o candidato. Sin embargo, no especificó la persona legitimada para presentarla. De una lectura diáfana del Art. 7.5 del Código Electoral de 2020, supra, lo que este exige es que de las alegaciones de la *Querella* surja una controversia real por el incumplimiento de los requisitos impuestos por la Constitución, el Código Electoral y sus reglamentos. Como vimos, así también lo interpreta la CEE en la Sec. 4.5 del *Reglamento para la radicación de candidaturas*, supra.

De manera que, en realidad, la presente no es una causa de acción general u ordinaria, sino una que surge de un artículo específico de la ley. O sea, en el Código Electoral, específicamente a través de este artículo, el legislador suplió un instrumento al alcance del Pueblo para que este pudiera depurar o asegurarse de que todo aspirante o candidato en un proceso electoral cumpla con todos los parámetros establecidos mediante la Constitución, la ley o los reglamentos. De manera que es el Pueblo en última instancia a quien este artículo pretende beneficiar, aunque el resultado del proceso termine beneficiando colateralmente a algún aspirante o candidato competidor.

En este contexto, no se trata entonces necesariamente de los daños particulares de los querellantes e interventores en este caso, sino de un claro interés público que surge del Art. 7.5. Eso, sin duda, tiene gran peso en la evaluación de la legitimación activa de ese ciudadano que, pudiendo tener un interés propio que se vea agraviado, presenta esta causa de acción.

En el presente caso, y como ya concluimos, el daño real identificado es la inversión económica, de tiempo, esfuerzos y recursos humanos que los peticionarios tuvieron que invertir en la gestión de obtener sus endosos, en contraste con los recurridos que no tuvieron que incurrir en tales gastos y esfuerzos y que, por lo tanto, podrán emplear tales recursos para cubrir otros gastos del proceso electoral.[32] Todo esto es

---

[32] A los peticionarios, que son aspirantes a senadores o representantes por acumulación de partidos políticos que no se acogieron al método alterno de nominación, les exigieron el recogido de endosos, como lo requieren los Arts.

producto de un claro trato desigual en términos de la ejecución e implementación de las disposiciones estatutarias y reglamentarias impuestas a los peticionarios, que no surtieron el mismo efecto con respecto a los recurridos ante el *incumplimiento* de estos con el Art. 7.15(3) del Código Electoral de 2020, supra, y con la Sec. 3.1 del *Reglamento para la radicación de candidaturas,* supra, aprobado por la CEE.

En conclusión, reiteramos que este caso no se trata de un interés general sino de un interés propio que se vio afectado en una controversia que, a su vez, involucra un alto interés público, un asunto electoral.[33] En esta ocasión, se da en el contexto del requisito del recogido de los endosos.[34] Las alegaciones concernientes al incumplimiento con el Código Electoral de 2020, *supra*, y con la Sec. 3.1 del *Reglamento para la radicación de candidaturas*, supra, que promulgó la CEE presentan una controversia real demostrada con el daño que ocasionó el trato desigual no uniforme en la aplicación del ordenamiento jurídico y reglamentario electoral. Por lo tanto, no tenemos duda que los peticionarios aspirantes primaristas a representantes y senadores por acumulación están legitimados

---

7.1 y 7.15(3) del Código Electoral de 2020, *supra* y la Sec. 3.1 del *Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes*, aprobado por la Comisión Estatal de Elecciones el 15 de junio de 2023 (*Reglamento para la radicación de candidaturas*), págs. 17-18. Estos afirmaron que, en vista de que los recurridos no habían seleccionado a los candidatos únicos para el 30 de diciembre de 2023 al mediodía, el daño se concretó al mediodía del 31 de enero de 2024, fecha y hora límite **fatal** para la presentación del 50% de los endosos. Entretanto, el MVC se acogió al método alterno de nominación de candidatos, promulgó un reglamento interno que no reconoce la Sec. 3.1 del *Reglamento para la radicación de candidaturas,* supra, y, en cumplimiento con este, los recurridos no presentaron los endosos.

[33] *Frente Unido Independentista v. C.E.E.,* 126 DPR 309, 318 (1990); *Escalona Vicenty v. C.E.E.*, 115 DPR 529 (1984). Véanse *Torres Montalvo v. Gobernador ELA*, supra, y Art. 13.3(4) del Código Electoral de 2020, 16 LPRA sec. 4843.

[34] *Escalona Vicenty v. C.E.E.,* supra, págs. 530-531.

para presentar la *Querella* de acuerdo con el Art. 7.5 del Código Electoral de 2020, *supra*, para solicitar la descalificación contra los recurridos aspirantes a representantes y senadores por acumulación.

Superada la controversia sobre el *standing*, pasamos a resolver la controversia del caso en sus méritos.

**F. Funciones, facultades y deberes de la CEE; deferencia debida a sus interpretaciones**

Según el Art. VI, Sec. 4 de nuestra Constitución, los partidos políticos, las candidaturas de los aspirantes a puestos políticos y los derechos de los electores están obligados por la legislación que, a esos efectos, promulgue la Asamblea Legislativa.[35] En atención a esa facultad constitucionalmente delegada, la Legislatura aprobó la Ley Núm. 58-2020, conocida como Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4501, *et seq.* (Código Electoral de 2020).

Mediante el Art. 3.2 del Código Electoral de 2020, 16 LPRA sec. 4512, la Asamblea Legislativa otorgó distintas funciones, deberes y facultades a la CEE.[36] La CEE tiene la responsabilidad de planificar, organizar, dirigir y supervisar el organismo electoral y los procedimientos de naturaleza electoral que, conforme a las normas estatales y federales aplicables, rijan en cualquier votación que se realice en Puerto Rico.[37] Así, para desempeñar estos deberes tendrá, además y entre otras funciones, que cumplir y hacer cumplir las disposiciones y los propósitos

---

[35] Sec. 4 del Art. VI, Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 283.

[36] *Rodríguez Ramos v. Comisión Estatal de Elecciones,* 206 DPR 16, 35-36 (2021).

[37] *Íd.,* y Art. 3.2 del Código Electoral de 2020, 16 LPRA sec. 4512.

del Código Electoral de 2020 y aprobar las reglas y los reglamentos que sean necesarios para implementar las disposiciones del ordenamiento electoral.[38] Con relación a los reglamentos, el Art. 14.3 del Código Electoral de 2020, 16 LPRA sec. 4862 dispone que la CEE, "revisará o adoptará por orden de prioridades todas las reglas y los reglamentos electorales que sean necesarios para la implementación de esta Ley".

En ese sentido, este Tribunal debe guardar la usual deferencia a la CEE en aquellos casos en que la determinación dependa principal o exclusivamente de una cuestión de derecho electoral especializado.[39] Cónsono con la interpretación que hemos otorgado, este Tribunal ha expresado que "esta interpretación merece gran respeto y deferencia sustancial, aun en casos marginales o dudosos, o cuando la interpretación del ente electoral especializado no sea la única razonable".[40]

## G. Proceso de candidaturas y primarias

El Capítulo VII del Código Electoral de 2020, *supra*, regula el proceso de candidaturas y primarias. En el Art. 7.1 del Código Electoral de 2020, 16 LPRA sec. 4611, la legislación creó una Comisión de Primarias para cada partido político que se activa automáticamente cuando la colectividad deba realizar primarias para la nominación de candidatos.[41] Asimismo, ordena a la CEE la aprobación de un reglamento de primarias y métodos

---

[38] Art. 3.2(1) y (3) del Código Electoral de 2020, *supra*.

[39] *Mundo Ríos v. CEE*, 187 DPR 200 (2012); *Granados v. Rodríguez Estrada I*, 124 DPR 1, 20 (1989).

[40] *Suárez Molina v. Comisión Loc. de Elecciones de Cataño*, 205 DPR 642, 652-653 (2020); *Suárez Cáceres v. Com. Estatal Elecciones,* supra, págs. 78-79.
[41] Art. 7.1 del Código Electoral de 2020, 16 LPRA sec. 4611.

alternos de nominación que deberá ser **uniforme** para todos los partidos políticos sujetos al Código Electoral.

En cumplimiento con el Art. 7.1 del Código Electoral de 2020, supra, el 24 de agosto de 2023 la CEE aprobó el *Reglamento y manual de primarias y métodos alternos de nominación 2024 (Reglamento de primarias y métodos alternos)*. Este reglamento regula exclusivamente todo el proceso de votación de primarias y los métodos alternos de nominación, pues ambos mecanismos "constituyen el procedimiento mediante el cual se seleccionan **los(as) candidatos(as) oficiales** de los Partidos Políticos a figurar en la papeleta de las próximas Elecciones Generales".[42]

En la Sec. 1.5 del *Reglamento de primarias y métodos alternos*, supra, pág. 11, surge el calendario que contiene las fechas límites relacionadas al proceso per sé de las primarias y de los métodos alternos de nominación. El mismo no contiene ninguna fecha concerniente a la etapa de radicación de las candidaturas, pues este presupone que el aspirante, aspirante primarista o candidato independiente, ha presentado la solicitud de intención de candidatura y, de existir uno o más aspirantes, su intención de concursar en primarias.

Sin embargo, y como discutiremos, ante el hecho de que el cierre de radicaciones de candidaturas es el 30 de diciembre de 2023 al mediodía, y en virtud de los incisos (1) y (3) del Art. 7.14 del Código Electoral de 2020, 16 LPRA sec. 4624, entre ambos reglamentos se establece que los partidos políticos tendrán hasta el 30 de noviembre de 2023 para varios asuntos. En lo pertinente,

---

[42] (Énfasis suplido). Introducción, *Reglamento y manual de primarias y métodos alternos de nominación 2024* aprobado el 24 de agosto de 2023 (*Reglamento de primarias y métodos alternos*), pág. 3.

los partidos políticos tienen hasta esa fecha para cumplir con dos asuntos medulares: (1) entregar su reglamento de primarias o métodos alternos de nominación de candidatos; y (2) si su categoría de partido político lo requiere o permite postular candidatos a uno o varios puestos, notificarle a la CEE la cantidad y ubicación de los candidatos que nominarán o postularán para las elecciones generales, estén o no sujetos a primarias o al método alterno de nominación. Una vez notificado, esta determinación será final y regirá cualquier procedimiento relacionado con dichos cargos.[43] Además, la Sec. 1.3 del *Reglamento de primarias y métodos alternos,* supra*,* pág. 4, reitera el Art. 7.1 del Código Electoral de 2020*, supra,* al establecer que se mostrará deferencia a los reglamentos que los partidos políticos promulgaron para sus primarias y métodos alternos, **"siempre que los mismos no conflijan con las disposiciones establecidas por el Código Electoral para ambos procesos de nominación".**[44] En cuanto al método alterno de nominación, el Art. 7.11 del Código Electoral de 2020, *supra*, regula las garantías que los partidos políticos tienen que cumplir con relación al método alterno de nominación de sus candidatos.

**H. Proceso de radicación de intención de primarias y candidaturas.**

A través del Art. 7.2 del Código Electoral de 2020, 16 LPRA sec. 4612, se atiende el proceso de radicación de

---

[43] Secs. 1.5 y 7.3 del *Reglamento de primarias y métodos alternos*, supra, págs. 11 y 49; Secs. 2.1 y 2.2 del *Reglamento para la radicación de candidaturas*, supra, págs. 10 y 11.

[44] (Énfasis suplido).

intenciones de primarias y de candidaturas. Entre los asuntos medulares, se establecen los requisitos legales para que un aspirante nominado por un partido político o el candidato independiente pueda ser calificado como aspirante a una candidatura a un cargo público electivo. Uno de los requisitos es la presentación de la solicitud de intención de candidatura o de primarias. A su vez, esta disposición le ordenó a la CEE la reglamentación de "lo concerniente a estos procesos de presentación de aspiraciones primaristas y candidaturas a cargos públicos electivos dentro de los parámetros dispuestos en esta Ley".[45] El Código Electoral de 2020 puntualiza que todo aspirante primarista o candidato a un cargo público electivo está obligado a presentar, en la plataforma electrónica que implementó la CEE, todos los formularios, documentos y certificaciones **no más tarde de la fecha mencionada.**

En el inciso (5)(g) de este Art. 7.2, se requiere que el elector que desee aspirar a un cargo público bajo la insignia de su partido político cumpla con los requisitos que su partido establezca. Claro está, "[e]stos requisitos deberán ser **aplicados y exigidos uniformemente** a todas las personas que presenten su intención de aspirar a una candidatura por su Partido Político y no podrán ser alterados retroactivamente luego de abrirse el período para la presentación de intenciones de candidaturas, ni podrá contravenir lo dispuesto en esta Ley".[46]

---

[45] Art. 7.2 del Código Electoral de 2020, 16 LPRA sec. 4612.
[46] (Énfasis suplido). Art. 7.2(5)(g) del Código Electoral de 2020, *supra*.

Por otro lado, el Art. 7.14(1) del Código Electoral de 2020, *supra*, establece la fecha de apertura y cierre para la presentación de las candidaturas de la manera siguiente:

> (1) La Comisión y los Partidos Políticos abrirán el proceso de presentación de candidaturas el día **1ro. y hasta 30 de diciembre del año anterior al que deba realizarse la próxima Elección General. Las demás fechas límites que aplicarán a los procesos y las actividades relacionadas con dichas primarias, serán reglamentadas por la Comisión. Toda fecha y hora límite, será considerada <u>un término fatal</u>**. En todos los casos, **la hora límite para todas las fechas serán las 12:00 (doce en punto) del mediodía.** Cuando alguna fecha límite coincida con un día feriado o no laborable para el Gobierno de Puerto Rico, esta se correrá al siguiente día laborable. Los **Candidatos Independientes presentarán sus candidaturas a través de este proceso y dentro [de] los mismos términos de tiempo.**

En atención a este mandato y al orden de prioridad a la que la CEE está obligada, el 15 de junio de 2023 aprobó el *Reglamento para la radicación de candidaturas,* supra. Según la Sec. 1.3 del *Reglamento para la radicación de candidaturas*, y en lo que nos atañe, este reglamento aplica "solamente **a los procesos de radicación de aspirantes a candidaturas de los partidos políticos** y candidaturas independientes para las elecciones generales […]".[47] En la Sec. 2.1 de este reglamento *se* establece que, para este ciclo electoral y a tenor con el Art. 7.14(1), *supra*, la CEE y los partidos políticos abrirán el proceso de presentación de candidaturas desde el viernes, 1 hasta el mediodía del sábado, 30 de diciembre de 2023. A su vez, en vista de que la fecha límite coincidió con un día no laborable para el Gobierno, se corrió al día siguiente laborable. Por lo tanto, de una lectura del ordenamiento jurídico y reglamentario electoral, **la fecha y hora límite fatal para presentar**

---

[47] Sec. 1.3 *Reglamento para la radicación de candidaturas,* supra, pág. 1.

**electrónicamente la solicitud de intención de candidatura con sus respectivos requisitos para este ciclo electoral era al mediodía del 2 de enero de 2024.**[48]

**I. Determinación y realización de primarias**

Según el Art. 7.10(1) del Código Electoral de 2020, 16 LPRA sec. 4620, el elector *bona fide* de un partido político tiene derecho a que este lo considere para ser nominado como aspirante en primarias para cualquier cargo electivo si cumple con los requisitos del ordenamiento jurídico y reglamentario electoral y el reglamento de su partido.

El Art. 7.10(2) del Código Electoral de 2020, *supra*, dispone la norma general de realización de primarias al establecer que, "[t]odo partido político tendrá la obligación de realizar primarias en aquellos casos donde surja más de un Aspirante calificado".[49] Entretanto, la Sec. 2.1 del *Reglamento para la radicación de candidaturas*, supra, pág. 1, dispone que "[e]n aquellos casos donde surja más de un(a) aspirante calificado(a), porque cumple con los requisitos del Código Electoral, los reglamentos de la Comisión y los reglamentos del partido al que pertenece, **los partidos políticos tendrán la obligación de realizar primarias o método alterno de nominación".**[50]

---

[48] Es una norma reiterada de que un plazo fatal o jurisdiccional es improrrogable, es decir, no se puede extender a discreción, además que su incumplimiento no es subsanable. *Peña Lacern v. Martínez Hernández*, 210 DPR 425, 443 (2022) (citando a *Ruiz Camilo v. Trafon Group, Inc.*, 200 DPR 254, 268-269 (2018)).

[49] Art. 7.10(2) del Código Electoral de 2020, 16 LPRA sec. 4620.

[50] (Énfasis suplido).

En otras palabras, como excepción, los partidos políticos pueden establecer métodos alternos para la nominación de sus candidatos a cargos públicos electivos, siempre que el organismo directivo central del partido lo apruebe y se cumplan con varias garantías mínimas.[51]

**J. Requisito de ley de peticiones de endosos (Art. 7.15(3))**

En el Art. 7.15 del Código Electoral, 16 LPRA sec. 4625, se atiende lo concerniente a las peticiones de endosos. En lo que nos es pertinente, el Art. 7.15(3) del Código Electoral de 2020, supra, dispone lo siguiente:

> **Artículo 7.15. -Peticiones de Endosos a Aspirantes Primaristas y Candidatos Independientes**
> …
> (3) Cualquier Elector que desee **concursar en unas primarias, como aspirante** o como candidato independiente, además de cumplir con los requisitos de esta Ley y los reglamentos de su Partido y la Comisión, deberá presentar ante la Comisión la cantidad de peticiones de endoso requerida por esta Ley para el cargo público electivo al que interese aspirar. (Énfasis suplido).

Una controversia surge en este caso relacionada con el contenido de este artículo, en el sentido de que los recurridos argumentan que un "aspirante" bajo un método alterno (conforme lo define el inciso 8 del Art. 2.3) no se encuentra como sujeto del artículo, por lo que la CEE no posee autoridad para requerirle la presentación de endosos.

Sin embargo, y en primer lugar, es importante aclarar lo siguiente. Lo cierto es que lo impuesto en la Sec. 3.1 del *Reglamento para radicación de candidaturas*, supra, no es un requisito a los aspirantes para la presentación de endosos, sino un término fatal a los partidos para la presentación de **un**

---

[51] Art. 7.11 del Código Electoral de 2020, 16 LPRA sec. 4621.

**candidato único** para las posiciones que anunciaron a la CEE. En ese sentido, huelga determinar si el término "aspirante" al que se refiere este artículo incluye o no a los recurridos, pues nada surge, ni del texto del artículo ni del Código en su totalidad, **que prohíba expresamente a la CEE la exigencia de recogido de endosos a aspirantes bajo métodos alternos**, sobre todo, cuando la exigencia es una colateral. O sea, el hecho de que el Art. 7.5(3) no incluya expresamente a los recurridos, no quiere decir que la CEE está impedida de requerir lo que aprobó en la Sec. 3.1 del *Reglamento para radicación de candidaturas*.

En el pasado hemos establecido que un reglamento promulgado para implementar la ejecución de una ley puede complementarla, pero no estar en conflicto con esta.[52] Sin embargo, eso de por sí es insuficiente, pues un reglamento podría no estar en conflicto con su ley habilitadora, pero contener una regla que en su texto o ejecución exige o demanda algo que resulta arbitrario o caprichoso.[53] En síntesis, lo que se busca es que la regla sea una razonable. Esto es, que lo exigido se relacione con el propósito regulado por el estatuto habilitador. Así, nuestra función en este caso es determinar si existe una relación, una conexión racional entre la regla y el estatuto.[54] Por eso, en el contexto de una regla arbitraria o caprichosa, "[e]l ataque contra la reglamentación adoptada para poder ser

---

[52] *J.P. v. Frente Unido I*, 165 DPR 445 (2005); *Asoc. Fcias. Com. v. Depto. de Salud*, 156 DPR 105, 128 (2002), citando a *P.S.P. v. Comisión Estatal de Elecciones*, 110 DPR 400, 409 (1980).

[53] *Buono Correa v. Sec. Rec. Naturales*, 177 DPR 415, 449-450 (2009); *M. & B.S., Inc. v. Depto. Agricultura*, 118 DPR 319, 326 (1987).
[54] D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 3ra ed., Colombia, Forum, 2013, pág. 165.

exitoso tiene que demostrar que 'las normas aplicadas son arbitrarias por descansar en motivos desvinculados del propósito de la reglamentación".[55]

En vista de lo anterior, determinamos que la Sec. 3.1 del *Reglamento para radicación de candidaturas* es una razonable, cuyo propósito está claramente vinculado con el propósito del Código Electoral 2020.

**K. El problema en el texto del Art. 7.15(3)**

Sin embargo, y en segundo lugar, es de notar que la redacción del texto del Art. 7.15(3) con que inicia el inciso, es de por sí extremadamente confusa. Y es que la expresión ("*Cualquier Elector que desee concursar en **unas primarias, como aspirante o como candidato independiente**…*") da entender que un "candidato independiente" tiene la opción de participar en "unas primarias", lo que claramente es un contrasentido. Esto es así porque según la definición que provee el propio Código Electoral de 2020, candidato independiente es "[t]oda persona natural que, **sin haber sido nominada formalmente por un Partido Político, figure como candidato** a un cargo público electivo **en la papeleta** de votación en una **Elección General o Elección Especial**, conforme a las disposiciones de esta Ley".[56] O sea, a pesar de que por ley el candidato independiente está obligado a presentar oportunamente las peticiones de endosos, como no es una persona natural nominada por un partido político, **este nunca puede aspirar a concursar en unas primarias de una colectividad.**

---

[55] *Román v. Trib. Exam. De Médicos*, 116 DPR 71, 80 (1985).

[56] Art. 2.3(12) del Código Electoral de 2020, *supra*.

Obligados como estamos a interpretar el texto de una ley cuando es posible de manera que podamos salvar su sentido, pudiéramos determinar (pues existe ausencia total en el historial legislativo con relación a esta expresión) que a lo que se refería el legislador al redactar el texto fue lo siguiente: cuando el texto señala "concursar" ("*[c]ualquier Elector que desee concursar,*") a lo que se refiere es al método de primarias, al aspirante primarista. Luego de la coma (,) el texto señala, "*como aspirante*", refiriéndose al aspirante de un método alterno, según definido en Art. 2.3(8). Finalmente, el texto dice, "*o como candidato independiente*", refiriéndose, claro está, a un candidato independiente. Y es que, como bien argumentan los recurridos, el canon hermenéutico de la distribución nos persuade a asignar los términos definidos con la definición correspondiente, evitando combinaciones erróneas.[57] Así, ciertamente cuando el Art. 2.3(8) habla de "aspirante" se refiere a aspirantes bajo métodos alternos, y cuando menciona "aspirantes primaristas" se refiere a aquellos que compiten bajo las llamadas primarias de ley de los partidos. El problema es que, aunque el término "aspirante primarista", conforme se define en el Art. 2.3(8) sí aparece en el título del Art. 7.15, no se encuentra en el texto de su inciso (3). Así, considerando que "aspirante" se refiere únicamente a electores cuyos partidos se acogen a métodos alternos, la manera más razonable de armonizar el texto es de la forma que lo hemos interpretado. De manera que determinamos que el Art. 7.15(3) incluye a los aspirantes bajo

---

[57] *Encino Motorcars v. Navarro,* 579 U.S. 211 (2018).

métodos alternos que, conforme al Art. 3.1 del *Reglamento para radicación de candidaturas*, al momento del cierre de candidaturas no eran candidatos únicos.

**L. Métodos alternos para la nominación de candidatos**

El método alterno para la nominación de candidatos se define como el "[p]rocedimiento alternativo que sustituye una Primaria o Elección Especial, según lo apruebe el organismo central de un Partido Político **para la elección de <u>candidatos</u>** a cargos públicos y que cumpla, procesalmente, con las garantías mínimas dispuestas en esta Ley".[58] Nótese entonces que la función única de un método alterno escogido por un partido es la elección de los que vendrán a ser sus candidatos únicos para cada puesto en las distintas papeletas de votación.

Así, el Código Electoral de 2020, mediante el Art. 7.11, reconoce la facultad de los partidos políticos de establecer internamente los métodos alternos de nominación de sus candidatos a cargos públicos electivos, sujeto a unas garantías mínimas que el propio artículo enumera. Estas garantías son las que rigen el método alterno que celebre el partido político que escogió este mecanismo. Por ello están recogidas además en la Sec. 6.1 del *Reglamento de primarias y métodos alternos*. El inciso (1)(c) de la Sec. 6.1 del *Reglamento de primarias y métodos alternos,* pág. 47, establece que "todo Aspirante tenga acceso, con no menos de sesenta (60) días de anticipación a la realización de la

---

[58] (Énfasis suplido). De igual modo, el Art. 2.3(60) del Código Electoral de 2020, *supra*. Entretanto, la Sec. 1.4(30) del *Reglamento para la radicación de candidaturas*, supra, pág. 7 define este mecanismo como "'Método Alterno': Procedimiento alternativo que sustituye una Primaria o Elección Especial, según lo apruebe el organismo central de un Partido Político **para la elección de <u>candidatos</u> a cargos públicos** y que cumpla, procesalmente, con las garantías mínimas dispuestas en el Código Electoral". (Énfasis suplido).

votación, a la lista de electores, afiliados o delegados, según corresponda, incluyendo los datos de contacto que tenga el partido de cada uno de estos".

Relacionado con esto, en su alegato, la Hon. Mariana Nogales argumentó lo siguiente, que citamos *in extenso*:

> "*si los métodos alternos tuviesen que celebrarse en o antes del 30 de diciembre como sugiere el Reglamento para la Radicación de Candidaturas de los Partidos Políticos y Candidatos Independientes, los aspirantes deberían tener acceso a estas listas desde[, cuanto menos,] el 1 de noviembre. Sin embargo, de conformidad con el Artículo 7.14 del Código Electoral… el proceso de presentación de candidaturas no inicia sino hasta el 1 de diciembre del año previo a la elección general. El problema con esto es que entre el 1 y el 30 de diciembre no hay sesenta (60) días. Ante ello, cualquier persona que presente su solicitud a partir del 1 de diciembre, como requiere la Ley, no podrá tener acceso a las listas de electores, afiliados o delegados que participarán del método alterno con sesenta (60) días de antelación al evento como requieren las garantías mínimas de la ley*".[59]

Como veremos, este problema es más aparente que real. El Art. 7.1 del Código Electoral de 2020, *supra*, ordena que se entregue el reglamento y entretanto el término que dispone la Sec. 2.2 del *Reglamento para la radicación de candidatura* lo que implica es que el partido tenía, como fecha límite, hasta el 30 de noviembre de 2023 para notificar su *Reglamento del procedimiento del método alterno*. Todo partido político, e incluso a través de sus Comisionados Electorales, tiene acceso a la lista de electores. Por lo tanto, el partido tiene la obligación de asegurarse de conciliar la fecha de celebración del método alterno y las responsabilidades que ello conlleva con las disposiciones del Código Electoral de 2020 y sus reglamentos.

---

[59] *Alegato* de la recurrida Hon. Mariana Nogales Molinelli, pág. 45.

Ni sus reglamentos ni sus actuaciones pueden ser contrarias al ordenamiento.

Por lo tanto, el partido es quien debe asegurarse de conciliar todo lo relacionado con la celebración del método alterno para que no esté en conflicto con las responsabilidades que, por disposición del Código Electoral de 2020 y, por ende, sus reglamentos, la colectividad debe garantizar en sus disposiciones reglamentarias. En otras palabras, esas garantías las tiene que proveer el partido, pues son cónsonas con el andamiaje que opera en el Código Electoral y sus reglamentos.

## M. Figura del retador del método alterno de nominación de candidatos

La figura del retador del método alterno se encuentra en los incisos (3) y (4) del Art. 7.11 del Código Electoral de 2020, supra. Asimismo, surgen de la Sec. 3.1 del *Reglamento para la radicación de candidaturas,* supra.

> (3) Todo Aspirante que **no resultare favorecido en el método alterno de nominación estará impedido de concurrir como Aspirante en cualquier proceso de primarias** para el mismo cargo durante el mismo ciclo de Elección General.
>
> (4) **Ningún proceso o método alterno de nominación** de candidatos a cargos públicos electivos **impedirá que otro** miembro o **afiliado del Partido que no participó** como Aspirante, **pueda reclamar su derecho a primarias para ese mismo cargo público electivo dentro de los términos de esta Ley** y el reglamento de primarias del partido. (Énfasis suplido).

Como vemos, el inciso (3) recoge el retador que participó, pero perdió en el método alterno de nominación de candidatos. Debido a que tuvo la oportunidad de participar en ese mecanismo, no podrá reclamar el derecho de primarias para concurrir como aspirante por el mismo cargo contra el aspirante que resultó favorecido de ese método alterno celebrado.

Por otro lado, el inciso (4) recoge el retador que no participó en el método alterno de selección de candidatos que celebró su partido. Al no haber participado, este sí puede reclamar su derecho a primarias para ese mismo cargo público dentro de los términos dispuestos en el Código Electoral de 2020, *supra*, y en el *Reglamento para la radicación de candidaturas, supra.*

De una lectura de estos incisos se puede colegir que el método alterno tuvo que haberse celebrado y el partido tiene que haber certificado el candidato único antes del mediodía del 30 de diciembre del año anterior a las elecciones generales. De lo contrario, el retador con derecho a primarias no podría radicar oportunamente su solicitud de intención de primarias cuyo término fatal vence en esa misma fecha y hora. En este ciclo electoral era al mediodía del 2 de enero de 2024.

En otras palabras, si el método alterno de nominación de candidatos se celebró **antes** de la fecha en que culminaba el proceso de radicación de las solicitudes de intención de candidaturas y el partido certifica a su candidato único en ese término, según el Código Electoral de 2020, *supra*, acontecerá lo siguiente: (1) conforme al Art. 7.11(2), *supra*, "[e]l Partido notificará públicamente por los medios que considere pertinentes sobre los resultados del proceso alterno de nominación, los datos de la persona nominada, incluyendo el cargo público electivo para el que fue nominado como Candidato"; (2) acorde con los Arts. 7.11(2) y (4) y 7.14(1), *supra*, el retador hábil conocerá del candidato único seleccionado en el método alterno y podrá solicitar primarias antes de que culmine el plazo para presentar

su candidatura; y (3) de radicar su solicitud de intención de primarias oportunamente, este retador tendrá la obligación de presentar los endosos que exige el Art. 7.15(3), *supra*.

Lo cierto es que los partidos políticos tienen dos opciones para lidiar con la situación de que cuenten con múltiples aspirantes para un mismo cargo político. La primera y, **la favorecida por ser la más democrática**, son las **primarias**.[60] La segunda, es la celebración de un método alterno a las primarias, según dispuesto por el Art. 7.11 del Código Electoral de 2020, *supra*, en el que se cumplan las garantías mínimas y en el que **se oficialicen los candidatos victoriosos en tiempo**. A continuación, nos enfocaremos en el surgimiento del método alterno para la nominación de candidatos como alternativa a las primarias y sus requisitos conforme a nuestro ordenamiento jurídico.

Como punto de partida utilizaremos el *Informe de la comisión especial para la revisión del proceso electoral de Puerto Rico* de 17 de mayo de 1982 (*Informe de la comisión especial*). En específico, prestaremos atención especial a la sección referente a la Ponencia del Lcdo. Héctor Luis Acevedo, intitulada, *Los procesos de nominación de candidatos* de 17 de diciembre de 1981 (Estudio).[61] Del referido *Informe de la comisión especial* surge que desde el 1974 se adoptó un sistema de primarias obligatorias

---

[60] *Informe de la comisión especial para la revisión del proceso electoral de Puerto Rico* de 17 de mayo de 1982 *(Informe de la comisión especial)*, pág. 333.
[61] Destacamos que el *Informe de la comisión especial* en el acápite relacionado con el proceso de selección de candidatos que se encuentra en el Capítulo IV que atiende los procesos electorales y su ordenamiento, se adoptó casi íntegramente el Apéndice 16 de la autoría del Lcdo. Héctor Luis Acevedo titulado: *Comisión para la revisión del proceso electoral: Los procesos de nominación de candidatos* de 17 de diciembre de 1981 (Estudio). Véase *Informe de la comisión especial,* págs. 330-338.

para todas las posiciones en Puerto Rico. Sin embargo, este sistema obligatorio trajo consigo una serie de consecuencias, tanto positivas como negativas. Entre las positivas resalta la participación más amplia del electorado y entre las negativas, las luchas internas inherentes a la competición que producen divisiones que debilitan la colectividad y representan una inversión de recursos considerables que afectan la posibilidad de candidatos sin esa disponibilidad material. Adujo que es a raíz de los aspectos negativos que los principales partidos políticos comenzaron a implementar procedimientos alternos de selección de candidatos que no estaban contemplados en el ordenamiento jurídico electoral para evitar someterse a las primarias y a la burocracia que conlleva el recogido de endosos.

Del *Estudio* del licenciado Acevedo emana que, a pesar de contar con un sistema de primarias obligatorias: "[l]os principales partidos políticos han comenzado a implementar procedimientos alternos de selección de candidatos no contemplados en la Ley Electoral vigente".[62] Siendo así, el *Estudio* del licenciado Acevedo señala que la vía óptima sería aceptar la existencia de estos mecanismos, incentivar el uso de las primarias según dispuestas en ley y "garantizar unos requisitos mínimos de democracia en todos los procesos de selección".[63] Al presente, las garantías propuestas en el *Estudio* se adoptaron en el *Informe de la Comisión* y son las que establece el Art. 7.11 del Código Electoral de 2020, *supra*.

---

[62] *Informe de la comisión especial,* pág. 333.
[63] *Íd.*

En cuanto a los elementos básicos que deben regir para la creación de los métodos alternos para la nominación de candidatos, el licenciado Acevedo expuso a grandes rasgos que: 1) las primarias estarán disponibles para aquellos partidos que opten por ellas; 2) los partidos políticos podrán establecer métodos alternos **siempre y cuando** cumplan con las garantías mínimas; 3) todo aspirante que compita en el método alterno, estará sujeto a su resultado; y 4) **"el proceso de primarias quedará disponible para todo candidato que no tuvo oportunidad de participar en el proceso de selección llevado a cabo por los partidos"**.[64]

Por otra parte, el licenciado Acevedo le da particular importancia a la **fecha de radicación de candidaturas**.[65] Según el profesor de derecho electoral, se debe adelantar la fecha de radicación para lograr dos propósitos. El primero, permitir un tiempo adecuado previo a las primarias para los trámites administrativos y para que los electores conozcan a los aspirantes. Segundo y, de mayor importancia para la controversia que nos ocupa:

> [P]ara establecer una fecha límite para radicación de candidaturas diferente a la fecha límite para someter peticiones de endoso en forma tal que si existe solamente un candidato por un partido, de este cumplir con los demás requisitos de la ley, quede certificado como tal sin la necesidad de tener que recoger peticiones de endoso. **Esta situación deberá existir en un número de casos quizás significativo dependiendo no solo de la ausencia de competencia, sino del uso de procedimientos alternos de selección por los partidos políticos.**[66]

---

[64] *Íd.,* pág. 334.

[65] Cabe destacar que la fecha de radicación de candidaturas se encuentra en el Art. 7.14 del Código Electoral de 2020, *supra*.

[66] *Informe de la comisión especial,* pág. 336.

En síntesis, el licenciado Acevedo vislumbró **la fecha de radicación de candidaturas como la fecha límite para presentar aquellos candidatos únicos que no cuenten con competencia para el escaño dentro de su partido, al igual que para presentar a los candidatos que resulten victoriosos en los métodos alternos celebrados por los partidos que opten por acogerse a ellos.** Siendo así, tal y como sugiere el profesor Acevedo, siempre y cuando se haya celebrado el método alterno y -como resultado- los partidos cuenten con sus candidatos únicos, se elimina la necesidad de presentar endosos. De esta forma se disminuiría radicalmente el trámite burocrático de innumerables candidaturas que no tienen competencia.

Por último y no menos importante, colocar la fecha límite de radicación de candidaturas como la fecha límite para la presentación del candidato victorioso del método alterno también representa gran importancia para la figura del retador del referido método. Según mencionamos, uno de los principios básicos es que aquellas personas que no participaron del método alterno tengan disponible el proceso de primarias luego de que el partido certifique el candidato único escogido para las elecciones generales.

Es a través de ese enfoque que debemos examinar la Sec. 3.1 del *Reglamento para la radicación de candidaturas,* pág. 17 que, además de reconocer la figura del retador en los incisos (3) y (4) del Art. 7.11, postula lo siguiente:

Sección 3.1 Garantías mínimas:

[…]

> Las personas seleccionadas mediante un Método Alterno de Nominación **no tendrán que cumplir con los requisitos de presentación de peticiones de endoso para primarias <u>para calificar como candidato(a); siempre y cuando sean escogidos y su expediente, con los documentos requeridos, sea radicado por su Partido Político como candidato único en la Comisión en o antes de las 12:00 (doce en punto) del [mediodía] del 30 de diciembre de 2023</u>**.
>
> Todo(a) aspirante que no resultare favorecido(a) en el método alterno de selección estará impedido(a) de concurrir como aspirante en cualquier proceso de primarias para el mismo cargo para el cual aspiró.
>
> El Partido notificará públicamente por los medios que estime pertinentes, los resultados del proceso alterno de nominación, los datos de la persona nominada, incluyendo el cargo público para el que fue seleccionada como candidato(a) .
>
> Ningún proceso o método alterno de nominación a cargos públicos electivos impedirá que un integrante o afiliado(a) del partido, que no participó como aspirante, pueda reclamar su derecho a primarias para ese mismo cargo público electivo dentro de los términos del Código Electoral y el reglamento de primarias del Partido.

Esta disposición reglamentaria es necesario analizarla a la luz de las disposiciones del Código Electoral respecto al candidato único que un partido político certifique porque no existe contrincante o en virtud de aquellos que por razón de un cargo político que permita más de un aspirante, se puedan certificar como candidatos oficiales.[67]

A su vez, hay que tener presente que **el método de nominación de candidatos,** de acuerdo con el profesor Acevedo, precisamente procura eso, **la certificación de un candidato que figure en la papeleta en los comicios generales**. Por lo tanto, y para que ello ocurra, evidentemente el partido tiene que notificar quién es el candidato único para la fecha límite fatal, esto es, al

---

[67] Sec. 4.1 del *Reglamento para la radicación de candidaturas*, pág. 19.

mediodía del 30 de diciembre del año anterior a las elecciones. **Debido a que este es un término fatal, de no celebrarse el método alterno de selección de candidatos, en realidad lo que el partido estaría notificando son meramente aspirantes a un cargo público, toda vez que los documentos que estarían remitiendo electrónicamente a la CEE son los relacionados a la radicación de solicitud de intención de candidatura, tal cual están obligados los aspirantes primaristas y candidatos independientes.**[68]

Lo anterior es cónsono con el Art. 7.25(g) del Código Electoral de 2020, *supra* y con la Sec. 4.11 del *Reglamento para la radicación de candidaturas*, pág. 31, en donde se establece:

> (g) Toda persona que desee aspirar a una candidatura para un cargo público electivo por un Partido Político deberá, además, cumplir con los requisitos que establezca su Partido Político. Estos **requisitos deberán ser aplicados y exigidos uniformemente a todas las personas que presenten su intención de aspirar a una candidatura por su Partido Político** y no podrán ser alterados retroactivamente luego de abrirse el período para la presentación de intenciones de candidaturas, ni podrá contravenir lo dispuesto en esta Ley.[69]

Esta premisa de **uniformidad** tiene total pertinencia en el contexto del derecho del retador que no participó como aspirante del método alterno de reclamar las primarias para ese mismo cargo electivo según establece el Art. 7.11(4) del Código Electoral de 2020, *supra*. Nótese que en virtud de los Arts. 7.14(1) y 7.15(3) del Código Electoral de 2020, *supra*, el retador estaría obligado a cumplir con el término fatal de radicar la solicitud de intención de candidatura al mediodía del 30 de diciembre de 2023

---

[68] Arts. 7.2 y 7.10(1) del Código Electoral de 2020, 16 LPRA sec. 4612 y sec. 4620.

[69] (Énfasis suplido).

y completar la presentación de los endosos al 15 de febrero de 2024.

Por lo tanto, a pesar de que la ley no refleja expresamente una obligación a los aspirantes del método alterno al recogido de endosos, las consecuencias de incumplir con lo establecido en la Sec. 3.1 del *Reglamento para la radicación de candidaturas*, supra, lo que procura es armonizar para extenderle efectividad a las garantías que el partido está obligado a cumplir por ley. **En otras palabras, esta sección garantiza que si el partido no certifica a su candidato único en el mismo término que dispone para la culminación del término para la radicación de la solicitud de intención de candidatura, pone a ese <u>aspirante</u> en la misma posición del retador que no participó en el método alterno, reclama su derecho a primarias y que, por ello, está obligado a recoger endosos.**

Este análisis es afín con lo expresado por el profesor Acevedo pues, según mencionamos, tanto el candidato único de un partido como el candidato único seleccionado por el método alterno debe ser certificado en o antes de la fecha de culminación de la radicación de las solicitudes de intención de candidaturas, para evitar la burocracia y el esfuerzo que conlleva las primarias y el recogido de endosos.

### III

Para finalizar, nos es menester responder a varias argumentaciones y teorías que se presentaron en los alegatos, o que surgieron durante la vista oral de este caso. Pero antes nos es necesario atender la situación particular de la Hon. Ana Irma Rivera Lassén.

***La particular situación de la Hon. Ana I. Rivera Lassén***

Surge del expediente que la doctora Ramírez Fort presentó una Demanda de Intervención para suplir la legitimación activa de los peticionarios al alegar que la CEE la descalificó por no haber presentado el 50% de los endosos al mediodía del 31 de enero de 2024. Reclamó la desventaja legal que la CEE provocó al mantener a la senadora Rivera Lassén en el ruedo como aspirante al puesto de Comisionada Residente y a los recurridos a pesar de que, en esa fecha, ninguno había presentado endoso alguno tras no haber sido presentados como candidatos únicos antes del 30 de diciembre de 2023. Cónsono con lo anterior, solicitó que, en su defecto, restablecieran sus aspiraciones para que no tuviera que recoger endosos como los recurridos.

Atendida la intervención de la doctora Ramírez Fort el Tribunal de Primera Instancia reconoció que, en virtud del cargo público por el cual competía y que en efecto resultó descalificada, esta poseía legitimación activa. Sin embargo, el foro apelativo intermedio consideró que no existía daño que reparar pues se conocía con certeza que ella no participaría, por lo que revocó la determinación del foro primario en cuanto a la doctora Ramírez Fort. Según adelantamos, contrario a los peticionarios, la doctora Ramírez Fort no recurrió de la *Sentencia* del Tribunal de Apelaciones. Por lo tanto, **la determinación del foro apelativo intermedio advino final y firme en cuanto a la senadora Rivera Lassén.**

Así las cosas, y en vista de que ninguno de los peticionarios, como aspirantes a representantes y senadores por acumulación, tiene un derecho adversario que se haya visto

agraviado por las actuaciones de la senadora Rivera Lassén quien aspira al cargo de Comisionada Residente, no tienen legitimación activa para solicitar, al amparo del Art. 7.5 del Código Electoral de 2020, supra, la descalificación de esta. Por lo tanto, prevalece la *Sentencia* del Tribunal de Apelaciones en el caso de la Hon. Ana I. Rivera Lassén de la cual nadie con legitimación activa recurrió ante nos.

**Discusión de algunas argumentaciones y teorías que se presentaron en los alegatos**

Señala el recurrido MVC que nada en el Código Electoral de 2020 autoriza a la CEE a imponer el requisito de endosos a sus candidatos sin el consentimiento del partido. Esto es, argumentan que por el hecho de que MVC se acogió a un método alterno, la imposición de endosos a sus miembros descansa en "la única discreción del propio partido".[70]

En primer lugar, y como adelantamos, es claro que la Sec. 3.1 del *Reglamento para la radicación de candidaturas*, supra, no impone el requisito de recogido de endosos a los partidos que han optado por algún método alterno como mecanismo para escoger sus candidatos. Al contrario, el reglamento respeta la forma y el proceso que estos escojan, incluyendo el que impongan o no el recogido de endosos a sus aspirantes. Nótese que el PIP se acogió también al mecanismo de método alterno, y certificó sus candidatos a la CEE sin que ninguno de ellos tuviera que recoger un solo endoso.

De manera que lo que le fue impuesto al MVC no fue un requisito para que sus aspirantes recogieran endosos, sino un

---

[70] *Alegato* de MVC, pág. 23.

**término fatal** para que estos presentaran sus **candidatos únicos** para los distintos puestos en las elecciones generales. Es el incumplimiento con ese requisito, al término requerido, lo que imponía a cada aspirante que no fuera candidato único el que, **al igual que cualquier otro aspirante primarista** que no hubiera sido certificado como candidato único, o **como cualquier aspirante de su propio partido que hubiera solicitado primarias**, o como cualquier **candidato independiente**, tuviera que presentar endosos.

Pero, en segundo lugar, y como también ya discutimos, no encontramos nada en el Código Electoral de 2020 que expresamente prohíba el que la CEE exija el recogido de endosos a aspirantes sometidos a los métodos alternos, **de la manera en que lo hizo en el caso de autos**. Nuevamente, nótese que la CEE no estableció un mandato o directriz para que los aspirantes por métodos alternos recogieran endosos, sino que **uniformó la condición** de todos aquellos que al momento del cierre de candidaturas no hubieran sido certificados como **candidatos únicos** de sus partidos, sin importar bajo qué mecanismo de selección estuvieran compitiendo. Se trata de que todos aquellos que compitan lo hagan en las mismas condiciones y bajo los mismos requisitos.

De hecho, el relevo que otorgaba el Código Electoral de Puerto Rico para el Siglo XXI, Ley Núm. 78-2011, en su Artículo 8.007,[71] que eximía a las personas seleccionadas bajo un método alterno el que tuvieran que recoger endosos, fue eliminado por

---

[71] 16 LPRA ant. sec 4117.

el Código Electoral actual. Y aunque la recurrida argumenta que lo que esto significa es que ahora son los partidos bajo métodos alternos los únicos que pueden exigir endosos a sus aspirantes, tal conclusión se fundamenta en el supuesto errado de que los partidos que se acogen a métodos alternos funcionan en una especie de total autonomía, con total independencia de la CEE durante todo el proceso. Sin embargo, tal supuesto no encuentra fundamento alguno en la letra de la ley.

Por otro lado, pero relacionado con la eliminación en el Código Electoral de 2020 del relevo de recogido de endosos para los aspirantes bajo los métodos alternos, la recurrida Nogales Molinelli arguye que nos "*enfrentamos al silencio de un estatuto, [por lo que] el tribunal viene obligado a distinguir si la omisión fue intencional o involuntaria para lo cual debe recurrir al contexto o al historial legislativo*".[72]

En primer lugar, lo correcto no es identificar la acción del legislador como un silencio, pues eso sería concluir que este no se había expresado en torno al asunto, ni en el estatuto vigente ni en el anterior. Pero **lo cierto es que el relevo de recogido de endosos para los aspirantes por métodos alternos existía y fue eliminada, por lo que de lo que se trata es, no de un silencio en el estatuto, sino de la eliminación del referido texto.**

En segundo lugar, nada en el historial legislativo ni en el contexto del estatuto nos indica que la eliminación de tal excepción no fuera una voluntaria, por lo que debemos

---

[72] *Alegato* de la recurrida, Hon. Mariana Nogales Molinelli, pág. 34.

abstenernos de añadir a lo omitido. De manera que con la eliminación voluntaria no podemos sino concluir, como bien determinó el Tribunal de Primera Instancia, que "[c]uando la Asamblea Legislativa remueve una frase que se ha repetido en varias leyes anteriores sobre el mismo tema se debe entender que es porque estos no deseaban que se les eximiera a las personas que escogieran un método alterno. Si la intención de la Asamblea Legislativa hubiese sido mantener la norma igual a los Códigos Electorales anteriores, no hubiese removido la frase que exime del recogido de endosos".[73]

En otro asunto, el *Alegato* de la recurrida Hon. Nogales Molinelli argumenta la teoría de una "secuencia operacional", alegadamente diseñada por el legislador en el Capítulo VII del Código Electoral de 2020 y dirigida, en síntesis, a establecer que el Código "parte de la premisa de que el método alterno se celebrará después de que haya culminado el proceso de radicación el 30 de diciembre".[74] Esto va dirigido a probar que la obligación de recoger endosos a aquellos aspirantes bajo métodos alternos que no fueran candidatos únicos al 30 de diciembre establecida en la Sec. 3.1 del *Reglamento para la radicación de candidaturas*, supra, es contraria a lo establecido en el Código Electoral de 2020, *supra*.

El problema con esa teoría, en primer lugar, es que la manera en que el legislador ubicó estos mecanismos en el Capítulo VII puede obedecer, no a una secuencia que excluye los unos de los otros, sino a una razón mucho más simple: a que el

---

[73] *Sentencia* del Tribunal de Primera Instancia, pág. 25.

[74] *Alegato* de la recurrida, Hon. Mariana Nogales Molinelli, *supra*, pág. 25.

legislador meramente quiso comenzar precisamente con lo más simple, y elaborar, **sin ninguna otra intención**, hacia lo más complicado. Lo más simple es la "certificación automática" que establece el Art. 7.10(3). Esto es, si al cierre del término de presentación de candidaturas lo que se presenta es un aspirante para la posición, sin importar a qué mecanismo de selección de candidaturas se acogió el partido, se certificará como candidato a ese aspirante, simplemente porque ya no hay nadie más; no hay competencia: ese fue el "candidato único". Después, el Art. 7.11 regula el mecanismo de método alterno que se presume más simple que la primaria, pero más complicado que la certificación automática, porque conlleva una competencia entre aspirantes. Finalmente, el legislador reguló el mecanismo de la primaria que, sin duda, es más democrático que cualquier método alterno, pero, a su vez, mucho más complicado.

Como postuló el célebre pensador Guillermo de Ockham, si dos teorías en igualdad de condiciones explican una misma cosa, debemos escoger como la más probable o correcta la más simple.[75] Así, aunque la teoría expuesta por la recurrida pudiera ser posible, la que hemos expuesto nos parece la correcta.

En segundo lugar, y como ya habíamos explicado, es claro que el método alterno tiene que celebrarse y el partido tiene que certificar su candidato único antes del mediodía del 30 de diciembre del año anterior a las elecciones generales, de manera que cualquier retador con derecho a reclamar primarias

---

[75] B. Russell, *The History of Western Philosophy*, New York, Simon & Schuster Inc., 1945, pág. 452.

pueda radicar oportunamente su solicitud de intención de primarias cuyo término fatal vence en esa misma fecha y hora.

En tercer lugar, y por último, el tiempo verbal de varias expresiones en el Art. 7.11 (Métodos Alternos de Nominación) parecen contradecir lo señalado por la recurrida, en el sentido de que el método alterno fue diseñado para celebrarse después de que haya culminado el proceso de radicación el 30 de diciembre. Por ejemplo, en el Art. 7.11(3) se señala que "*[t]odo Aspirante que **no resultare** favorecido en el método alterno de nominación estará impedido de concurrir como Aspirante en cualquier proceso de primarias para el mismo cargo durante el mismo ciclo de Elección General*".[76] Nótese que el "no resultare" de la expresión implica que es un hecho que ya pasó.

Igual ocurre en el inciso (4) de ese mismo artículo, donde se señala que: "*[n]ingún proceso o método alterno de nominación de candidatos a cargos públicos electivos impedirá que otro miembro o afiliado del Partido **que no participó** como Aspirante, pueda reclamar su derecho a primarias para ese mismo cargo público electivo dentro de los términos de esta Ley y el reglamento de primarias del partido*".[77] Nuevamente, la expresión "que no participó" denota que el hecho en el que no se participó claramente ocurrió en el pasado.

**Alegación de que la CEE, a través del Sistema de notificación de intención de aspirar a una candidatura y sistema de endosos (SIEN), indujo a error a los recurridos y que, por ello, se debe aplicar la doctrina de los actos propios.**

---

[76] (Énfasis suplido).

[77] (Énfasis suplido).

El Art. 7.15(2) dispone que "[a] partir del Ciclo Electoral 2024 toda petición de endoso para estos propósitos solamente se tomará, presentará y evaluará a través del sistema SIEN dispuesto en esta Ley".[78] Según la Exposición de Motivos del Código Electoral de 2020, el Sistema de endoso o SIEN es parte de la innovación tecnológica en nuestro sistema electoral. Allí, expresamente el legislador reconoció que "toda petición de endoso para Partidos Políticos por Petición, Aspirantes en Primarias, **Candidatos** y Candidatos Independientes se realizará con métodos electrónicos a través del Sistema de Endosos (SIEN) de la Comisión".[79]

Cuando un aspirante a una candidatura presenta la solicitud de intención de candidatura en el *Sistema de notificación de intención de aspirar a una candidatura y sistema de endosos (SIEN)* dicho portal lo reconoce como un aspirante y no como candidato.[80] Como parte del andamiaje de la plataforma, esta contiene una nota que lee como sigue: "Si su partido ha sido acogido por método alterno de selección según el Código Electoral de Puerto Rico de 2020 no es requisito presentar peticiones de endosos".[81]  Igualmente, establece la cantidad de los endosos requeridos y las fechas de cumplimiento establecidas por el ordenamiento jurídico y reglamentario electoral que, de ser

---

[78] Véase Art. 7.16 del Código Electoral de 2020, 16 LPRA sec. 4626 y Sec. 5.2 del *Reglamento para la radicación de candidaturas*, supra, págs. 39-41.

[79] Exposición de Motivos, del Código Electoral de 2020, *supra*.

[80] Petición de *certiorari* de los Interventores, Apéndice, pág. 277.
[81] *Íd.*, pág. 278.

aplicable, todo aspirante tendría la obligación de presentar. Por su naturaleza, el SIEN no distingue ni menciona a qué mecanismo, si primarias o método alterno, se acogió el partido al que pertenece el aspirante.

Los recurridos señalaron que la CEE los indujo a error al hacerles creer que, en virtud de esta nota, en efecto, no tenían la obligación de presentar los endosos. Argumentaron que, en vista de lo anterior, correspondía la aplicación de la doctrina de los actos propios. Diferimos. Por ser la más completa, evaluamos la documentación que el recurrido,      Hon. Rafael Bernabe Riefkohl, sometió a la CEE sobre su intención de candidatura.[82]

Contrario a los planteamientos de los recurridos, una vez el partido notifica que aprobó al aspirante, la colectividad informa su decisión a la CEE y esta se limita a aceptar la notificación de intención de candidatura que el partido le informe sobre el aspirante. Cuando la CEE acepta la notificación de candidatura, le indica al aspirante **"usted deberá pasar por la Unidad de Radicaciones de la [CEE] para ser orientado y recoger las peticiones de endosos (si aplica)"**, pero además le advierte la cantidad de endosos requeridos para la candidatura en particular.[83] En otras palabras, todo aspirante está obligado a visitar la Unidad de Radicaciones para recibir la orientación respecto a la obligación o no de presentar los endosos antes de

---

[82] *Íd.*, págs. 271-279.
[83] (Énfasis suplido). *Íd.*, pág. 276.

culminar el trámite de la solicitud de intención de candidatura. En el caso del recurrido, Hon. Rafael Bernabe Riefkohl, este estaba advertido desde el 22 de diciembre de 2023 que su candidatura requería 1,491 peticiones de endosos.[84]

Sobre este particular, la CEE explicó en su *Alegato* y en la vista oral que esa notificación se le dio a todos los aspirantes que hubiesen presentado la documentación requerida en la plataforma y que esa notificación parte de la premisa de que el aspirante conoce plenamente las disposiciones del *Reglamento para la radicación de candidaturas*, supra, por lo que la referida nota está forzosamente supeditada al conocimiento de los términos del ordenamiento jurídico y reglamentario electoral.[85] Añadió que todos los aspirantes de todos los partidos, incluso los del PIP, recibieron la notificación que incluye tal nota.

Al analizar el asunto, nos resulta claro que **la CEE no cometió error alguno en la notificación**. Esto es así porque tal notificación incluye toda la información que aplica a todo tipo de aspirante. Aun así, es alto conocido que los errores administrativos no crean derechos y pueden ser corregidos en cualquier momento por parte del Estado.[86] Por ello, una parte no puede pretender ampararse en una actuación administrativa incorrecta.[87]

---

[84] *Íd.*

[85] Véanse *Alegato* de la CEE, págs. 14-15 y Vista oral de 23 de mayo de 2024, al tiempo 3:20:00 en adelante. https://www.youtube.com/live/qZdA6fAohF8?si=GPKjnEK-Le0PiO93 (7 de junio 2024).

[86] *Quiles v. Del Valle*, 167 DPR 458, 477 (2006).

[87] *González v. ELA*, 167 DPR 401 (2006); *Magriz v. Empresas Nativas*, 143 DPR 63, 71 (1997).

Ahora bien, en cuanto a la doctrina de actos propios y *estoppel*, cabe señalar que **hemos expresado que, de ordinario, no aplican en contra del Estado cuando hay de por medio una cuestión de interés público implicada.**[88] Asimismo, **no aplica de forma general a las relaciones de partes privadas frente al Gobierno y se ha limitado únicamente a que un demandante pueda invocar en contra del Estado la doctrina de los actos propios en circunstancias apropiadas.**[89]

Con el pasar de los años, tanto en Puerto Rico como en varias jurisdicciones norteamericanas, se ha reconocido que en situaciones en las que no se afecte el interés público y en las que pueda ocurrir una clara injusticia, las doctrinas como la de los actos propios o "equitable estoppel" pueden ser utilizadas contra el Estado.[90] Sin embargo, están excluidas las situaciones en las que se ven lesionados el interés y la política pública del Estado.[91] Ahora bien, tal doctrina está predicada en la existencia de un error, que ya hemos determinado **que la CEE no cometió.**

### *La utilización de "podrá" en el Art. 7.5 del Código Electoral*

Por último, durante la vista oral de este caso se discutió la posibilidad de que el Art. 7.5 (Descalificación de Aspirantes y Candidatos) nos otorgue discreción para conceder un remedio distinto al de la descalificación de los recurridos. Esto está

---

[88] *Quiles v. Del Valle*, supra, pág. 478.

[89] *OCS v. Universal*, 187 DPR 164, 174 (2012). Véanse, también: *Hernández, Romero v. Pol. De P.R.*, 177 DPR 121, 141 (2009); *Berríos v. UPR*, 116 DPR 88, 98 (1985).

[90] *Quiles v. Del Valle*, supra.

[91] *OCS v. Universal*, supra, citando a *Quiles v. Del Valle*, supra.

basado en la posibilidad de que la palabra "podrá", que se usa en la primera oración del Artículo, significa que el Tribunal posee discreción para crear un remedio distinto al de la descalificación. Sin embargo, después de un análisis detallado del texto nos vemos obligados a descartar esa interpretación. Vayamos nuevamente sobre el texto íntegro del Art. 7.5, para explicar nuestra determinación. El Art. 7.5 del Código Electoral de 2020, supra, reza lo siguiente:

> Cualquier Aspirante o Candidato nominado **podrá** ser descalificado como tal, por el Tribunal de Primera Instancia, cuando medie querella porque no cumple con los requisitos impuestos por la Constitución o la ley, o cuando se demostrare que ha violado cualesquiera de las disposiciones de esta Ley o de sus reglamentos. El Aspirante o Candidato impugnado **deberá** contestar bajo juramento dicha querella, dentro de los diez (10) días siguientes de haber sido notificada.
>
> Si el Tribunal de Primera Instancia, designado de conformidad con el Capítulo XIII de esta Ley, encontrare que de las alegaciones surge una controversia real, **deberá** citar a vista a ser realizada dentro de los diez (10) días de haber el querellado presentado su contestación. Dicho término **podrá** ser reducido por el Tribunal de Primera Instancia, según lo requieran las circunstancias del caso. (Énfasis suplido).

Aunque en muchas ocasiones la palabra "podrá" implica discreción, tal acepción dependerá de si esta se ajusta **al sujeto** a quien va dirigida o se refiere a la palabra. En el **Art. 7.5** es claro que el sujeto de la expresión, a quien va dirigido el "podrá" de esa primera oración, es al Aspirante o Candidato nominado ("*[c]ualquiler **Aspirante o Candidato nominado podrá** ser descalificado…*"). Siendo así, en esta instancia el "**podrá**" se está utilizando en un sentido o

significado de "**ocurrencia**", de **algo que pudiera ocurrir**, y no de discreción.[92]

De igual forma, en aquellas ocasiones en que el legislador utiliza la palabra "podrá" en el contexto de permitir que el tribunal ejerza su sana discreción, identifica claramente al tribunal como el sujeto del "podrá". Lo mismo ocurre cuando el legislador utiliza la palabra "deberá", implicando que el tribunal carece de discreción. Nótese que en el último párrafo de este Art. 7.5 se señala que "[s]i **el Tribunal** [...] encontrare que de las alegaciones surge una controversia real, **deberá** citar a vista...". Aquí sabemos claramente que, de darse el caso que el Tribunal de Primera Instancia se tope con una controversia real, no tiene discreción para no enviar el caso a la vista requerida. Esto, porque el sujeto de ese mandato ("deberá") está claramente identificado ("el Tribunal de Primera Instancia"). Lo mismo ocurre con el "podrá" de la última oración donde se identifica claramente al sujeto de la oración como "el Tribunal de Primera Instancia" y es claro que la acepción es de discreción.

Lo mismo debió entonces hacer el legislador si su intención era otorgar discreción al tribunal para encontrar otro remedio distinto al de la descalificación. En específico, el tribunal debió estar claramente identificado como el sujeto de esa discreción, de ese "podrá". Al no ser así, y para que la oración no carezca de sentido, es evidente que el "podrá"

---

[92] Según el diccionario de la Real Academia Española (RAE), una de las acepciones del término "podrá" se refiere a "[s]er contingente o posible que suceda algo". https://dle.rae.es/poder?m=form (última visita 7 de junio de 2024).

en esa oración se utiliza en el sentido de "ocurrencia", y va dirigido a los aspirantes o candidatos contra quienes se presente una solicitud de descalificación. Es decir, ninguno de ellos viene obligado a solicitar la descalificación en el tribunal, pero puede hacerlo si así lo desea.

Asimismo, en nuestro ejercicio interpretativo de un estatuto debemos velar celosamente por poner en vigor y hacer efectiva la intención del legislador. En el artículo en cuestión nada en el historial legislativo ni en la discusión del proyecto de ley en el hemiciclo nos indica que el legislador tuvo la intención de otorgarnos discreción para buscar una alternativa diferente a la descalificación, en aquellos casos que se demuestre que un aspirante o candidato hubiera fallado en alguno de los requisitos dispuestos en la ley.

En conclusión, el Art. 7.5 del Código Electoral de 2020, *supra*, dispone que cualquier Aspirante o Candidato nominado podrá ser descalificado como tal, por el Tribunal de Primera Instancia, cuando medie querella porque no cumple con los requisitos impuestos por la Constitución o la ley, o cuando se demostrare que ha violado cualesquiera de las disposiciones de esta Ley o de sus reglamentos. Habría que forzar por fiat judicial el texto de dicho articulado para concluir que el mismo le brinda la alternativa al foro primario para no descalificar a un aspirante luego de haberse probado su incumplimiento.

En vista de lo anterior, es forzoso concluir que al utilizar el término "podrá", el legislador hizo referencia que, hasta tanto no se haya demostrado que el aspirante o candidato

haya en efecto incumplido con los dispuesto en la ley, el Tribunal no estará facultado para descalificarlo. Siendo así, **la descalificación es contingente a que se demuestre el referido incumplimiento.**

Por último, precisamos aclarar otro asunto que surgió del trámite procesal del presente caso en el Tribunal de Primera Instancia, el Tribunal de Apelaciones, e incluso, en este Tribunal. Los querellantes acumularon como querellados al Sr. Edgardo Cruz Vélez, aspirante a Comisionado Residente por MVC, al Sr. Edwin Marrero Martínez aspirante a representante por acumulación por MVC, al Lcdo. Olvin M. Valentín aspirante a senador por acumulación por MVC y, luego de enmendada la demanda, se incluyó al Sr. Ramón Cruz Díaz, aspirante a senador por acumulación por MVC. Al igual que con los recurridos, contra estos pesó la *Sentencia* de descalificación que dictó el Tribunal de Primera Instancia, pero no apelaron la decisión ante el Tribunal de Apelaciones. Recuérdese que, mientras se estaba dilucidando el caso en el foro primario, este grupo de querellados resultó derrotado en el método alterno que el MVC decidió celebrar el 16 de marzo de 2024. Es decir, no apelaron la decisión del foro primario porque descansaron en el resultado del método alterno que, según resolvimos, el MVC celebró a destiempo. Por lo tanto, para estos la descalificación que dictaminó el foro primario es final y firme. En consecuencia, debido al cuadro fáctico y procesal del presente caso, conforme con los Arts. 7.2 del Código Electoral de 2020, supra, y la Sec. 4.1 del *Reglamento para la radicación de candidaturas*,

pág. 19, ni siquiera cabe hablar de la posibilidad de la existencia de una vacante en esta etapa del proceso, pues

> Cuando surja una vacante **previ[a] a la expiración del término para la presentación de endosos, y el número restante de aspirantes sea igual o menor de los puestos nominados por ese partido político**, quienes cumplan con todos los requisitos serán **considerados candidatos oficiales y no tendrán que presentar peticiones de endoso**. Las razones por las que podría surgir un vacante son las siguientes: retiro de candidatura, **descalificación, incumplimiento con el cincuenta (50) por ciento de endosos requeridos** o muerte del aspirante.[93]

En consecuencia, la *Sentencia* del foro primario que milita en contra de este grupo de querellados y la descalificación de los recurridos que salieron airosos en el método alterno celebrado luego de concluido el término para la presentación de los endosos, el MVC ni este grupo de querellados tienen el derecho de reclamar puesto vacante alguno. Por ende, debido a que no existe vacante disponible para MVC, el cargo público electivo por el cual aspiraban los recurridos descalificados no es susceptible de sustitución.

Asimismo, los querellantes acumularon a tres aspirantes para el Distrito representativo Núm. 38 por el Partido PD, a saber: el Sr. Anthony Sánchez Aponte, el Sr. Stephen Gil Álamo y el Sr. Wilfredo Pérez Torres. La Hon. Wanda del Valle Correa, es y aspira nuevamente a cargo de Representante por el Distrito Núm. 38, intervino en el pleito de epígrafe. Al amparo del razonamiento discutido, el foro primario los descalificó porque PD no celebró el método alterno de manera oportuna. En consecuencia, al igual que el grupo antes descrito, dicha *Sentencia* advino final y firme sin que estos apelaran

---

[93] (Énfasis suplido).

oportunamente al Tribunal de Apelaciones y, por ende, ante este Tribunal. Evidentemente, la descalificación emitida por el Tribunal de Primera Instancia tampoco da pie a que estos reclamen la posibilidad de la existencia de una vacante, ni el cargo público electivo para el cual aspiraban es susceptible de sustitución.

**IV**

Por todo lo anterior, se declaran Ha Lugar los recursos presentados por las partes peticionarias y, en consecuencia, se revoca la *Sentencia* del Tribunal de Apelaciones, se **ordena la descalificación** como aspirantes para aparecer en las papeletas para votación en las elecciones de 2024 de los siguientes recurridos: la Hon. Mariana Nogales Molinelli y la Sra. Gladys Myrna Conty como aspirantes a representantes por acumulación por MVC y al Hon. Rafael Bernabe Riefkohl y al Sr. Alejandro Santiago Calderón como aspirantes a senadores por acumulación por MVC.

Se dictará *Sentencia* en conformidad.

Erick V. Kolthoff Caraballo<br>Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación<br><br>Recurridos<br><br>v.<br><br>Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo | CC-2024-0266<br><br>cons. con<br><br>CC-2024-0267 | Certiorari |

Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Peticionarios

_____

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Peticionarios

v.

Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty

Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Recurridos

SENTENCIA

En San Juan, Puerto Rico, a 10 de junio de 2024.

Por los fundamentos antes expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se declaran Ha Lugar los recursos presentados por las partes peticionarias y, en consecuencia, se revoca la Sentencia del Tribunal de Apelaciones, se **ordena la descalificación** como aspirantes para aparecer en las papeletas para votación en las elecciones de 2024 de los siguientes recurridos: la Hon. Mariana Nogales Molinelli y la Sra. Gladys Myrna Conty como aspirantes a representantes por acumulación por el Partido Movimiento Victoria Ciudadana (MVC) y al Hon. Rafael Bernabe Riefkohl y al Sr. Alejandro Santiago Calderón como aspirantes a senadores por acumulación por MVC.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente. El Juez Asociado señor Estrella Martínez emitió una Opinión disidente. El Juez Asociado señor Colón Pérez emitió una Opinión disidente.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Recurridos

v.

Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván

CC-2024-0266 cons. con CC-2024-0267

*Certiorari*

Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Peticionarios

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Peticionarios

v.

Hon. Ana Irma Rivera Lassén Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabe Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil

Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

        Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

        Recurridos

La Jueza Presidenta ORONOZ RODRÍGUEZ emitió una Opinión disidente.

En San Juan, Puerto Rico, a 10 de junio de 2024.

**No hay injusticia más grande que tratar de forma similar cosas que, a todas luces, son distintas.** Bajo el pretexto de alcanzar un resultado "justo" y "uniforme", la mayoría predica una noción de justicia que parte de una premisa errónea de que nuestro Código Electoral se erige sobre elementos de igualdad para todo aspirante a un puesto electivo. Nada más lejos de la verdad. De hecho, aun considerando el resultado de este caso, en noviembre se enfrentarán aspirantes que no tuvieron condiciones similares para figurar en la papeleta. Por tal razón, es un error

pretender decir que **este caso se trata de supuestos que se encuentran en las mismas circunstancias, a saber, la figura de las primarias *vis a vis* los métodos alternos de nominación de candidatos.**

En la situación en la que nos encontramos, la carencia de rigor metodológico al ejercer muestra responsabilidad interpretativa puede tener efectos trascendentales. Esa es, precisamente, la realidad con la que nos confrontamos en este caso. La decisión de una mayoría de este Tribunal, tras realizar un ejercicio hermenéutico errado de las normas aplicables a esta controversia, lacera los procesos democráticos del País. Con este proceder se refrenda el razonamiento del Tribunal de Primera Instancia, lo cual supone despojar a los partidos políticos y **<u>a los electores</u>** de la oportunidad de pasar juicio sobre quiénes, finalmente, deben componer la propuesta electoral.

Ciertos integrantes de esta Curia han optado por un curso de acción que representa un quebrantamiento de la doctrina de separación de poderes, toda vez que adicionaron —en un acto de legislación judicial— un requisito de presentación de peticiones de endosos que no es exigible para los aspirantes aquí impugnados. Su decisión incorrecta no llega hasta ahí, pues también validan el contenido de un reglamento de la Comisión Estatal de Elecciones (CEE) que es *ultra vires* al estar en conflicto con el mismísimo estatuto cuya interpretación nos convoca en esta ocasión.

**Democracia no es eliminar a la competencia con trucos y artimañas para ganar; es hacer el espacio para una pluralidad de ideas y candidatos a fin de que el País se sienta representado y tenga la oportunidad de seleccionar —de ese grupo amplio y diverso— la mejor opción.**

El saldo de la determinación de este Tribunal redunda en un impacto severo a la democracia puertorriqueña. Por fíat judicial se descalifica la plantilla legislativa que un partido político de minoría procuró ofrecer como sus opciones al electorado para las próximas elecciones. Así, de un plumazo, se remueve de la papeleta a un grupo de aspirantes, entre los que incluso se hallan varios incumbentes en la Asamblea Legislativa.

**Esta decisión es contraria a los cánones de hermenéutica, a la intención legislativa clara y a la tradición jurídica electoral.** Me veo impedida de acompañar a mi compañera y compañeros de estrado por semejante derrotero. Por las razones que expongo a continuación, disiento.

I

No hay controversia sobre los hechos que originaron este caso. Se trata, pues, de una disputa de estricto derecho.

En síntesis, los partidos políticos Movimiento Victoria Ciudadana (MVC) y Proyecto Dignidad (PD) contaban con más de un aspirante con intención de postularse a ciertas candidaturas. Para atender esa situación, el Código Electoral de 2020, *infra*, reconoce dos mecanismos de selección de candidatos: la primaria —que es el mecanismo por defecto

("*default*")— y los métodos alternos de nominación (método alterno). Tanto el MVC como el PD decidieron que seleccionarían a sus candidatos a través del método alterno. Según la tesis de los aspirantes impugnados, a diferencia de aquellos aspirantes que debían atravesar por una primaria, los aspirantes que se sometieron al método alterno no tenían la obligación de presentar peticiones de endosos y, naturalmente, no estaban sujetos a la fecha límite para ello.

Una lectura **desapasionada, sosegada, integrada, estructurada y secuencial** del Código Electoral de 2020, *infra*, apunta inexorablemente a la conclusión de que el requisito de peticiones de endosos no alcanza a aquellos aspirantes sometidos al método alterno. Veamos.

## II

Previamente he denunciado el proceder de una mayoría de este Tribunal de fundamentar sus determinaciones en "análisis interpretativo[s] simplista[s], incompleto[s] y somero[s]". UPR v. Unión Oficiales UPR, 206 DPR 140, 169 (J. Oronoz Rodríguez, Opinión disidente). De este modo, he invitado a que se realicen los **"ejercicio[s] interpretativo[s] riguroso[s]** que se exige[n] de este Tribunal como máximo intérprete de las leyes". (Negrilla suplida). Íd.

En ese tono, es menester tener presente que la adjudicación de esta controversia involucra el uso de varias reglas de hermenéutica, las cuales interactúan entre sí y, en su conjunto, conducen al resultado que aludí. Las "normas de hermenéutica legal [constituyen] […] principios rectores del

ejercicio de nuestra función adjudicativa". <u>FCPR v. ELA</u> *et*

*al.*, 211 DPR 521 (2023). Al respecto, este Tribunal ha

expresado que

> [e]l proceso de interpretar las leyes —la hermenéutica jurídica— consiste en auscultar, averiguar, precisar, determinar, cuál ha sido la voluntad legislativa, o sea, qué es lo que ha querido decir el legislador. **Las reglas de hermenéutica legal no son arbitrarias o caprichosas. Todas descansan en sanos principios de lógica.** (Cita depurada y negrilla suplida). <u>Pueblo v. Zayas Rodríguez</u>, 147 DPR 530, 537 (1999).

En primer lugar, existe el consabido mandato

interpretativo de que, cuando la ley es clara y libre de toda

ambigüedad, su texto no se debe menospreciar bajo el pretexto

de cumplir su espíritu.[1] Esto es lo que se conoce como la

interpretación literal. <u>Íd.</u> Al echar mano de este axioma, se

ha establecido que "el primer paso al interpretar un estatuto

es remitirnos al propio texto de la ley, puesto que cuando

[la Asamblea Legislativa] se ha expresado en un lenguaje claro

e inequívoco, el propio texto de la ley es la expresión por

excelencia de la intención legislativa". (Citas omitidas).

<u>Martajeva v. Ferré Morris</u>, 210 DPR 612, 626 (2022).

En segundo lugar, al interpretar una ley, **ello debe**

**hacerse en su conjunto —íntegramente— y no por secciones**

**separadas.** <u>Íd.</u>, pág. 627. Véase, también, <u>Const. José Carro</u>

<u>v. Mun. Dorado</u>, 186 DPR 113, 126 (2012). En tal sentido,

"[t]oda ley debe ser examinada y comparadas sus partes, de

suerte que sean hechas consistentes y tengan efecto". <u>Rolón</u>

<u>Martínez v. Caldero López</u>, 201 DPR 26, 40-41 (2018). Así,

"deben interpretarse las diferentes secciones, las unas en

---

[1] 31 LPRA sec. 5341.

relación con las otras, completando o supliendo lo que falte o sea oscuro en una con lo dispuesto en la otra, procurando siempre dar cumplimiento al propósito [del Poder Legislativo]". Íd. Véanse, también, Pueblo v. Santana Vélez, 168 DPR 30, 43 (2006); R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2.a ed. rev., San Juan, Pubs. JTS, 1987, pág. 315.

A. La exposición de motivos

Nuestra tarea en esta ocasión se ciñe en interpretar la Ley Núm. 58-2020, 16 LPRA sec. 4501 et seq., mejor conocida como el Código Electoral de Puerto Rico de 2020 (Código Electoral de 2020).[2] A poco se comienza a examinar esta legislación, se halla una sección en la Exposición de Motivos en la que, a mi parecer, se puede atisbar la intención legislativa de dispensar del requisito de peticiones de endosos a los aspirantes cuyos partidos se acogieron a un método alterno.[3] En particular, allí se enuncia la innovación que procura la nueva legislación al instaurar ciertos sistemas tecnológicos, como el Sistema de Endosos (SIEN). A renglón seguido, se expresa que "toda petición de endoso para Partidos Políticos por Petición, Aspirantes en Primarias, Candidatos y Candidatos Independientes se realizará con métodos electrónicos a través del Sistema de Endosos (SIEN) de la Comisión [Estatal de Elecciones]". Exposición de

---

[2] Específicamente, se aprobó el 20 de junio de 2020.
[3] Hemos mencionado que se puede recurrir a la exposición de motivos de la ley para indagar la intención de la Asamblea Legislativa al aprobarla. Véase Pueblo v. Zayas Rodríguez, 147 DPR 530, 539 (1999).

Motivos de la Ley Núm. 58-2020 (2020 [Parte 2] Leyes de Puerto Rico 1164). **Nótese que no se incluye a aquellos aspirantes de método alterno.**

### B. Las definiciones que provee la ley

#### i. "Aspirante" o "Aspirante Primarista"

Superado este aspecto, es meritorio repasar las definiciones del Código Electoral de 2020 sobre los términos en controversia.

Primero, al definir "aspirante" o "aspirante primarista", se esboza:

> **"Aspirante" o "Aspirante Primarista"** — Toda aquella persona natural que participe en los procesos de primarias internas o los métodos alternos de nominación de un partido político de Puerto Rico con la intención de, o que realice actividades, recaudaciones o eventos dirigidos a ocupar cualquier cargo interno u obtener una candidatura a cargo público electivo.[4]

Es mi lectura que, al referirse a "aspirante primarista", evidentemente es a quienes participan de una primaria, mientras que "aspirante" es aquel que participa de otro proceso que no sea una primaria. En esta tesitura, aplica el canon hermenéutico de *distribución*. Este canon normativiza que el fraseo distributivo parea cada expresión a su referente apropiado. Reconoce que, "a veces, [c]uando una oración contiene varios antecedentes y varios consecuentes", los tribunales deben "leerlas distributivamente y aplicar las palabras a los sujetos que, por el contexto, parecen relacionarse más apropiadamente". (Traducción suplida).

---

[4] 16 LPRA sec. 4503 (8).

Encino Motorcars, LLC v. Navarro, 584 U.S. 79, 87 433 (2018) (citando a 2A N. Singer & S. Singer, *Sutherland Statutes and Statutory Construction* § 47:26, p. 448 (rev. 7th ed. 2014)). Además, el canon distributivo tiene mayor fuerza cuando el estatuto permite el pareo uno a uno (*one-to-one matching*). Íd.

Al aproximarme a la definición del término en cuestión, se aprecia fácilmente que los dos antecedentes —"aspirante" o "aspirante primarista"— parean razonablemente con sus consecuentes del modo que mencioné. De esta forma, un "aspirante" es "toda aquella persona natural que participe en los métodos alternos de nominación de un partido político", mientras que un "aspirante primarista" es "toda aquella persona natural que participe en los procesos de primarias internas de un partido político". Después de todo, el objetivo es evitar resultados absurdos mediante combinaciones forzadas.

Un ejemplo de esto se puede apreciar en lo que establece el Art. 2.3(88) del Código Electoral de 2020. En lo pertinente, dicha disposición define los conceptos "plebiscito" y "referéndum" como "[m]étodo de [v]otación o consulta para presentar al electorado una o más alternativas para resolver el estatus político de Puerto Rico sobre asuntos de ordenamiento constitucional, público, jurídico o político. **Ambos términos se utilizarán de manera indistinta"**. (Negrilla suplida).[5] Obsérvese que una de las definiciones corresponde

---

[5] Íd., sec. 4503 (88).

al plebiscito ("consulta [de...] estatus"), mientras que la otra corresponde al referéndum ("asuntos de ordenamiento constitucional[...]"). Sobre esto, el MVC plantea atinadamente, que

> **[a] nadie se le ocurriría plantear que los plebiscitos son para enmendar la Constitución o que el referéndum se utiliza para resolver el problema de estatus.** Esto, a pesar de que ambos términos están definidos en el mismo artículo del Código Electoral. Por eso mismo [la Asamblea Legislativa] se tomó la molestia de añadir la oración "[a]mbos términos se utilizarán de manera indistinta", pues de lo contario serían distintos. **Dicho lenguaje no es utilizado en el Art. 2.3(8). (Negrilla suplida).** [6]

Por otro lado, conviene pasar juicio sobre la evolución que ha tenido la definición de "aspirante" si se compara con la forma en que se definía en la Ley Núm. 78-2011, 16 LPRA ant. sec. 4001 (derogada), conocida como el *Código Electoral de Puerto Rico para el Siglo XXI* (Código Electoral de 2011). Allí, "aspirante" se definía de la forma siguiente: "Toda aquella persona que participe de los procesos de selección interna de uno o más partidos políticos debidamente inscritos con la intención de, o que realice actividades, recaudaciones o eventos dirigidos a, ocupar cualquier cargo interno u obtener una candidatura o cargo electivo". [7]

La definición del Código Electoral de 2020, *vis a vis* la del Código Electoral de 2011, evidentemente es más específica en cuanto a la diferenciación entre los aspirantes que participan en primarias y los de método alterno. **Esto denota la intención clara de la Asamblea Legislativa de tratar de forma distinta ambos procesos.**

---

[6] *Alegato del Movimiento Victoria Ciudadana*, pág. 33.
[7] 16 LPRA ant. sec. 4003 (derogado).

Al fin y al cabo, como expondré más adelante, una *primaria*, según se define y se trata a lo largo del Código Electoral de 2020, es un proceso **concreto y delimitado**. No hay margen para entender que se refiere, por ejemplo, a los métodos alternos de nominación de candidatos.

### ii. **"Primarias"** *vis a vis* **"Método Alterno"**

Segundo, veamos la definición que provee el Código Electoral de 2020 del término "Primarias":

> **"Primarias"** — Proceso de Votación a través del cual se seleccionan los Candidatos a cargos públicos electivos con arreglo a esta Ley y a las reglas que adopte la Comisión y el organismo directivo del Partido Político concernido.[8]

A su vez, el término "Método Alterno" se define de la forma siguiente:

> **"Método Alterno"** — Procedimiento alternativo que sustituye una Primaria o Elección Especial, según lo apruebe el organismo central de un Partido Político para la elección de candidatos a cargos públicos y que cumpla, procesalmente, con las garantías mínimas dispuestas en esta Ley.[9]

Partiendo de un acercamiento literal, ambos términos son mutuamente excluyentes. En concreto, la definición de "método alterno" indica que este **"sustituye"** una primaria.[10] Es decir, cuando da lugar un "método alterno" no ocurre una primaria, **pues no constituyen lo mismo. Quiérase decir también que, cada vez que en el Código Electoral de 2020 se mencione**

---

[8] 16 LPRA sec. 4503 (92).

[9] Íd., sec. 4503 (60).

[10] La Real Academia Española provee varias acepciones para el término **"sustituir"**, entre las cuales se encuentran: (1) "Poner a alguien o algo en lugar de otra persona o cosa", y (2) "Dicho de una persona o una cosa: Ocupar el lugar de otra". *Diccionario de la lengua española*, 2023, https://dle.rae.es/sustituir, (última visita, 22 de mayo de 2024).

**"primaria", ello significa que no se puede asumir que se refiere al "método alterno". <u>Esta es la única interpretación razonable de la distinción que las propias definiciones hacen de los términos reseñados.</u>**

Con lo anterior en mente, pasemos a examinar otras secciones pertinentes de la ley.

### C. Capítulo VII del Código Electoral de 2020: Candidaturas y primarias

#### i. La certificación automática de candidatos únicos

Previo a si quiera recurrir a los mecanismos de nominación de candidatos —como lo son las primarias y el método alterno—, hay que evaluar, como cuestión de umbral, si en efecto surge la necesidad para ello. Es decir, si amerita utilizar alguno de estos mecanismos para depurar el número de personas que se nominarán a cada puesto electivo. El Art. 7.10 del Código Electoral de 2020 establece cuándo no habrá que utilizar alguno de estos mecanismos, habida cuenta de que la cantidad de aspirantes es igual o menor que la cantidad de candidaturas disponibles:

> (3) Certificaciones automáticas de aspirantes como candidatos únicos
>
>> (a) El Presidente de la Comisión de Primarias del partido que corresponda certificará como candidatos únicos a los aspirantes a gobernador, comisionado residente en Washington D.C. senador o representante por acumulación o senador o representante por distrito, alcalde y legislador municipal que cumplan con todos los requisitos legales y reglamentarios de sus respectivos partidos políticos para participar en primarias **sin necesidad de realizarlas** en los siguientes casos:
>>
>>> i. Si la cantidad de Aspirantes es igual o menor que la cantidad máxima de candidatos que el partido político pueda o deba postular para esos

> cargos en las próximas Elecciones Generales.
>
> ii. Si la cantidad de Aspirantes es igual o menor que once (11) para senadores o representantes por acumulación. En los casos de senadores por distrito, esta disposición aplica si la cantidad de aspirantes es igual o menor que dos (2). En los casos de gobernador, comisionado residente en Washington D.C., representantes por distrito y alcaldes, esta disposición aplica si la cantidad de aspirantes por cada partido político es igual o menor que uno (1) en la demarcación geoelectoral que correspondan. En los casos de legisladores municipales, esta disposición aplicará cuando la cantidad de aspirantes sea igual o menor a la cantidad máxima de estas candidaturas en cada municipio. (Negrilla suplida).[11]

Como se puede apreciar, en principio el partido político podrá certificar automáticamente como "candidatos únicos" a aquellos aspirantes que, esencialmente, no tengan contendor en la misma candidatura. De haber varios aspirantes para un mismo puesto, como surge de la ley, habrá que recurrir a las primarias o al método alterno que el partido político seleccione.

Sin duda, las primarias son el mecanismo por defecto (*default*) para la selección de candidatos. Véase Art. 7.10 (2) del Código Electoral de 2020 ("Todo partido político tendrá la obligación de realizar primarias en aquellos casos donde surja más de un Aspirante calificado").[12] Ahora bien, el Código Electoral de 2020 ofrece a los partidos políticos la opción de establecer internamente "métodos alternos para

---

[11] 16 LPRA sec. 4620.
[12] 16 LPRA sec. 4620.

la nominación de sus candidatos a cargos públicos electivos".[13]

### ii. La regulación de los métodos alternos en el Art. 7.11 del Código Electoral de 2020

Precisamente, el Art. 7.11 del Código Electoral regula todo lo concerniente a los métodos alternos de nominación. Corresponde, en esta coyuntura, destacar una peculiaridad del modo y orden de regulación en el Código Electoral de 2020, tanto de los métodos alternos como de las primarias. Una vez se determina que es necesario recurrir a algún método de nominación de candidatos, la legislación —en su Art. 7.11— pasa a establecer, de manera genérica, unas garantías mínimas con las que deben cumplir los métodos alternos. Tras ese ejercicio, el resto del Capítulo VII del Código Electoral de 2020 —del Art. 7.12 al Art. 7.23— se dedica a regular **en detalle** todo los concerniente a las primarias. Esto es cónsono con las definiciones de estos términos en la propia ley.

Según se reseñó, estas definiciones diferencian claramente las "primarias" de los "métodos alternos". Mientras que las "primarias" se realizarán "con arreglo a [este Código Electoral] y a las reglas que adopte la [CEE] y el organismo directivo del Partido Político concernido",[14] los métodos alternos deberán ser "apr[obados por] el organismo central de un Partido Político […] y […] cump[lir], procesalmente, con las garantías mínimas dispuestas en est[e]

---

[13] Íd., sec. 4621.
[14] Íd., sec. 4503 (92).

[Código Electoral]".[15] Nótese que, si bien en cuanto a las primarias se remite, de forma general, a las disposiciones de la ley, para los métodos alternos solo se exige que lo apruebe el partido político y se cumplan con las garantías mínimas que enumera la ley. Específicamente, el Art. 7.11 dispone esas garantías mínimas y, entre estas, **no hay un requisito de presentación de peticiones de endosos.**

Aquí, en lo concerniente, el MVC aprobó, mediante su reglamento, la utilización de métodos alternos de nominación de candidatos y no exigió el requisito de presentación de peticiones de endosos.

### iii. El requisito de peticiones de endosos

Como parte del ejercicio de examinar secuencialmente el Código Electoral de 2020, corresponde justipreciar en este momento el precepto que ha originado esta disputa. Se trata del Art. 7.15, el cual, en lo pertinente, establece:

**Artículo 7.15. — Peticiones de Endosos a Aspirantes Primaristas**
                    **y Candidatos Independientes.**

(1) Sin menoscabar lo dispuesto en esta Ley, la Comisión reglamentará todo asunto relacionado con las peticiones de endosos. El período para la presentación de peticiones de endosos para Aspirantes Primaristas y Candidatos Independientes a cargos públicos electivos comenzará a partir del 1ro. de diciembre del año anterior al de Elecciones Generales y concluirá al mediodía (12:00 p.m.) del 15 de febrero del año de Elecciones Generales. El anterior constituye un término fatal. Cuando esta fecha coincida con un día feriado o no laborable para el Gobierno de Puerto Rico, se extenderá al siguiente día laborable.

(2) A partir del Ciclo Electoral 2024 toda petición de endoso para estos propósitos solamente se tomará, presentará y evaluará a través del sistema SIEN dispuesto en esta Ley.

**(3) Cualquier Elector que desee concursar en unas primarias, como aspirante o como candidato independiente, además de**

---

[15] Íd., sec. 4503 (60).

**cumplir con los requisitos de esta Ley y los reglamentos de su Partido y la Comisión, deberá presentar ante la Comisión la cantidad de peticiones de endoso requerida por esta Ley para el cargo público electivo al que interese aspirar.**

.    .    .    .    .    .    .

(Subrayado y negrilla suplidos).[16]

Al tomar como base lo ya discutido, y al realizar una lectura de este artículo, surge claramente que el requisito de peticiones de endosos es aplicable únicamente a **aspirantes primaristas** y a **candidatos independientes, a nadie más**.[17] En ninguna parte se menciona a aspirantes cuyos partidos se acogieron a algún método alterno de nominación. Interpretar lo contrario es simple y llanamente una hazaña insensata y extralimitada. Recuérdese que "un tribunal no está autorizado a adicionar limitaciones o restricciones que no aparecen en el texto de una ley, ni a suplir omisiones al interpretarla, con el pretexto de buscar la intención legislativa". <u>Rosado Molina v. ELA</u>, 195 DPR 581, 589-590 (2016). Aquí, el proceder mayoritario representa una limitación de acceso a la papeleta al imponer el requisito inexiste de presentación de peticiones de endosos para los aspirantes impugnados. **Añadir algo que no está en la ley es un acto burdo de legislación judicial.**

---

[16] 16 LPRA sec. 4625.

[17] Como bien reconoce la Opinión mayoritaria, la inclusión del término "candidato independiente" en el contexto de una primaria es improcedente, ya que este, según nuestro diseño, "nunca puede aspirar a concursar en unas primarias de una colectividad". Véase *Opinión mayoritaria*, págs. 36-37. Eso nos deja con el término "aspirante" que, en unión a lo que dice el artículo, evidentemente se refiere a un aspirante en una **primaria.**

**III**

La discusión que elaboré en el acápite que precede indudablemente fuerza la conclusión de que la intención de la Asamblea Legislativa fue eximir a los aspirantes cuyos partidos políticos se acogieron a algún método alterno del requisito de presentación de peticiones de endosos. Esto, según se desprende del texto del Código Electoral de 2020 al leerlo rigurosamente junto con las normas de hermenéutica. Además, que, en esta coyuntura, el método alterno es un asunto cuyo diseño y reglamentación se le delegó a los partidos políticos. Pese a que, a mi juicio, esto dispone de la controversia, es meritorio explorar el trasfondo histórico de los métodos alternos como mecanismo de selección de candidatos.

**A. Trasfondo histórico de los métodos alternos de selección de candidatos**

Cuando se aprobó la Ley Núm. 4 de 20 de diciembre de 1977, mejor conocida como la *Ley Electoral de Puerto Rico* (Código Electoral de 1977), 16 LPRA ant. sec. 3001 (derogada), esta no contenía alusión alguna a los métodos alternos de selección de candidatos ni a que los aspirantes sujetos a los referidos métodos estaban exentos del requisito de recogidos de endosos.

Ahora bien, el 2 de julio de 1981 la Asamblea Legislativa aprobó la Resolución Conjunta Núm. 21 (Resolución), mediante la cual creó la *Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico* (CERPE). Esta contaría con la

representación de los partidos políticos debidamente inscritos a esa fecha.[18] Al aprobar esta Resolución, la Asamblea Legislativa "respondió al clamor público de que se realizara una revisión del proceso electoral, que estaba ampliamente justificado por las experiencias que [se vivieron] durante el periodo eleccionario de 1980". Informe de las Comisiones de Gobierno, Jurídico Civil y Jurídico Penal de la Cámara de Representantes en torno al P. del S. 719, Expediente del P. del S. 719, pág. 1. Así pues,

> [e]l propósito fundamental para […] [la] creación [de la CERPE] fue facultarla para formular propuestas concretas sobre la adaptación de nuestro sistema electoral a los últimos adelantos a la luz de las experiencias de los últimos comicios, y para estudiar, entre otras cosas[,] los mecanismos para la constitución y el nombramiento de los funcionarios electorales y de los organismos apelativos, el nombramiento y remoción de los oficiales electorales, el sistema de voto adelantado, las primarias presidenciales simultáneas, la mecanización del sistema electoral, el establecimientos de oficinas permanentes de las comisiones locales de elecciones, y el proceso de votación y recusación. Íd., pág. 2.

La labor de la CERPE desembocó en la confección de un *Informe*, el cual rindió el 17 de mayo de 1982. En lo pertinente, en este se explicaron los cambios que habían surgido en términos de los mecanismos de selección de candidatos que utilizaban los partidos políticos, a pesar de que, en el Código Electoral de 1977, el sistema de primarias era el mecanismo compulsorio. Véase Informe de la Comisión

---

[18] A tal efecto, la CERPE quedó constituida por el Prof. Charles Cuprill Oppenheimer, quien la presidió, y por los Sres. Peter Kryzanowski, Héctor Luis Acevedo y David Noriega, en representación del Partido Nuevo Progresista, el Partido Popular Democrático y el Partido Independentista Puertorriqueño, respectivamente. *Informe de las Comisiones de Gobierno, Jurídico Civil y Jurídico Penal de la Cámara de Representantes en torno al P. del S. 719*, Expediente del P. del S. 719, pág. 2.

Especial para la Revisión del Proceso Electoral de Puerto Rico, 17 de mayo de 1982, pág. 39. En particular, se esbozó:

> El mecanismo de primarias ha traído consecuencias positivas y negativas para los partidos políticos. Por un lado[,] ha permitido la renovación democrática del liderato y la participación más amplia del electorado. Por otro lado[,] ha representado unas luchas internas en los partidos, las cuales han producido divisiones que debilitan [a] estos a la vez que representan una inversión de recursos considerables que afectan las posibilidades de candidatos sin esa disponibilidad material.
>
> **Los principales partidos políticos han comenzado a implementar procedimientos alternos de selección de candidatos no contemplados en la Ley Electoral vigente. Esta realidad no puede ignorarse.** (Negrilla suplida). Íd., págs. 39-40.

Dada esta realidad, el *Informe* proveyó una serie de recomendaciones para incorporar y regular en el ordenamiento electoral los métodos alternos de selección. En particular, enumeró una serie de garantías mínimas que estos debían cumplir.[19] Además, el *Informe* consignó que "[l]os candidatos que hayan sido seleccionados por los mecanismos internos y hayan cumplido con los requisitos que se establecen en la ley, **no tendrán que recoger peticiones para primarias [(endosos)] pues ya han demostrado un nivel de respaldo efectivo.** (Negrilla suplida).[20] Íd., págs. 42-43.

Así las cosas, a los efectos de acoger las recomendaciones del *Informe*, en 1982 se presentó el Proyecto del Senado 719. Según se desprende de su historial legislativo, específicamente del *Informe de las Comisiones de Gobierno, Jurídico Civil y Jurídico Penal de la Cámara de*

---

[19] Como cuestión de hecho, esas garantías mínimas son esencialmente las mismas que se incluyeron en el Código Electoral de 1977 y en los Códigos Electorales de 2011 y 2020.

[20] En el pasado, se le denominaba "peticiones de primarias" a las "peticiones de endosos".

*Representantes*, el interés era armonizar el mecanismo de las primarias —que se concebía como un derecho de los aspirantes— con los otros métodos que adoptaran los partidos políticos para la selección de sus candidatos. De esta forma, en este proyecto se hacía un "reconocimiento oficial a la posibilidad de adoptar métodos internos de selección de candidatos cuando estos —los candidatos— renunci[aran] al derecho estatutario de las primarias". Informe de las Comisiones de Gobierno, Jurídico Civil y Jurídico Penal de la Cámara de Representantes en torno al P. del S. 719, Expediente del P. del S. 719, pág. 5. Entonces, "queda[ba] relevado el partido de conseguir peticiones de endoso para sus candidatos cuando ya ha[bían] celebrado un proceso interno de selección". Íd.

Este informe legislativo luego pasa a discutir la situación específica de los procesos de selección de candidatos y la propuesta a tal efecto:

> La Ley Electoral vigente provee para la celebración de primarias en todo caso en que exista más de un candidato para un puesto que los que un partido pueda o desee nominar. Esta práctica obedece al interés público de democratizar el proceso nominativo y de ampliar la participación de los electores afiliados en las decisiones fundamentales de los partidos. Sin embargo, la primaria puede significar gastos considerables y problemas muy serios para la unidad de los partidos y, en ocasiones, se convierten en empresa fútil provocada por candidaturas espurias.
>
> . . . . . . . .
>
> Ni la Comisión Especial ni nosotros creemos propio eliminar el mecanismo de primarias. La Comisión no consideró conveniente para nuestra salud democrática la eliminación de derechos adquiridos. Con ese principio coincidimos. Es nuestro propósito firme el mantener la primaria como mecanismo predilecto.
>
> El proyecto establece mecanismos de selección de candidatos que simplemente mejoran el sistema existente y lo regulan más rigurosamente. **Bajo el estado de derecho vigente[,] nada impide que los partidos establezcan métodos de selección distintos a la primaria provista por ley**. Como cuestión de realidad[,] tanto el Partido Nuevo Progresista

como el Partido Popular Democrático tiene[n] disposiciones reglamentarias sobre este asunto. De su legalidad no existen dudas.

.   .   .   .   .   .   .   .

El propuesto artículo 4.006A reconoce a los partidos políticos el derecho a establecer métodos internos para la nominación de sus candidatos siempre que así lo apruebe su organismo directivo central y se cumpla con unas garantías mínimas. […] El partido podría anunciar que la persona seleccionada es el candidato oficial y **este no tendría que someter peticiones de primarias, ya que su triunfo en el proceso interno es suficiente muestra de apoyo.** (Cita depurada y negrilla suplida). Íd., págs. 15-18.

La Asamblea Legislativa aprobó el Proyecto del Senado 719 y el Gobernador de turno lo firmó, para convertirse en la Ley Núm. 3 de 10 de enero de 1983. Esta enmendó el Código Electoral de 1977 para añadir un Art. 4.006A y regular los métodos alternos de selección de candidatos. Además de incorporar una serie de garantías mínimas que estos debían cumplir, casi al final de lo que allí se disponía se expresaba que **"[l]as personas seleccionadas de conformidad con el procedimiento antes descrito no tendrán que cumplimentar los requisitos de radicación de peticiones de primarias para cualificar como candidato en la papeleta electoral"**. (Negrilla suplida). Ley Núm. 3 de 10 de enero de 1983 (1983 [5ta. y 6ta. sesiones ordinarias] Leyes de Puerto Rico 450).

Posteriormente, se derogó este código electoral y se aprobó el Código Electoral de 2011. Adviértase que se mantuvo una regulación idéntica sobre los métodos alternos en el Art. 8.007 y este, al final, contenía un lenguaje similar al del Código Electoral de 1977: **"[l]as personas seleccionadas de conformidad con el procedimiento antes descrito no tendrán que cumplir con los requisitos de presentación de peticiones**

**de endoso para primarias para calificar como candidato".** (Negrilla suplida).[21]

Como vimos, históricamente, por décadas, incluso antes de un reconocimiento formal en la legislación, los partidos políticos han utilizado métodos alternos a la primaria como mecanismos de selección de candidatos. Además, se ha considerado que es innecesario requerir peticiones de endosos a los aspirantes que sean escogidos a través de estos, ya que su triunfo en el proceso interno es suficiente muestra de apoyo. **¿Acaso ese entendido histórico cambió meramente porque en el Código Electoral vigente se omitió incluir una exención expresa al cumplimiento de recogido de endosos? ¿Esto significa que la omisión de esa exención ahora representa la exigencia de ese requisito? <u>La contestación a ambas interrogantes es que no.</u>**

B. **Omisión en el Código Electoral de 2020 de la exención del requisito de recogido de endosos**

Nos confrontamos con una omisión de la Asamblea Legislativa o, como se le denomina en el ámbito hermenéutico, un supuesto de *casus omissus.* R.E. Bernier y J.A. Cuevas Segarra*, op. cit.,* pág. 311. Esta regla postula que "las omisiones de [la Asamblea Legislativa] no pueden ser curadas por los tribunales". <u>Íd.</u> Su razón es que el tribunal solo interpreta y no legisla. Por lo tanto, no puede añadir nada

---

[21] 16 LPRA ant. sec. 4117 (derogado).

al estatuto. Íd. Véase <u>Andrades v. Pizza Hut Mgt. Corp.</u>, 140 DPR 950, 957 (1996).

¿Acaso esa omisión que estamos llamados a dejar inalterada supone la instauración de una obligación afirmativa? **Claramente, no.** En esta tesitura, conviene recordar que "es un principio de derecho seguido comúnmente por este Foro el cual, en circunstancias determinadas, **se entiende por permitido lo que no está prohibido**". (Negrilla suplida). <u>Pueblo v. Román Feliciano</u>, 181 DPR 679, 687 (2011). Véase, también <u>Campos del Toro v. Ame. Transit Corp.</u>, 113 DPR 337, 345 (1982).[22] **Así como no está expreso en la ley un requisito afirmativo de presentación de peticiones de endosos para aquellos aspirantes cuyos partidos políticos se acogieron a un método alterno, en igual tono, tampoco está prohibido que estos compitan sin, precisamente, hacer acopio de estos.**

En resumen, el Código Electoral de 2020 **no incorpora una norma imperativa** en cuanto a los endosos para los aspirantes cuyos partidos políticos optaron por algún método alterno de selección.

> Son normas imperativas, o de 'ius cogens', aquellas cuyo mandato es de inexcusable cumplimiento, debiéndose ajustar la conducta de la persona, su comportamiento, a lo establecido por la norma para que sus actos tengan validez y eficacia jurídica. […] Mientras que las normas facultativas o dispositivas conceden a la autonomía de la voluntad privada un margen de facultades distinto del preceptuado en las propias normas, en las imperativas y prohibitivas ese margen de autonomía queda eliminado, teniéndose que acomodar la actuación de las personas a lo preceptuado concretamente en el mandato normativo. J.R. Bonet Correa, <u>Los actos contrarios</u>

---

[22] *Véase*, además, Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u>, pág. 93 (2012) (comentando que no es la función del juzgador ampliar la ley o añadir prerrogativas no provistas por un estatuto).

a las normas y sus sanciones, XXIX (Núms. 1-2) An. Der. Civ. 309, 317-318 (1976).

El estatuto que nos ocupa, al ser examinado en su totalidad, no devela una norma de esa índole en cuanto al requisito en controversia.

**IV**

**Gran parte de esta controversia la generó la propia CEE.** Así como su conducta errática descalabró el ciclo electoral de 2020 al no poder llevar a cabo, adecuadamente, las primarias que dispone la ley,[23] en esta ocasión, sus representaciones indujeron a error a los aspirantes impugnados. La CEE, a través de una serie de actos, hizo pensar a los aspirantes impugnados que su interpretación del ordenamiento electoral vigente —en cuanto a que los aspirantes acogidos a los métodos alternos no tenían que presentar peticiones de endosos— era la correcta. Veamos.

**A. Reglamentos internos de los partidos políticos**

El Art. 7.1 del Código Electoral de 2020 establece, de manera relevante, lo siguiente:

> La Comisión aprobará un Reglamento de Primarias y Métodos Alternos de Nominación que deberá ser uniforme para todos los Partidos Políticos en los campos electorales ocupados por esta Ley; **mostrando deferencia a los reglamentos aprobados por cada Partido para sus primarias internas y sus métodos alternos de nominación para cargos públicos electivos;** pero siempre que estos no menoscaben o vulneren las garantías, reglas y normas protegidas por esta Ley para ambos procesos de nominación.
>
> .  .  .  .  .  .  .  .  .

(Negrilla suplida).[24]

---

[23] Véase Pierluisi-Urrutia v. CEE, 204 DPR 841, 869 (2020) (J. Oronoz Rodríguez, Opinión de conformidad) ("[L]a Comisión Estatal de Elecciones […] falló abismalmente").
[24] 16 LPRA sec. 4611.

Del expediente ante nos surge que el reglamento interno del MVC —sobre este particular— disponía que se había acogido al método alterno de nominación y que no requeriría endosos a sus aspirantes. Además, que este lo celebraría después del 30 de diciembre de 2023. Este reglamento se presentó ante la Secretaría de la CEE y esta, aparte de acusar recibo, **no hizo señalamiento alguno en cuanto a su contenido.**

### B. Sistema de Notificación de Intención de Aspirar a una Candidatura y Sistema de Endosos (SIEN)

También se desprende del expediente que del SIEN —en el que los aspirantes impugnados notificaron su intención de candidatura— surgía una nota particular. Cuando los aspirantes veían su perfil en el referido sistema, podían apreciar en la sección de la cantidad de endosos requerida que, previo a informar el número de endosos que les aplicaba, se expresaba: **"Si su partido ha sido acogido por método alterno de selección según el Código Electoral de Puerto Rico de 2020[,] no es requisito presentar peticiones de endosos". Razonablemente, los aspirantes del MVC entendieron que la cantidad de endosos que el sistema les requería no les era aplicable porque el partido político se había acogido a un método alterno de selección de candidatos.**

Es meritorio resaltar también que del propio expediente incluso surge que en el SIEN, en los perfiles de los aspirantes impugnados —particularmente en la sección del listado de los documentos requeridos por ley para completar la presentación de la intención de candidatura—, en el encasillado del **"[l]istado de funcionarios autorizados a**

**tomar las firmas de las peticiones de endosos, según aplique"**, se hizo constar que su estatus era "**[no] aplica**".[25] Evidentemente, al aspirante sujeto al método alterno no le era requerido el cumplimiento de ese requisito puntual, pues, como cuestión de umbral, no debía presentar peticiones de endosos, por lo que obviamente no necesitaba los funcionarios a tal efecto.

### C. Reglamentos de la CEE

Es menester abordar ahora los dos reglamentos que la CEE aprobó que repercuten en este caso.

#### i. Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes (*Reglamento de candidaturas*)

La CEE aprobó el *Reglamento de candidaturas* el 15 de junio de 2023.[26] Este es componente integral de la controversia presente. Las partes peticionarias ampararon su postura, no solo en el Art. 7.15 del Código Electoral de 2020, sino también en la Sec. 3.1 del *Reglamento de candidaturas.* El foro primario acogió su teoría y resolvió de conformidad. La Sec. 3.1 del referido cuerpo dispone:

**SECCIÓN 3.1: GARANTÍAS MÍNIMAS**

. . . . . . . .

Las personas seleccionadas mediante un Método Alterno de Nominación no tendrán que cumplir con los requisitos de presentación de peticiones de endoso para primarias para calificar como candidato(a); siempre y cuando sean escogidos y su expediente, con los documentos requeridos, sea radicado por su Partido Político como candidato **único** en la Comisión

---

[25] Véase Apéndice la *Petición de certiorari CC-2024-0267*, págs. 3193-3207.
[26] Este reglamento se aprobó según el mandato del Código Electoral de 2020 a los efectos de que "[l]a Comisión reglamentará lo concerniente a estos procesos de presentación de aspiraciones primaristas y candidaturas a cargos públicos electivos dentro de los parámetros dispuestos en esta Ley". Véase 16 LPRA sec. 4612.

en o antes de las 12:00 (doce en punto) del medio día del 30 de diciembre de 2023.

. . . . . . . .

(Subrayado y negrilla en el original).

La mayoría lee esta sección de modo que, para que un aspirante cuyo partido se acogió a un método alterno pueda calificar como un candidato y quede relevado de presentar peticiones de endosos se requería que: (1) haya sido escogido por el partido como candidato único, tras la celebración del método alterno, y (2) que la colectividad haya presentado su candidatura en la CEE con su expediente y los documentos requeridos en o antes de las 12:00 (doce en punto) del medio día del 30 de diciembre de 2023.[27] Es decir, presupone la celebración del método alterno antes de esa fecha para así compaginar el derecho que tiene todo elector que no concursó en el método alterno a solicitar la celebración de una primaria.[28] Cabe destacar también que, en cuanto a este extremo, la mayoría intenta imprimirle una lectura distinta —y, honestamente, confusa— a esta sección reglamentaria para defender su corrección al exponer que:

---

[27] Se extendió hasta el 2 de enero de 2024 debido a que el 30 de diciembre de 2023 fue sábado y el lunes, 1 de enero de 2024, fue día feriado.

[28] Según el Art. 7.11 del Código Electoral de 2020, entre las garantías mínimas que los partidos políticos deben observar al utilizar métodos alternos de nominación de candidatos se encuentran:

(a) Todo Aspirante que no resultare favorecido en el método alterno de nominación estará impedido de concurrir como Aspirante en cualquier proceso de primarias para el mismo cargo durante el mismo ciclo de Elección General.

(b) **Ningún proceso o método alterno de nominación de candidatos a cargos públicos electivos impedirá que otro miembro o afiliado del Partido que no participó como Aspirante, pueda reclamar su derecho a primarias para ese mismo cargo público electivo dentro de los términos de esta Ley y el reglamento de primarias del partido.** (Negrilla suplida). 16 LPRA sec. 4621.

> Lo cierto es que lo impuesto en la Sec. 3.1 del *Reglamento para radicación de candidaturas*, *supra*, no es un requisito a los aspirantes para la presentación de endosos, sino un término fatal a los partidos para la presentación de **un candidato único** para las posiciones que anunciaron a la CEE. En ese sentido, huelga determinar si el término "aspirante" al que se refiere [el Art. 7.15 del Código Electoral] incluye o no a los recurridos, pues nada surge, ni del texto del artículo ni del Código en su totalidad, **que prohíba expresamente a la CEE la exigencia de recogido de endosos a aspirantes bajo métodos alternos**, sobre todo, cuando la exigencia es una colateral. O sea, el hecho de que el Art. 7.5(3) no incluya expresamente a los recurridos, no quiere decir que la CEE está impedida de requerir lo que aprobó en la Sec. 3.1 del *Reglamento para radicación de candidaturas*.[29] (Negrilla en el original).

En principio, el lenguaje de la referida sección incorpora una incoherencia conceptual insalvable que impide su puesta en vigor. Hacer alusión a los métodos alternos de nominación al mismo tiempo que a la figura del "candidato único" es un sinsentido. Como ya expliqué, esta figura se utiliza en el contexto de la certificación automática que dispone el Art. 7.10. Precisamente, debido a la imposibilidad de certificar automáticamente candidatos únicos a puestos electivos —por haber más aspirantes interesados que puestos disponibles— es que se recurre a algún mecanismo de nominación de candidatos, entre los cuales están los métodos alternos. En términos secuenciales, determinar si se certifica automáticamente a algún aspirante como candidato único **necesariamente precede** la consideración de si se utiliza algún mecanismo de nominación de candidatos. En ese sentido, el candidato único, por ejemplo, no tendría que atravesar método alterno alguno.

---

[29] *Opinión mayoritaria*, págs. 34-35.

Por otro lado, si bien el Código Electoral de 2020 fija una fecha para la celebración de las primarias, no ocurre lo mismo para los métodos alternos, por lo que argüir que tal fecha era el 30 de diciembre de 2023 es igualmente incorrecto. Asimismo, como arguye el MVC:

> No tiene sentido alguno realizar el método alterno de selección **antes** de saber si, en efecto, habrá más aspirantes que candidaturas disponibles para determinado puesto. El método alterno existe, **precisamente**, para que el partido escoja un candidato oficial entre varios aspirantes. Y no es hasta después del 30 de diciembre de 2023 que el partido sabe con certeza absoluta cuántos aspirantes [presentaron] sus intenciones de candidaturas. (Negrilla y subrayado en el original).[30]

En cuanto al entendido de la mayoría de que es necesario celebrar el método alterno antes del 30 de diciembre de 2023 para preservar el derecho a primarias de quien no se acoja a este, ello es incorrecto. Según plantea certeramente el MVC,

> nada impide que una persona que radica su intención de candidatura en el periodo dispuesto durante el mes de diciembre de 2023 pida una primaria, a pesar de que el método alterno a celebrarse —y en el cual ha decidido no participar— se celebre después del 30 de diciembre de 2023. En este caso, el desenlace es relativamente sencillo: se llevaría a cabo el método alterno entre aquellos aspirantes que se sometieron a este, y el vencedor de este proceso se enfrentaría en junio [de 2024] a las personas que hayan solicitado primaria, de estas existir y de estas haber presentado los endosos correspondientes. **En otras palabras, es perfectamente compatible celebrar el método alterno posterior al 30 de diciembre de [2023] y preservar el derecho de cualquier integrante a solicitar una primaria a celebrarse en junio de 2024.** (Negrilla suplida).[31]

Es menester puntualizar también que los reglamentos que la CEE promulgó en el pasado, al amparo de las legislaciones anteriores, reproducían esencialmente el texto de estas, incluyendo la prohibición a requerir endosos a los aspirantes

---

[30] *Alegato del Movimiento Victoria Ciudadana*, pág. 25. Según la ley, el 30 de diciembre de 2023 es la fecha límite para presentar candidaturas.
[31] Íd., pág. 37. Como cuestión de hecho, ningún aspirante del MVC solicitó la celebración de primarias.

cuyo partido se acogió a un método alterno. Contradictoriamente, ahora que la legislación vigente omite esa prohibición —pero no requiere de manera imperativa el requisito de peticiones de endosos—, **la CEE incluyó el requisito por la vía reglamentaria. Ese proceder incoherente no se puede sostener.**

Independientemente de esto, asumiendo que esta sección es exigible contra los aspirantes impugnados en cuanto al requisito de presentación de peticiones de endosos, opino que esta es *ultra vires* —y, en consecuencia, nula— toda vez que está en conflicto directo con el propio Código Electoral de 2020.

Es harto conocido que la Asamblea Legislativa tiene la facultad de delegar el poder de reglamentar a las agencias administrativas. R&B Power, Inc. v. Junta de Subastas ASG, 213 DPR ___ (2024), 2024 TSPR 24. En ese sentido, "les corresponde a los organismos administrativos adherirse estrictamente a los poderes que les han sido delegados". Íd. Por tanto, "en ausencia de un mandato legislativo expreso o implícito, aquella actuación administrativa que no obedezca el poder conferido sería una actuación *ultra vires* de la agencia y, por ende, nula". Íd. Véase, también, FCPR v. ELA *et al.*, 211 DPR 521 (2023).

Es indiscutible que el Código Electoral de 2020 facultó a la CEE a adoptar el reglamento en cuestión. Asimismo, a reglamentar "todo asunto relacionado con las peticiones de endosos". 16 LPRA sec. 4625. **Ahora bien, esa delegación de**

**poder no se extiende al rebasamiento de los linderos de la propia ley.** La CEE actuó de forma extralimitada al imponer un requisito que el propio estatuto no dispone. **En consecuencia, debe entenderse que la porción en controversia de la Sec. 3.1 del *Reglamento de candidaturas* es nula, dada la actuación *ultra vires* de la agencia.**[32]

> ii. **Reglamento y manual de primarias y métodos alternos de nominación de 2024 (*Reglamento de primarias y métodos alternos*)**

La CEE aprobó el *Reglamento de primarias y métodos alternos* el 24 de agosto de 2023, según lo mandata el Art. 7.1 del Código Electoral de 2020 para regular estos mecanismos de selección de candidatos. Nótese que este reglamento se promulgó después que el *Reglamento de candidaturas* y regula, **con carácter de especialidad,** por ejemplo, la cuestión de los métodos alternos. **Este, el cual por el principio de especialidad prevalece sobre *el Reglamento de candidaturas*, no hace alusión a requisito alguno de endosos para los métodos alternos.** La sección pertinente que aborda el particular se

---

[32] En el pasado, y casualmente en contextos electorales, he elaborado un razonamiento similar: "En fin, en la jerarquía del derecho, la ley prevalece sobre cualquier disposición reglamentaria o actuación administrativa que sea contraria a esta. Por consiguiente, si la regla o actuación administrativa contraviene el texto legal, esta es nula; sencillamente no puede prevalecer por encima de la ley". Gautier Vega v. CEE, 205 DPR 724, 783 (2020) (J. Oronoz Rodríguez, Opinión disidente).

Por otro lado, los peticionarios plantearon que, dado que el *Reglamento de candidaturas* no se impugnó en el término estatutario, los aspirantes impugnados se allanaron a su validez. Es harto conocido que una persona que alegue ser afectada personalmente por la aplicación de un reglamento puede impugnar su validez ante el Tribunal de Primera Instancia. Véase Sierra Club v. Junta de Planificación, 203 DPR 596, 607 (2019); Centro Unido Detallistas v. Com. Serv. Púb., 174 DPR 174, 184-185 (2008). Precisamente, mediante el litigio que originó estos recursos consolidados los aspirantes impugnados cuestionaron la disposición reglamentaria en controversia y aseveraron que la interpretación que le imprimen los peticionarios es *ultra vires* y, por tanto, sería nula.

limita a reproducir lo que dispone el Art. 7.11 del Código Electoral de 2020.

En fin, como mínimo, no se debe penalizar a los aspirantes impugnados por descansar en las representaciones que hizo la CEE. **Recuérdese que este es el primer ciclo electoral completo que se celebra bajo la vigencia del Código Electoral de 2020.** Además, dado que no había un precedente que despejara esta controversia, toda vez que el entendido histórico era la no exigencia de las peticiones de endosos a los aspirantes sujetos a un método alterno, **este Tribunal debió considerar emitir su dictamen con efecto prospectivo.**[33]

**V**

Finalizo esta exposición con enmarcar, en términos de trascendencia, la decisión que una mayoría de este Tribunal emite hoy. **El dictamen de esta Curia debilita el ejercicio democrático del País al privar al electorado de la propuesta política del partido aquí concernido.** No es afín a un sistema como el nuestro que se suprima la pluralidad de opciones disponibles para ofrecer a quienes, a fin de cuentas, ostentan el poder de decidir sobre las personas que deben figurar en las posiciones de liderato político.

---

[33] Como norma general, las decisiones emitidas por esta Curia tienen carácter retroactivo. McNeil Healthcare, LLC v. Mun. Las Piedras, 2023 TSPR 135, 213 DPR ___ (2023). Ahora bien, "en el ejercicio de nuestra discreción judicial, hemos emitido opiniones con efecto prospectivo en consideración a las circunstancias fácticas del caso, la justicia, la equidad, la mejor convivencia social o para evitar dislocaciones severas en nuestro sistema económico". Rosario Domínguez v. ELA, 198 DPR 197, 216 (2017). A los fines de dar un tratamiento realmente justo a esta controversia y evitar emitir un remedio tan drástico como la descalificación, en el ejercicio de nuestra discreción judicial, este Tribunal debió sopesar la emisión de un dictamen con efecto prospectivo.

Al momento de tomar determinaciones que puedan incidir en el derecho al voto consagrado en nuestro esquema constitucional, corresponde, como decimos coloquialmente, "hilar fino". Previamente, he puntualizado que "[u]na de las garantías fundamentales y emblemáticas de nuestro ordenamiento democrático es el derecho al voto". Com. PNP v. CEE III, 196 DPR 706, 746 (2016) (J. Oronoz Rodríguez, Opinión disidente). Este Tribunal lo ha reconocido como "la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su poder soberano y expresa su voluntad". P.P.D. v. Admor. Gen. de Elecciones, 111 DPR 199, 207 (1981).

**Con esto en mente, es preocupante que, *a priori*, una mayoría de esta Curia se convierta en un comité evaluador y decida que los aspirantes en cuestión no pueden acceder a la papeleta el próximo mes de noviembre, al aplicarles un requisito inexiste y, al así proceder, incurrir en un acto arbitrario.**

En esta coyuntura, precisa reseñar, brevemente, la doctrina de acceso a la papeleta. En PAC v. ELA I, 150 DPR 359, 388-389 (2000), este Tribunal explicó:

> En aquellos casos en que se impugna la constitucionalidad de una ley que reglamenta el acceso a la papeleta electoral, no se impone automáticamente a los tribunales el deber de aplicar un escrutinio estricto. El someter automáticamente cada disposición electoral al escrutinio estricto le ataría las manos a los estados en su interés de reglamentar para garantizar que las elecciones se lleven a cabo de forma equitativa y eficiente.
>
> Ante un reclamo de inconstitucionalidad al amparo de la doctrina de acceso a la papeleta, corresponde al tribunal, en primer lugar, determinar si la restricción es severa, irrazonable o discriminatoria, y examinar la naturaleza y magnitud del daño alegado y la dimensión del perjuicio

ocasionado. Si se determina que la restricción es severa, irrazonable o discriminatoria, se sujeta la reglamentación al escrutinio estricto.

Al amparo de la doctrina de acceso a la papeleta se entiende que es severa aquella restricción que tiene el efecto de hacer imposible que todo nuevo candidato o asociación política pueda tener acceso a la papeleta electoral. La pregunta que debe contestarse es si un candidato que ejerce una diligencia razonable puede satisfacer los requisitos impuestos por el Estado. (Cita depurada). <u>Íd.</u>

A través de este crisol, aunque el estatuto en cuestión no exige el requisito de endosos, si lo exigiera, habría que mirarlo con sospecha. Máxime cuando **"se ha utilizado con frecuencia […] para impedir efectivamente la entrada de nuevos jugadores al [ruedo] electoral. Tanto en Estados Unidos como en Puerto Rico, la ley fue creada y es regularmente modificada por legisladores que pertenecen a los dos partidos principales"**. (Negrilla suplida). A. Padilla Babilonia & I. Molina Villarino, <u>Las nuevas reglas del juego electoral: un análisis constitucional del acceso a la papeleta</u>, 85 Rev. Jur. UPR 1143, 1147 (2016).

El requisito de presentación de peticiones de endosos —por fíat judicial— tornaría en superflua la distinción entre las primarias y los métodos alternos, y despojaría a los partidos políticos que se acogieron a estos últimos de las facultades que se les confiere por ley y daría al traste con la deferencia debida a sus procesos internos. Lo resuelto por una mayoría es aún más dramático, pues redundará en que los encasillados —de los aspirantes descalificados— en las papeletas de las elecciones de noviembre de 2024 **aparecerán en blanco**.

Resulta contradictorio que, por un lado, la mayoría pregone la importancia de la "uniformidad" para mantener el orden en el proceso electoral, a la vez que, por el otro, el propio Código Electoral de 2020 no trata de manera uniforme a quienes logran acceso a la papeleta electoral en noviembre. En dicha papeleta figurarán tanto candidatos que no tuvieron que presentar peticiones de endosos —por múltiples razones— como aquellos que tuvieron la obligación de cumplir con ese requisito. Ese esquema lo delineó la propia Asamblea Legislativa y es, de por sí, heterogéneo y da al traste con el argumento de la presunta uniformidad.

**VI**

La disposición correcta de esta controversia debió conducir a la mayoría del Tribunal a resolver, sin más, que la legislación electoral vigente —interpretada de la forma correcta y con particular atención a los delicados intereses involucrados—, en modo alguno instituye un requisito de endosos para los aspirantes cuyos partidos políticos se acogieron a un método alterno. Además, de considerar que esa exigencia surge de un reglamento, este es, sin duda, nulo. Debió pesar también en su análisis los efectos trascendentales de su decisión sobre los procesos democráticos y el derecho fundamental al voto, pues súbitamente se despoja de toda oportunidad a los aspirantes impugnados.[34]

---

[34] A su vez, el dictamen constituye de cortapisa a lo que dispone el Art. 7.9 del Código Electoral de 2020, a los efectos de que "**cada [p]artido [p]olítico tendrá derecho a nominar un candidato para cada cargo público electivo objeto de votación en una Elección General**".

En vista de que ese no fue el curso de acción adoptado, es mi obligación consignar mi total inconformidad con lo resuelto.[35]

Maite D. Oronoz Rodríguez
Jueza Presidenta

---

16 LPRA sec. 4619. En este caso, se limita la oportunidad de nominar candidatos a la papeleta legislativa.

[35] Aclaro que con el único aspecto con el que concurro con la decisión mayoritaria, aunque por los fundamentos que he expuesto en esta ponencia, es el de permitir que la Hon. Ana Irma Rivera Lassén figure en la papeleta de noviembre de 2024, pues es lo que procede en derecho.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Recurridos

v.

Hon. Ana Irma Rivera Lassen Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabé Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen

CC-2024-0266

cons. con

CC-2024-0267

Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo. Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana

Recurridos

José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort

Peticionarios

Hon. Jorge Alfredo Rivera Segarra Representante Distrito 22; Hon. Héctor Santiago Torres Senador Distrito de Guayama; Lcda. Yulixa Paredes Albarrán Aspirante a Representante Distrito 13; y Jorge Quiles Gordillo Aspirante a Representante por Acumulación

Peticionarios

v.

Hon. Ana Irma Rivera Lassen Aspirante Comisionada Residente MVC; Edgardo Cruz Vélez Aspirante Comisionado Residente MVC; Alejandro Santiago Calderón Aspirante Senador por Acumulación MVC; Ramón Cruz Díaz Aspirante Senado por Acumulación MVC; Edwin Marrero Martínez Aspirante Senado por Acumulación MVC; Hon. Rafael Bernabé Riefkohl Aspirante Senador por Acumulación MVC; Hon. Mariana Nogales Molinelli Aspirante Representante por Acumulación MVC; Lcdo. Olvin Valentín Rivera Aspirante Representante por Acumulación MVC; Gladys Myrna Conty Hernández Aspirante Representante por Acumulación MVC; Anthony Sánchez Aponte Aspirante a Representante por Distrito 38 PD; Sthephen Gil Álamo Aspirante a Representante por Distrito 38 PD; Wilfredo Pérez Torres Aspirante a Representante por Distrito 38 PD; Hon. Jessika Padilla Rivera Presidente Interina CEE; Lcda. Lilliam Aponte Dones Comisionada Movimiento Victoria Ciudadana; Lcda. Vanessa Santo Domingo Cruz Comisionada Partido Nuevo Progresista; Lcda. Karla Angleró Comisionada Partido Popular Democrático; Roberto Iván Aponte Comisionado Partido Independentista Puertorriqueño; Lcdo.

| Nelson Rosario Comisionado Proyecto Dignidad; y Partido Movimiento Victoria Ciudadana |  |
| Recurridos |  |
| José "Pichy" Torres Zamora; Keren Riquelme Cabrera; Leyda Cruz Berríos; y Marigdalia Ramírez Fort |  |
| Recurridos |  |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 10 de junio de 2024.

> **"Si su partido ha sido acogido por método alterno de selección según el Código Electoral de Puerto Rico de 2020 no es requisito presentar peticiones de endosos"**.
>
> > – Notificación que recibieron los candidatos descalificados por parte del Sistema de Notificación de Intención de Aspirar a una Candidatura y Sistema de Endosos operado por la Comisión Estatal de Elecciones.

Hoy, teníamos la oportunidad de ponerle un detente a la improvisación, desorganización y contradicciones que recientemente ha exhibido la dirección administrativa de la Comisión Estatal de Elecciones (CEE). Específicamente, en el contexto de la intervención unilateral de la Presidencia de la CEE en los métodos alternos para selección de candidatos del Movimiento Victoria Ciudadana y Proyecto Dignidad. En su lugar, hoy se valida una acción administrativa que atenta

directamente contra lo dispuesto en el Código Electoral de 2020, Ley Núm. 58-2020, 16 LPRA sec. 4501 et seq. (Código Electoral de 2020), la interpretación integral de sus reglamentos y, sobre todo, las protecciones y derechos que garantiza la Constitución de Puerto Rico.

El resultado es que la igualdad electoral **real** se vio reducida por una igualdad **artificialmente creada** para equiparar distintos métodos de acceder a una papeleta electoral. **Como no puedo avalar que se laceren estas garantías de gran envergadura y, mucho menos, que se instaure un método alterno selectivo —disfrazado de una falsa igualdad— que tiene el efecto de excluir que ciertos candidatos participen de las elecciones generales del 2024, disiento**.

Nuestro rol en esta controversia se centraba en contestar si ciertos aspirantes que presentaron su intención de candidatura para las elecciones generales de 2024 bajo el método alterno delineado por sus partidos políticos y que cumplieron con todos los requisitos dispuestos en el Código Electoral de 2020 tenían que, además, recoger peticiones de endosos.

La respuesta a tal interrogante es de consecuencias trascendentales para la credibilidad de la Comisión Estatal de Elecciones (CEE) como institución con la responsabilidad de llevar a cabo los procesos y eventos electorales en un ambiente de absoluta pureza e imparcialidad y, en

específico, para la integridad de nuestras instituciones, incluyendo al Poder Judicial. **De ahí la importancia de que esta controversia fuese resuelta con el máximo rigor jurídico.**

Pese a lo anterior, en la tarea de brindar una contestación, este Tribunal interpreta erróneamente el Código Electoral de 2020 y concluye que el recogido de endosos era indispensable para que estos aspirantes pudiesen ser certificados. Con esta interpretación equivocada, ciertos candidatos del Movimiento Victoria Ciudadana y el Proyecto Dignidad quedarán fuera de la papeleta, infringiéndose así el axioma constitucional de la igualdad electoral, el derecho a la libre asociación y al ejercicio del voto del electorado puertorriqueño.

Expuesta la médula de la controversia, adelanto, como punto de partida, que mi **disenso** tiene como fundamentos los postulados siguientes:

**Postulado #1:**

El Código Electoral de 2020 no exige que los aspirantes de un partido que se acogió al método alterno para la nominación de sus candidatos tengan que recoger endosos como parte del proceso de presentación de su candidatura. De hecho, no cabe hablar de este requisito en la selección de aspirantes a través del método alterno debido a que el recogido de endosos exigido para la primaria de ley y el

procedimiento alterno son mutuamente excluyentes e independientes entre sí.

**Postulado #2:**

La eliminación en el Código Electoral de 2020 de la exención contenida en las leyes electorales predecesoras que expresamente disponía que los partidos políticos acogidos a un método alterno no pueden exigir a los aspirantes recoger endosos, no implica que el legislador tipificó el requerimiento obligatorio de endosos para este procedimiento. Es decir, la ausencia de tal exención no puede entenderse como que actualmente sí es necesario el recogido de endosos, pues de haber sido esa la intención de la Asamblea Legislativa, así debió hacerlo constar expresamente en el Código Electoral de 2020. **Sin embargo, no lo hizo.**

**Postulado #3:**

El Código Electoral de 2020 reafirma que los partidos políticos tienen el poder de reglamentar cómo se conducirán sus procesos internos relacionados con la selección de sus candidatos, siempre y cuando cumplan con ciertas garantías mínimas. No siendo los endosos una de esas garantías mínimas requeridas dispuestas en la ley, la forma en que los partidos políticos manejan internamente el método alterno para la nominación de sus candidatos es una cuestión en la que los tribunales están limitados de inmiscuirse. Sobretodo cuando el efecto de esa intromisión es para dictaminar un

requerimiento adicional no legislado que tiene la consecuencia de vetar irrazonablemente el acceso a la papeleta electoral, coartando múltiples garantías constitucionales.

**Postulado #4:**

La Sección 3.1 del Reglamento para la radicación de candidaturas de los partidos políticos y candidatos independientes del 15 de julio de 2023, pretende imponerle el requisito de recogido de endosos a los aspirantes que participaron del proceso de método alterno. No obstante, esta disposición debe declararse nula por añadir requisitos que no fueron contemplados en su ley habilitadora: el Código Electoral de 2020. Ello, particularmente, dado que la Asamblea Legislativa así pudo requerirlo, mas, según adelantado, optó por no incluir tal exigencia.

**Postulado #5:**

Es incorrecta jurídicamente la conclusión de que la celebración del método alterno posterior a la fecha establecida reglamentariamente violentaría la prerrogativa de las personas afiliadas y los miembros del partido a reclamar su derecho a solicitar primarias. **Lo anterior es más crucial todavía dado que, en este caso, en ningún momento un elector del Movimiento Victoria Ciudadana o el Proyecto Dignidad ejerció esta prerrogativa, por lo cual tal premisa resulta totalmente especulativa.**

Igualmente, tal y como anticipé, la introducción de tal limitación por la vía reglamentaria, en ausencia de una autorización por parte del Código Electoral de 2020, es <u>ultra vires</u>. En todo caso, la falta de designación de una fecha cierta anterior para que en el supuesto de que se solicite primaria de ley en alguno de los escaños donde los aspirantes fueron seleccionados mediante el método alterno, de modo que finalmente todos los aspirantes tengan la misma fecha límite, es un vacío provocado por la Asamblea Legislativa que no puede tener el efecto de perjudicar los derechos garantizados en el Código Electoral y en la Constitución de Puerto Rico. Más que todo, cuando existen remedios en equidad que no lesionarían garantías constitucionales y que la Mayoría ha descartado para echar mano simplemente a la opción más drástica.

**Postulado #6:**

La descalificación ordenada por este Tribunal vulnera el axioma de la igualdad electoral, el derecho a la libre asociación y el ejercicio al voto garantizado por la Constitución de Puerto Rico. Ello cobra una importancia mayor en el caso del Movimiento Victoria Ciudadana, ya que estos llevaron a cabo asambleas distritales y una asamblea nacional en la que los miembros de esta colectividad seleccionaron con su voto a los candidatos de su preferencia para los próximos comicios electorales.

**Postulado #7**:

Finalmente, la CEE notificó expresamente a las y los aspirantes que, toda vez que sus partidos se acogieron al método alterno, no tenían que presentar peticiones de endosos. Cónsono con ello, desde el inicio y hasta la culminación del procedimiento administrativo, la CEE no rebatió la corrección de la notificación expresa que les representó a esos efectos. Por tanto, aún si se concluyera que se debían recoger los endosos en cuestión —**lo cual reafirmo, no era necesario**—, los tribunales tenían el deber de proveer un remedio justo a todas las partes. Como mínimo, ese remedio requería la concesión de un tiempo razonable para que los aspirantes cumplieran con la presentación de los endosos en controversia.

**Indudablemente, la aplicación de estos postulados resultaba esencial para impartirle confianza a nuestro sistema electoral. No podíamos decidir en abstracción de lo que realmente ocurrió.**

En vista de que con la descalificación dictada por este Tribunal hubo un sesgo impermisible del Derecho aplicable, desafortunadamente ciertos candidatos de los partidos Movimiento Victoria Ciudadana y Proyecto Dignidad no podrán competir en las próximas elecciones generales. **Como disiento de este derrotero, procedo a exponer el marco legal en el que se fundamenta mi postura.**

**I**

La controversia ante nuestra consideración exige precisar si bajo nuestro sistema electoral es necesario el recogido de endosos por parte de un grupo de aspirantes pertenecientes a un partido político que se acogió al mecanismo alterno para la selección de sus candidatos.

Por un lado, ciertos querellantes e interventores afiliados al Partido Popular Democrático (PPD) y al Partido Nuevo Progresista (PNP) (en conjunto, Querellantes) presentaron una <u>Demanda</u> en la que arguyeron que determinados aspirantes pertenecientes a los partidos Movimiento Victoria Ciudadana y Proyecto Dignidad no radicaron al 30 de diciembre de 2023 ante la CEE los expedientes de aquellas personas que fueron seleccionadas como candidatos únicos.

El grupo de aspirantes está compuesto por doce (12) personas que buscan ocupar diversos escaños en la comisaría residente, el Senado y la Cámara de Representantes. Específicamente, estos son: la Hon. Ana Irma Rivera Lassen; el Sr. Edgardo Cruz Vélez; el Sr. Alejandro Santiago Calderón; el Sr. Ramón Cruz Díaz; el Sr. Edwin Marrero Martínez; el Hon. Rafael Bernabe Riefkohl; la Hon. Mariana Nogales Molinelli; el Lcdo. Olvin Valentín Rivera; la Sra. Gladys Myrna Conty Hernández; el Sr. Anthony Sánchez Aponte; el Sr. Sthephen Gil Álamo, y el Sr. Wilfredo Pérez Torres (Querellados).

Los Querellantes expresaron que los Querellados estaban obligados a recoger peticiones de endosos como condición para poder participar de los próximos comicios electorales. Toda vez que no lo hicieron, solicitaron que estos fuesen descalificados al amparo del Art. 7.5 del Código Electoral de 2020, supra.

En respuesta, los Querellados contestaron la demanda y presentaron sendas mociones dispositivas. De entrada, plantearon que los Querellantes carecían de legitimación activa, pues no se cumplían los requisitos doctrinales exigidos. En los méritos, expusieron una diversidad de razones por las cuales entendían que el recogido de endosos no operaba contra ellos, ya que sus partidos se habían acogido al método alterno de selección de candidatos en lugar de las primarias de ley.

Luego de varios trámites, los cuales incluyeron una vista argumentativa, el Tribunal de Primera Instancia emitió una Sentencia en la que estableció que algunos de los Querellantes sí contaban con legitimación activa para llevar la causa de acción. Seguido de ello, evaluó el reclamo de los Querellantes en los méritos.

En principio, el foro primario analizó el Art. 7.15 del Código Electoral de 2020, supra, y determinó que la única interpretación lógica de tal disposición es que esta "establece [tres] (3) categorías de electores que están obligados a recoger endosos, a saber: 1) el que desee

concursar en primarias; 2) el que desee ser aspirante; y 3) los candidatos independientes".[1] Fundamentado en ello, concluyó que, como "aspirantes", los Querellados tenían la obligación de recoger endosos.

Amparado en que aún si se entendiera que el texto del Art. 7.15 no fuese claro, el foro primario articuló que la intención legislativa al aprobar el Código Electoral de 2020 es que todos los aspirantes deben cumplir con tal requisito, ya que se eliminó la exención al recogido de endosos contenida en las leyes electorales predecesoras para quienes se regían bajo un método alterno. Sentenció que "[s]i la intención de la Asamblea Legislativa hubiese sido mantener la norma igual a los Códigos Electorales anteriores, no hubiese removido la frase que exime del recogido de endosos".[2]

Por otro lado, el Tribunal de Primera Instancia acudió al Art. 7.11 del Código Electoral de 2020, supra, y señaló que celebrar un método alterno posterior al término establecido reglamentariamente violentaría la prerrogativa de otros miembros o afiliados del partido de reclamar el derecho a primaria bajo el Art. 7.11 del Código Electoral de 2020, 16 LPRA sec. 4621(4), ya que no se tendría tiempo para el recogido de endosos. Por último, se amparó en la Sección

---

[1] Sentencia [del Tribunal de Primera Instancia], pág. 24.

[2] Íd., pág. 25.

3.1 del Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes, supra, para finiquitar la necesidad de la recolección de endosos antes del mediodía del 30 de diciembre de 2023.

Inconformes, los Querellados pertenecientes al Movimiento Victoria Ciudadana y Proyecto Dignidad acudieron al Tribunal de Apelaciones. Tras la celebración de, incluso, una vista oral, el foro apelativo intermedio determinó, en esencia, que el reconocimiento de legitimación activa realizado por el foro primario en cuanto a ciertos Querellantes fue erróneo. Así, y tras estimar que ninguno de los Querellantes había sufrido un daño real, revocó el dictamen recurrido con la consecuencia de dejar sin efecto la descalificación de los candidatos impugnados.

Tras ello, los Querellantes recurrieron a este Tribunal. Luego de la emisión de una multiplicidad de Resoluciones para señalar una vista oral, ordenar la presentación de alegatos, así como el otorgar el permiso parcial a solo ciertas partes para argumentar, una mayoría de este Tribunal determina que los Querellantes ostentan legitimación activa y, acto seguido, revocan al foro apelativo intermedio en sus méritos. Esto último con la consecuencia de descalificar a varios candidatos del Movimiento Victoria Ciudadana y Proyecto Dignidad, impidiéndoles que aparezcan en la papeleta de las elecciones generales del 2024.

Ahora bien, previo a adentrarnos en el Derecho sustantivo de la controversia, puntualizaré varios aspectos sobre el asunto de umbral de la legitimación activa.

## II

## A. <u>Legitimación activa estatutaria</u>
## <u>e interés público</u>

En primer lugar, destaco que, consecuente con mi visión de acceso a la justicia, la legitimación activa como parte de una de las doctrinas de autolimitación judicial bajo el principio de justiciabilidad debe evaluarse como una norma de prudencia en cuanto a la intervención judicial en una controversia en particular.[3] Esto es así debido a que en el caso de Puerto Rico, la legitimación activa —la cual, en esencia, procura que el pleito sea tramitado a nombre de quien por ley tenga el derecho de lo que se reclama— fue creada jurisprudencialmente.

De ahí que, al examinar quién es esa persona con capacidad para ser demandante, este Tribunal ha concluido inequívocamente que, "en ausencia de un estatuto que expresamente confiera legitimación activa a ciertas

---

[3] (Énfasis en el original omitido). <u>Amadeo Ocasio et al. v. Gobernador et al.</u>, 211 DPR 278, 320 (2023) (Opinión de conformidad del Juez Asociado Señor Estrella Martínez) (citando a J. M. Farinacci Fernós, <u>Cualquier persona: La facultad plenaria de la Asamblea Legislativa para otorgar legitimación activa por la vía estatutaria</u>, 84 Rev. Jur. UPR 359, 366 (2015)).

personas",[4] es que entraría en función que el litigante demuestre su capacidad bajo los criterios de la legitimación activa ordinaria. Por tanto, como primer paso al examinar la existencia y el alcance de la legitimación codificada, los tribunales deben auscultar si alguna disposición legal le confiere una causa de acción a determinada persona.[5]

En caso de que determinada ley conceda legitimación estatutariamente, la persona designada estará capacitada para presentar su reclamo por pura voluntad legislativa sujeto únicamente a las exigencias dispuestas en la ley correspondiente.[6] En estos casos, "el elemento decisivo será determinar el juicio legislativo en cuanto a las circunstancias que deben existir para que una parte pueda presentar un asunto para la consideración del tribunal".[7] Es decir, lo esencial para viabilizar la capacidad para

---

[4]Hernández Torres v. Gobernador, 129 DPR 824, 835 (1992).

[5]B-Billboard BG, LLC v. Out of Home Media, LLC, 2024 TSPR 51 (Opinión disidente del Juez Asociado Señor Estrella Martínez). En síntesis, la legitimación activa estatutaria cobra eficacia "cuando una ley, ya sea de manera expresa o implícita, otorga a una persona legitimación activa para instar una acción judicial, independientemente de que esta haya sufrido un daño particular, más allá del mero hecho de la violación de la ley". Farinacci Fernós, La justiciabilidad en Puerto Rico, 1ra ed., Interjuris, 2024, pág. 139.

[6]Íd.

[7]Farinacci Fernós, La justiciabilidad en Puerto Rico, supra, pág. 132.

demandar es cumplir con aquellos requisitos consignados en el estatuto.[8]

Por otra parte, es en caso de que no exista una disposición legal concediendo legitimación activa por la vía estatutaria que entra en función la legitimación ordinaria, la cual generalmente exige que la parte demandante acredite: "(1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto o hipotético; (3) que existe una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la causa de acción surge bajo el palio de la Constitución o de una ley".[9]

Ahora bien, un examen del Código Electoral de 2020 revela que, dada la importancia del voto y en beneficio de la protección existente contra toda coacción, se le confirió legitimación estatutaria a los electores que procuren vindicar este derecho. Por ser el sufragio la más clara expresión y representar la intención de la voluntad democrática del Pueblo, mediante el Art. 5.1 del Código antes aludido:

> [s]e concede a los electores la legitimación activa para iniciar o promover cualquiera acciones legales al amparo de este Artículo, ante el Tribunal de Primera Instancia que corresponda de

---

[8]**Enfatizo, los rigorismos característicos de la legitimación ordinaria son ajenos a la legitimación estatutaria.** B-Billboard BG, LLC v. Out of Home Media, LLC, supra.

[9]Torres Montalvo v. Gobernador ELA, 194 DPR 760, 767 (2016) (citando a Hernández Torres v. Gobernador, supra, pág. 836).

conformidad con el Capítulo XIII de esta
Ley.[10]

Siendo ello así, una las instancias que habilita que los electores acudan a los tribunales bajo la carta de derechos codificada en el Art. 5.1 del Código Electoral de 2020, <u>supra</u>, es cuando lo que se cuestiona es que se le ha otorgado primacía a los derechos y las prerrogativas de los partidos políticos sobre los derechos electorales individuales de los ciudadanos electores.[11]

El Código Electoral de 2020 viabiliza diversas formas en la que los electores podrán guiar sus reclamos electorales. Una de ellas se estableció mediante el Art. 7.5, el cual dispone que

> Cualquier Aspirante o Candidato nominado podrá ser descalificado como tal, por el Tribunal de Primera Instancia, cuando medie querella porque no cumple con los requisitos impuestos por la Constitución o la ley, o cuando se demostrare que ha violado cualesquiera de las disposiciones de esta Ley o de sus reglamentos.
> El Aspirante o Candidato impugnado deberá contestar bajo juramento dicha querella, dentro de los diez (10) días siguientes de haber sido notificada.
> Si el Tribunal de Primera Instancia, designado de conformidad con el Capítulo XIII de esta Ley, encontrare que de las alegaciones surge una controversia real, deberá citar a vista a ser realizada dentro de los diez (10)

---

[10]16 LPRA sec. 4561.

[11]Concretamente, lo que protege el Art. 5.1(2) es "[l]a supremacía de los derechos electorales individuales del ciudadano sobre los derechos y las prerrogativas de los Partidos Políticos, Candidatos Independientes y agrupaciones políticas". 16 LPRA sec. 4561.

días de haber el querellado presentado su contestación. Dicho término podrá ser reducido por el Tribunal de Primera Instancia, según lo requieran las circunstancias del caso.

Teniendo en cuenta lo anterior, queda claro que todo elector está legitimado estatutariamente para solicitar la descalificación de cualquier aspirante o candidato, siempre y cuando medie querella afirmando que estos incumplieron con los requisitos impuestos en la Constitución, el Código Electoral de 2020 o sus reglamentos. Destaco que no se exige la consumación del daño claro y palpable característico de la legitimación activa ordinaria, sino que basta con una alegación a los efectos de que existe un incumplimiento con la ley electoral para que los tribunales se vean obligados a dilucidar el reclamo.

Sobre el alcance de la legitimación activa estatutaria, el Profesor Farinacci Fernós comenta lo siguiente:

> [E]sto explica por qué una persona que no ha sido directamente agraviada puede, de todos modos, recurrir al foro judicial si la Asamblea Legislativa ha autorizado tal accionar mediante la otorgación de legitimación activa por la vía estatutaria. En esos casos, la parte promovente está autorizada —o legitimada— para presentar su acción por pura voluntad legislativa. Precisamente, la existencia de esa alternativa es indicativa de que la doctrina de legitimación activa no implica directamente el principio de separación de poderes, sino que surge mayormente del requisito de autolimitación judicial de caso o controversia […].[12]

---

[12] Farinacci Fernós, supra, pág. 132.

Aquí, no existe duda de que los Querellantes aspirantes son, a su vez, electores[13] que válidamente presentaron su reclamo al amparo del Art. 7.5 por, entre otros fundamentos, alegar que los respectivos partidos políticos de los Recurridos, mediante sus reglamentos internos, establecieron que sus aspirantes no tenían que recoger endosos.[14]

Por lo anterior, los Querellante teorizaron que esta disposición contravenía el Código Electoral de 2020 y sus reglamentos, los cuales, supuestamente, exigen el recogido de endosos luego de cierta fecha.[15]

---

[13]Véase, en lo particular, que el Art. 5.2 del Código Electoral de 2020, supra, establece que un elector "es todo ciudadano que haya cumplido con todos los requisitos de inscripción y la actualización de sus datos en el registro General de Electores […]. 16 LPRA sec. 4562.

[14]Particularmente, en el caso del Movimiento Victoria Ciudadana, reglamentariamente se dispuso lo siguiente:

> [L]as personas que se sometan al presente proceso de nominación y elección de candidaturas, **no tendrán que cumplir con los requisitos de presentación de peticiones de endoso** para Primarias de Ley para calificar como candidata o candidato del Movimiento.

Sección 2.1 del Reglamento para la elección de candidaturas para las elecciones Generales de 2024 del Movimiento Victoria Ciudadana, pág. 7.

[15]La Sección 3.1 del Reglamento para la radicación de candidaturas de los partidos políticos y candidatos independientes, es la que establece tal requerimiento:

> Las personas seleccionadas mediante un Método Alterno de Nominación no tendrán que cumplir con los requisitos de presentación de peticiones de endoso para primarias para calificar como

A la luz del Art. 5.1, el cual, tal y como expuse, le otorga primacía a los derechos individuales de los electores sobre los de los partidos políticos, un elector que manifieste que la reglamentación interna de su partido, o el de su opositor, vulnera los derechos contenidos en el Código Electoral de 2020 o sus reglamentos, es suficiente en Derecho para abrir las puertas del Poder Judicial. **Habida cuenta de que estamos ante la figura de la legitimación estatutaria, no se puede exigir más.**

En segundo lugar, resalto que, consecuentemente, este Tribunal ha reconocido legitimación activa, aunque no se configuren los requisitos doctrinales tradicionales, en controversias donde media un alto interés público y existen cuestiones constitucionales de gran envergadura. <u>Fuster v. Busó</u>, 102 DPR 327 (1974);[16] <u>Acevedo Vilá v. Meléndez</u>, 164 DPR

---

candidato(a); siempre y cuando sean escogidos y su expediente, con los documentos requeridos, sea radicado por su Partido Político como candidato único en la Comisión en o antes de las 12:00 (doce en punto) del medio día del 30 de diciembre de 2023.

Íd., págs. 15-16.

[16]"Decimos que es controvertible la capacidad jurídica de los demandantes porque este pleito tiene el propósito nominal de sentar en la Cámara de Representantes de Puerto Rico al señor Roberto Sánchez Vilella pero el señor Sánchez Vilella quien sería la persona realmente interesada no es demandante ni es parte en el litigio. **Sin embargo, debido al interés público del asunto y a que están envueltas en él varias disposiciones constitucionales, una disposición de la Ley Electoral y una actuación de la Junta Estatal de Elecciones, hemos decidido entrar en los méritos**".

875 (2005);[17] <u>Torres Montalvo v. Gobernador ELA</u>, 194 DPR 760 (2016).[18]

**Toda vez que la Querella incoada procura la descalificación de ciertos candidatos de diversos partidos opositores por el presunto incumplimiento con la ley electoral, asunto que implica uno de los más altos intereses existentes en cualquier democracia y con el potencial de infringir el derecho fundamental al voto y a la libre asociación, así como el axioma de la igualdad electoral, se justifica, por este otro fundamento, la concesión de legitimación activa.**

---

(Negrillas suplidas). <u>Fuster v. Busó</u>, 102 DPR 327, 328 (1974).

[17]"<u>Ahora bien</u>, **<u>y con el propósito de que no quede duda en la mente de persona alguna sobre la validez de los actos de la Cámara de Representantes en una controversia de tanta importancia pública como la de autos</u>**, <u>aun aceptando —a los fines de la argumentación— que los peticionarios tuvieran acción legitimada ("standing") para instar el recurso de "mandamus", el resultado sería el mismo</u>". (Negrillas suplidas y énfasis en el original). <u>Acevedo Vilá v. Meléndez</u>, 164 DPR 875, 889-890 (2005).

[18]"Esto nos lleva a concluir que el licenciado Torres no posee legitimación activa, lo que de ordinario nos conduciría a abstenernos, prudencialmente, de entrar en los méritos de este asunto. Véanse, por ejemplo: <u>Acevedo Vilá v. Meléndez</u>, 164 DPR 875 (2005); <u>Fuster v. Busó</u>, 102 DPR 327 (1974).

No obstante, tal y como hicimos en <u>Nieves Huertas et al. v. ELA I</u>, supra, donde también se cuestionó, entre otros, la legitimidad de unos puestos judiciales, y en **consideración al alto interés público que reviste el asunto ante nos, entendemos necesario adentrarnos finalmente en los méritos de esta controversia de manera inmediata**". (Negrillas suplidas). <u>Torres Montalvo v. Gobernador ELA I</u>, 194 DPR 760, 767-68 (2016).

Aclarado ese extremo, si bien es cierto que los Querellantes tienen legitimación para cuestionar si ha habido una violación de reglamento o ley —**aunque, como veremos a continuación, ello no ha ocurrido**— destaco que, desde el prisma del razonamiento mayoritario, resulta obvio que el verdadero carácter adversativo de esta controversia sería si un afiliado de uno de los partidos que celebró método alterno hubiese invocado su derecho a celebrar primarias de ley. **Sin embargo, en realidad, ninguna persona perteneciente al Movimiento Victoria Ciudadana o al Proyecto Dignidad solicitó participar en las primarias de ley para este ciclo electoral.**

En ese sentido, la Mayoría obvia que la supuesta necesidad de requerir endosos a partir de determinado momento está predicada en alegadamente procurar que se pueda celebrar una primaria que en este ciclo electoral ni siquiera se solicitó.

Superado el asunto jurisdiccional de umbral, corresponde analizar la controversia en sus méritos. Veamos.

### III

Al aprobarse el **Código Electoral de 2020** se reafirmaron las virtudes de que el electorado puertorriqueño pueda asociarse con su partido o candidato de preferencia y así elegirlo mediante su voto directo, de manera que estos últimos puedan tramitar los reclamos de los constituyentes

frente al Gobierno.[19] Claro está, previo a aparecer en la papeleta electoral, una o un candidato debe cumplir con ciertos requisitos, los cuales, en el caso de los partidos políticos, dependerán de si estos optan por celebrar unas primarias de ley o si se acogen a un método alterno para la selección de sus candidatos.

En virtud del Art. **7.1** del Código Electoral de 2020, 16 LPRA sec. 4611, se creó una Comisión de Primarias para cada partido político y, adicionalmente, se dispuso que la Comisión Estatal de elecciones aprobará un reglamento y manual de primarias y métodos alternos de nominación. Naturalmente, la aprobación de tales normas debe obedecer las garantías mínimas dispuestas en el Código Electoral para ambos procesos de nominación. Íd.

Así las cosas, el **Art. 7.10** del Código Electoral, 16 LPRA sec. 4620, regula lo concerniente a la determinación y celebración de primarias. Como veremos, esta disposición establece la obligación de celebrar primarias en aquellos casos en que surja más de un aspirante calificado, salvo que la cantidad de aspirantes sea igual o menor que las candidaturas que el partido postuló, en cuyo caso se certifica automáticamente como candidato único.

Por otra parte, en el **Art. 7.11** del Código antes citado, 16 LPRA sec. 4621, se otorga a los partidos políticos la

---

[19] 16 LPRA sec. 4502.

potestad de estructurar internamente un método alterno a las primarias de ley para la nominación de sus candidatos, siempre y cuando cumplan con una serie de garantías mínimas, las cuales examinaremos más adelante.

Ahora bien, el Art. 7.15, 16 LPRA sec. 4625, dispone que la Comisión Estatal de Elecciones reglamentará todo asunto relacionado con las peticiones de endosos. Asimismo, añade que "el periodo para la presentación de peticiones de endosos para **Aspirantes Primaristas** y **Candidatos Independientes** a cargos públicos electivos comenzará a partir del 1ro. de diciembre [del 2023] y concluirá al mediodía (12:00p.m.) del 15 de febrero [del 2024]". (Negrillas y énfasis suplido). Íd. Más adelante, dictamina que "[c]ualquier Elector que desee concursar en unas primarias, como aspirante o como candidato independiente, además de cumplir con los requisitos de esta Ley y los reglamentos de su Partido y la Comisión, deberá presentar ante la Comisión la cantidad de peticiones de endoso requerida" por el Código Electoral de 2020 para el cargo público aplicable. Íd.

En acorde con el mandato estatuido en el Art. 7.1 del Código Electoral de 2020, supra, la Comisión Estatal de Elecciones aprobó el Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes, supra. Este, en lo aquí pertinente, estableció en su Sección 3.1 que las personas seleccionadas

mediante un método alterno no tendrán que presentar peticiones de endosos, siempre y cuando sean certificadas como candidatos únicos en o antes de las 12:00 del medio día del 30 de diciembre de 2023. Íd., pág. 17.

Es al amparo del Art. 7.15 del Código Electoral de 2020 y de la Sección 3.1 del Reglamento antes aludido que este Tribunal concluye que los Recurridos debían recoger endosos si, a cierta fecha, no eran presentados como candidatos únicos.

A continuación, expongo los múltiples errores que condujeron a esta conclusión, la cual tiene el efecto de ir en contra del Derecho electoral y de las garantías de la Carta Magna de Puerto Rico.

A. **El Código Electoral de 2020 particulariza que la recolección de endosos le aplica únicamente a los aspirantes primaristas y a los candidatos independientes**.

De inicio, preciso que el Art. 2.3 del Código Electoral de 2020 define el término "'Aspirante' **o** 'Aspirante Primarista'" como "[t]oda persona natural que participe en los procesos de **primarias internas o** los **métodos alternos de nominación** de un partido político […]". (Negrillas y énfasis suplido). 16 LPRA sec. 4503(8). Asimismo, establece que las "primarias" son el "[p]roceso de Votación a través del cual se seleccionan los Candidatos a cargos públicos electivos con arreglo a esta Ley y a las reglas que adopte la Comisión

y el organismo directivo del Partido Político concernido".
Íd., sec. 4503(92).

Ahora bien, ¿cuándo se deben celebrar las primarias? Eso, por supuesto, lo contesta la ley electoral vigente.

Al respecto, el **Art. 7.10** del Código Electoral de 2020, titulado "Determinación y realización de primarias", preceptúa lo siguiente:

> **(1)** Todo Elector afiliado y miembro de un partido político tendrá derecho a que se le considere por el organismo directivo para ser nominado como Aspirante en primaria a cualquier cargo público electivo, siempre que sea un Aspirante calificado porque cumple con los requisitos de esta Ley, sus reglamentos y los reglamentos del partido.
> **(2)** Todo partido político tendrá la obligación de realizar primarias en aquellos casos donde surja más de un Aspirante calificado.
> **(3)** Certificaciones automáticas de aspirantes como candidatos únicos
>   **(a)** El Presidente de la Comisión de Primarias del partido que corresponda certificará como candidatos únicos a los aspirantes a gobernador, comisionado residente en Washington D.C. senador o representante por acumulación o senador o representante por distrito, alcalde y legislador municipal que cumplan con todos los requisitos legales y reglamentarios de sus respectivos partidos políticos para participar en primarias sin necesidad de realizarlas en los siguientes casos:
>       **i.** Si la cantidad de Aspirantes es igual o menor que la cantidad máxima de candidatos que el partido político pueda o deba postular para esos cargos en las próximas Elecciones Generales.
>       **ii.** Si la cantidad de Aspirantes es igual o menor que once (11) para senadores o representantes por acumulación. En los casos de

senadores por distrito, esta disposición aplica si la cantidad de aspirantes es igual o menor que dos (2). En los casos de gobernador, comisionado residente en Washington D.C., representantes por distrito y alcaldes, esta disposición aplica si la cantidad de aspirantes por cada partido político es igual o menor que uno (1) en la demarcación geoelectoral que correspondan. En los casos de legisladores municipales, esta disposición aplicará cuando la cantidad de aspirantes sea igual o menor a la cantidad máxima de estas candidaturas en cada municipio.

De lo anterior surge que el proceso de selección de candidaturas dispone que, como norma general, esto puede ocurrir de dos (2) modos distintos.[20] El primero entra en función cuando la cantidad de aspirantes es igual o menor que las candidaturas que el partido pueda o deba postular para esos cargos, lo cual provoca su certificación automática como candidato único. En este escenario resulta innecesario recurrir a otras opciones para seleccionar los candidatos.[21] El segundo cobra eficacia cuando la cantidad de aspirantes calificados es mayor que las candidaturas, lo que activa el mecanismo clásico de la celebración de

---

[20] 16 LPRA sec. 4620.

[21] 16 LPRA sec. 4620 (3). Destacamos que esto no fue lo que ocurrió en el caso de autos.

primarias.[22] **Es decir, habrá primarias cuando haya más aspirantes que escaños disponibles.**

Ahora bien, el Código Electoral de 2020 le confiere a los partidos políticos la facultad de seleccionar a sus candidatos, no mediante primarias de ley, sino a través de un mecanismo alterno. Pero realmente, ¿qué es un método alterno?

Según la ley electoral vigente, un método alterno es un

> [p]rocedimiento alternativo **que sustituye una Primaria** o Elección Especial, **según lo apruebe el organismo central** de un Partido Político para la elección de candidatos a cargos públicos **y que cumpla, procesalmente, con las garantías mínimas dispuestas en esta Ley**.[23]

De acuerdo con lo expuesto, un mecanismo alterno es un método de selección de candidatos que **sustituye** las primarias de ley. Por tanto, cuando un partido se acoge al método alterno de su preferencia, las disposiciones referentes a las primarias **quedan desplazadas y, en consecuencia, son inaplicables**. A diferencia de las primarias de ley, el proceso alterno se guiará por los lineamientos que apruebe el partido político, los cuales tienen que ir en acorde con las garantías mínimas establecidas en el propio Código Electoral de 2020.

---

[22] 16 LPRA sec. 4620 (2).

[23] (Negrillas y énfasis suplidos). 16 LPRA sec. 4503(60). Véase, además la Secc. 1.4 (30) del Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes, supra, pág. 7.

Más adelante, en el Art. 7.11 del Código Electoral de 2020, se fijan cuáles son tales garantías mínimas exigidas:

**(1) Los Partidos Políticos podrán establecer internamente métodos alternos para la nominación de sus candidatos a cargos públicos electivos, siempre que así lo apruebe su organismo directivo central y se cumplan con las siguientes garantías mínimas:**

**(a)** Que el método de nominación que se establezca garantice la más amplia participación y la expresión del voto directo y secreto de:

i. los miembros y afiliados que formen parte del Registro de Electores Afiliados del Partido y aquellos que se inscriban en el mismo inmediatamente antes de ejercer su voto; o

ii. los delegados de un organismo reglamentario de ese partido previamente seleccionados en proporción con la población electoral de la demarcación geoelectoral correspondiente al cargo público electivo sujeto a nominación; o en proporción con la cantidad de votos obtenidos por el partido político para ese cargo público electivo en la Elección General anterior.

**(b)** Que el procedimiento para el método alterno de nominación haya sido formalmente aprobado por el organismo directivo central del Partido Político, no menos de sesenta (60) días antes de la realización de la votación; y que esté por escrito y disponible para todos los miembros de ese Partido Político. Este procedimiento, además, deberá ser ampliamente divulgado por el partido y entregado a los Aspirantes y potenciales Aspirantes de los que se tenga conocimiento. Las reglas que han de regir el proceso incluirán los lugares, fechas y horas donde se han de realizar los mismos.

**(c)** Que todo Aspirante tenga acceso, con no menos de sesenta (60) días de anticipación a la realización de la votación, a la lista de electores, afiliados o delegados, según corresponda, incluyendo los datos de contacto que tenga el partido de cada uno de estos, como por ejemplo, direcciones, teléfonos y correos electrónicos, entre otros.

**(d)** Que a los Aspirantes se les provea un foro adecuado para impugnar las reglas del procedimiento aprobado por el organismo directivo central del Partido y el contenido de la lista descrita en el apartado (c) de este Artículo.

**(e)** Que todos los Aspirantes tengan derecho a representación efectiva y proporcional en las etapas críticas del proceso de nominación, tales como la elección de delegados, el registro de los participantes y el proceso de votación y de escrutinio.

**(f)** Que las posiciones en que ha de figurar el nombre de cada Aspirante en la papeleta de votación sean seleccionadas mediante sorteo, en presencia de los Aspirantes o sus representantes.

**(g)** Que se garantice el derecho a recusar a los participantes por las razones que se disponen en esta Ley y las que se dispongan en el reglamento de su partido político.

**(h)** Que haya igual acceso y protección a los participantes en todas las etapas del proceso de nominación.

**(i)** Que la votación sea libre y secreta.

**(j)** Que haya mecanismos internos eficaces para impugnar la violación de estas normas y agotado ese foro, el derecho de recurrir en apelación al Tribunal de Primera Instancia, designado de conformidad con el Capítulo XIII de esta Ley, y dentro de los cinco (5) días laborables siguientes a la determinación final del Partido Político.

**(2)** El Partido notificará públicamente por los medios que considere pertinentes sobre los resultados del proceso alterno de nominación, los datos de la persona nominada,

incluyendo el cargo público electivo para el que fue nominado como Candidato.

**(3)** Todo Aspirante que no resultare favorecido en el método alterno de nominación estará impedido de concurrir como Aspirante en cualquier proceso de primarias para el mismo cargo durante el mismo ciclo de Elección General.

**(4)** Ningún proceso o método alterno de nominación de candidatos a cargos públicos electivos impedirá que otro miembro o afiliado del Partido que no participó como Aspirante, pueda reclamar su derecho a primarias para ese mismo cargo público electivo dentro de los términos de esta Ley y el reglamento de primarias del partido. 16 LPRA sec. 4621.

**Del precitado artículo surge diáfanamente que ninguna de las garantías mínimas exigidas a los aspirantes bajo el método alterno es el recogido de endosos**. Por esta razón, los organismos centrales de los partidos políticos que no celebrarán las primarias de ley pueden dispensar del requisito de endosos, pues este no es parte de la lista taxativa de garantías mínimas ordenada en el Art. 7.11 del Código Electoral de 2020, <u>supra</u>.[24]

**Conforme a lo expuesto, las primarias de ley se regirán por lo dispuesto en el Código Electoral de 2020, las reglas que adopte la CEE y el correspondiente partido político. Sin embargo, el mecanismo alterno goza de una deferencia mayor**

---

[24]Dicho de otro modo, el diseño del método alterno solo estará limitado por las garantías mínimas, lo cual incluye el hecho de que un miembro del partido que no haya sido aspirante exija la celebración de una primaria, independientemente de que el partido haya decidido acogerse al método alterno. **Empero, nuevamente, no exige el recogido y la presentación de endosos, así como tampoco ningún miembro de los partidos Recurridos exigió la celebración de primarias.** 16 LPRA sec. 4621(4).

**puesto que este proceso se llevará a cabo con sujeción únicamente del reglamento interno que apruebe, <u>no la CEE</u>, sino el organismo central del partido político en cuestión.**

El Movimiento Victoria Ciudadana, al igual que Proyecto Dignidad, se acogieron al mecanismo alterno para la selección de sus candidatos. Por ello, la aprobación de sus reglamentos internos eximiendo del recogido de endosos, el cual es exigido a quienes participarán de las primarias de ley, cumplió cabalmente con lo dispuesto en el estatuto por no ser tal recolección una de las garantías mínimas acorde al Art. 7.11 del Código Electoral de 2020, <u>supra</u>.

Esta interpretación es consecuente, además, con el Art. 7.15 del Código Electoral de 2020, <u>supra</u>, el cual preceptúa lo siguiente:

> **(1)** Sin menoscabar lo dispuesto en esta Ley, la Comisión reglamentará todo asunto relacionado con las peticiones de endosos. El período para la presentación de peticiones de endosos para **<u>Aspirantes Primaristas</u>** y **<u>Candidatos Independientes</u>** a cargos públicos electivos comenzará a partir del 1ro. de diciembre del año anterior al de Elecciones Generales y concluirá al mediodía (12:00 p.m.) del 15 de febrero del año de Elecciones Generales. El anterior constituye un término fatal. Cuando esta fecha coincida con un día feriado o no laborable para el Gobierno de Puerto Rico, se extenderá al siguiente día laborable.
> **(2)** A partir del Ciclo Electoral 2024 toda petición de endoso para estos propósitos solamente se tomará, presentará y evaluará a través del sistema SIEN dispuesto en esta Ley.
> **(3)** **<u>Cualquier Elector que desee concursar en unas primarias</u>**, **<u>como aspirante o como candidato independiente</u>**, además de cumplir

con los requisitos de esta Ley y los reglamentos de su Partido y la Comisión, deberá presentar ante la Comisión la cantidad de peticiones de endoso requerida por esta Ley para el cargo público electivo al que interese aspirar.

[…]

**(6) <u>Las peticiones de endosos para primarias y candidaturas independientes</u>** deberán tener completada la siguiente información del Elector endosante: [lista de requisitos que debe contener cada endoso].

A pesar de lo anterior, el Tribunal de Primera Instancia e, igualmente, este Tribunal, interpretaron que en esta disposición se establecieron tres (3) categorías de electores que estaban obligados a recoger endosos: (1) el que interese concursar en primarias; (2) el que desee ser aspirante, y (3) los candidatos independientes.

Empero, contrario a lo determinado, sostengo que cuando el texto de la ley se refiere a "[c]ualquier elector que desee concursar en unas primarias, como aspirante o como candidato independiente", solo establece una dupla de categorías: (1) los electores que deseen concursar como **<u>aspirantes primaristas</u>** dentro de un partido, o (2) los electores que correrán como **<u>candidatos independientes</u>**. **<u>Esta es la única interpretación lógica</u>**, puesto que "cualquier elector" no es una categoría independiente, sino que representa una condición general de todas las personas que deseen ser aspirantes. Ambas categorías están definidas por la intención del elector —de aspirar, ya sea dentro de un

partido o independientemente—, quienes necesariamente tendrán que cumplir por igual con el requisito general de ser electores.

Esta interpretación está respaldada por el primer inciso del Art. 7.15, el cual claramente presupone que la reglamentación que promulgará la Comisión sobre las peticiones de endoso solo le aplicará a los **"Aspirantes Primaristas" y "Candidatos Independientes"**. En sintonía, el tercer inciso requiere únicamente el recogido de endosos por parte de aspirantes que participarán en el proceso de primarias, así como a los candidatos independientes, pero no hace mención alguna sobre los aspirantes bajo un método alterno.

**En conclusión, un análisis jurídico integral de los Arts. 7.11 y 7.15 del Código Electoral de 2020 demuestra que el primer fundamento utilizado por este Tribunal para concluir que el recogido de endosos también le aplicaba a los Querellados es incorrecto en Derecho.** No cabe duda, pues, que lo que este Tribunal hoy precisa como un problema existente en la redacción del Art. 7.15(3) del Código Electoral de 2020, <u>supra</u>, es, en realidad, acoger la teoría de los Querellantes que descansa en una  falla de la lectura del articulado, con el fin de desarrollar un argumento en apoyo de su conclusión.[25]

---

[25]Véase, <u>Opinión</u> mayoritaria, págs. 36-38.

**B. La eliminación de la exención al recogido de endosos que disponían las leyes predecesoras no representa la intención legislativa del Código Electoral de 2020 ni su ausencia tiene el efecto de entenderse como que ahora ese requisito es exigible.**

En segundo lugar, el foro primario y, también, una mayoría de este Tribunal, recurrieron a la supuesta intención legislativa para sustentar la descalificación decretada. Particularmente, la Mayoría se basó en que con la aprobación del Código Electoral de 2020 se eliminó la frase "[l]as personas seleccionadas de conformidad con el procedimiento antes descritos [sobre métodos alternos de selección] no tendrán que cumplir con los requisitos de presentación de peticiones de endoso para primarias para calificar como candidato". Art. 8.007 del Código Electoral de Puerto Rico para el Siglo XXI, 16 LPRA ant. sec. 4117 y Art. 4.007 de la Ley Electoral de 1977, 16 LPRA ant. sec. 3156a. En consecuencia, refrendaron que "[s]i la intención de la Asamblea Legislativa hubiese sido mantener la norma igual a los Códigos Electorales anteriores, no hubiese removido la frase que exime del recogido de endosos".[26]

Ahora bien, ¿la eliminación de un lenguaje expreso dispensando el recogido de endosos tiene el efecto de exigir que los aspirantes de un partido que se acogió al método

---

[26]Véase, Opinión mayoritaria, pág. 53.

alterno deban recolectar los endosos en cuestión? **<u>Evidentemente no</u>**.

Históricamente, las leyes electorales en Puerto Rico han exonerado de la recolección de endosos a los aspirantes de partidos políticos que optaron por seleccionar a sus candidatos mediante un método alterno. Según consta en el <u>Informe de la comisión especial para la revisión del proceso electoral de Puerto Rico de 17 de mayo de 1982</u> (Informe de la Comisión), la inclusión expresa de esta exención obedeció al reconocimiento de que, a esa época, "[l]os principales partidos políticos ha[bían] comenzado a implementar procedimientos alternos de selección de candidatos no contemplados en la Ley Electoral vigente". Véase, Anejo 16 del Informe de la Comisión, pág. 40.

La implementación de los métodos alternos por parte de los gremios políticos constituyó una alternativa a las primarias tradicionales, las cuales "representan una inversión de recursos considerables que afectan las posibilidades de candidatos sin esa disponibilidad material". Íd., págs. 39-40. Dado este fenómeno, la Comisión finalmente recomendó la adopción formal de los métodos alternos de selección de candidatos con la intención de proveer una alternativa a las primarias de ley. Id., págs. 41-42.

Concretamente, las motivaciones para la promulgación expresa de los métodos alternos respondió a que

>  [l]os candidatos que hayan sido seleccionados por los mecanismos internos y hayan cumplido con los requisitos que se establecen en la ley, **no tendrán que recoger peticiones para primarias <u>pues ya han demostrado un nivel de respaldo efectivo</u>**.
>           Uno de los <u>**problemas del proceso**</u> de selección a través <u>**de las primarias es**</u> la <u>**gran cantidad de trámites burocráticos**</u> que se requieren aún en casos en que no hay competencias para algunas posiciones.
>
>  […]
>
>  De esta forma <u>**se disminuiría radicalmente el trámite burocrático de innumerables candidaturas**</u> […], así como <u>**los costos al erario público**</u>.

Como vemos, las razones principales que sustentan el que no se recojan endosos bajo un método alterno son: (1) que ya estos candidatos han demostrado un respaldo efectivo por parte de los integrantes de su partido; (2) eliminar el exceso de trámites requeridos en las primarias de ley; (3) disminuir el trámite oneroso de innumerables candidaturas, y (4) dispensar al erario de los gastos relacionados a la celebración de una primarias de ley.

Según anticipé, como el actual Art. 7.11 del Código Electoral de 2020, <u>supra</u>, no contiene expresamente el lenguaje de las leyes predecesoras, este Tribunal valida que entonces la intención de la Asamblea Legislativa fue exigir el recogido de endosos.

No obstante, como cuestión hermenéutica, al interpretar una disposición legal antes debemos "remitirnos al propio texto de la ley, puesto que cuando el legislador se ha

expresado en un lenguaje claro e inequívoco, [...] es la expresión por excelencia de la intención legislativa". Cordero et al. v. ARPe et al., 187 DPR 445, 456 (2012) (citado en Rosado Molina v. ELA y otros, 195 DPR 581, 589 (2016). "Reiteradamente hemos enfatizado que **'el tribunal no está autorizado a adicionar limitaciones o restricciones que no aparecen en el texto de la ley, ni a suplir omisiones al interpretarla con el pretexto de buscar la intención legislativa**". (Negrillas suplidas). (Gautier Vega v. CEE, 205 DPR 724, 755 (2020) (citando a Rosado Molina v. ELA y otros, supra, págs. 589-590. Véanse: Román v. Superintendente de la Policía, 93 DPR 685, 690 (1966); Meléndez v. Tribunal Superior, 90 DPR 656, 662 (1964)).

Lo anterior se debe a que la doctrina de hermenéutica legal casus omissus generalmente restringe que las omisiones de la Asamblea Legislativa sean curadas por los tribunales. R. E. Bernier y J. A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 311. Máxime cuando lo eliminado en la ley anterior no se prohibió expresamente en la nueva ley, tal y como ocurrió en el caso de autos. Pueblo v. Román Feliciano, 181 DPR 879, 687 (2011); Campos del Toro v. Ame. Transit Corp., 113 DPR 337, 345 (1982); Victoria Iturralde Sesma, Consideración crítica del principio de permisión según el cual "lo no prohibido está

permitido", pág. 211, País Vasco, España (1998) (citas omitidas).

Como señalamos, el Art. 7.11 del Código Electoral de 2020, supra, regula todo lo concerniente a los métodos alternos y en ninguna parte exige la presentación de endosos a los candidatos seleccionados bajo dicho mecanismo. Esto cobra mayor importancia dado que, a diferencia de las primarias de ley, un método alterno que cumpla con las garantías mínimas está sujeto únicamente a lo que disponga internamente el partido político **y no a requisitos adicionales impuestos unilateralmente por la Comisión Estatal de Elecciones**.

Según lo expuesto, el Código Electoral de 2020 le otorga a los partidos políticos el derecho a "establecer internamente métodos alternos para la nominación de sus candidatos a cargos públicos electivos" siempre y cuando "se cumplan con las […] garantías mínimas" allí estatuidas taxativamente. Art. 7.11, supra. **Si la intención legislativa hubiese sido imponer el requisito de endosos en este escenario, tenía que incluirlo expresamente y de manera inequívoca como una de las garantías mínimas exigidas a los partidos políticos en la promulgación de sus procesos internos. Especialmente, ante la onerosidad y la carga sustancial que impone la recolección de endosos sobre los aspirantes. La Asamblea Legislativa sabía cómo hacerlo, pero no lo hizo y eso no debe ser tomado livianamente.**

Ante ello, no puedo avalar la imposición de requisitos que afecten los derechos constitucionales de la ciudadanía. Lo contrario está reñido con las disposiciones del Código Electoral de 2020 que obligan a la CEE a salvaguardar el derecho al voto, sin sujeción a cortapisas injustificadas. Véase el Art. 5.1 del Código Electoral de 2020, supra.

En fin, aún cuando la ley electoral vigente no incluyó la exención en cuestión contenida en las leyes electorales predecesoras, tampoco lo legisló expresamente dentro de los requisitos que enmarcan el uso del método alterno. Además, el historial legislativo no derrota el entendido histórico de que cuando un candidato es seleccionado mediante un método alterno, este ya ha demostrado un respaldo efectivo por el partido político al que pertenece, lo cual torna innecesarios los gastos sustanciales del erario y la burocracia exigida a los candidatos que participarán de las primarias de ley. No menos importante, las normas de hermenéutica discutidas y los postulados constitucionales prohíben validar la tipificación de una exclusión de acceso a la papeleta mediante la inclusión de un requisito no contemplado en ley. **Por tanto, la interpretación que realizó este Tribunal bajo este fundamento, refrendando al foro primario, es también incorrecta jurídicamente y la más drástica.**

C. **La Sección 3.1 del Reglamento para la radicación de candidaturas de los partidos políticos y candidatos independientes contraviene el Código Electoral del 2020, por lo cual es ultra vires y, por consiguiente, nula.**

En tercer lugar, este Tribunal precisa que la celebración del método alterno luego del término establecido reglamentariamente infringe sobre la prerrogativa de las personas de reclamar el derecho a primaria, ya que no se tendría tiempo para el recogido de endosos. Por su estrecha relación, discutiremos lo erróneo de este argumento junto con la invalidez de la imposición del requerimiento fatal de presentación de endosos antes de una fecha cierta por la vía administrativa sin que la ley habilitadora así lo haya autorizado.

De conformidad con la Sección 3.1 del Reglamento para la radicación de candidaturas de los partidos políticos y candidatos independientes, supra:

> Las personas seleccionadas mediante un Método Alterno de Nominación no tendrán que cumplir con los requisitos de presentación de peticiones de endoso para primarias para calificar como candidato(a); siempre y cuando sean escogidos y su expediente, con los documentos requeridos, sea radicado por su Partido Político como candidato único en la Comisión en o antes de las 12:00 (doce en punto) del medio día del 30 de diciembre de 2023.[27]

Sin duda, la disposición reglamentaria antes citada impone un requisito no contemplado en el Código Electoral de

---

[27] (Énfasis suplido).

2020, a saber: la exigencia de que las personas escogidas mediante un método alterno tengan que ser presentados como candidatos únicos antes de una fecha cierta, so pena de que tengan que recoger endosos. Según discutimos, absolutamente en ninguna parte de la ley electoral vigente se establece tal requisito en el contexto de métodos alternos de nominación de candidaturas. Ello, en lugar de complementar, provoca un conflicto directo con múltiples disposiciones del Código Electoral de 2020.

En abstracción de lo anterior, este Tribunal concluye que nada "**prohíb[e] expresamente a la CEE la exigencia de recogido de endosos a aspirantes bajo métodos alternos**, sobre todo, cuando tal exigencia es una colateral. O sea, el hecho de que el Art. 7.15(3) no incluya expresamente a los recurridos, no quiere decir que la CEE está impedida de aprobar lo que aprobó en la Sec. 3.1 del Reglamento para radicación de candidaturas".[28] Al respecto, la Mayoría entiende que "lo que le fue impuesto al MVC no fue un requisito para que sus aspirantes recogieran endosos, sino un **término fatal** para que estos presentaran sus **candidatos únicos**".[29]

Para comenzar, el Art. 7.15 del Código Electoral de 2020, supra, solamente exige la presentación de endosos en

_____

[28](Negrillas y énfasis suplidos en el original). Opinión mayoritaria, pág. 35.

[29](Negrillas y énfasis suplidos en el original). Íd., pág. 51.

los casos de aspirantes primaristas y aspirantes que sean candidatos independientes y, de ningún modo, establece como una de las garantías mínimas exigidas que el aspirante bajo un método alterno recoja endosos, como tampoco estipula una "fecha fatal" para llevar a cabo tal proceso. Por tanto, esto debería darse por no puesto, sin más, dado que por la la vía reglamentaria no pueden establecerse "exigencias colaterales" que, a todas luces, son condiciones sustantivas adicionales a las contempladas en la ley con efectos cualitativos adversos para los Recurridos.

Ello también choca con el hecho de que, según el propio Art. 7.1 del Código Electoral de 2020, supra, los reglamentos que apruebe la CEE relacionados con los métodos alternos de nominación deben mostrar deferencia a la reglamentación interna aprobada por cada partido político. Bajo este marco legal, el 12 de noviembre de 2023, el partido Movimiento Victoria Ciudadana aprobó el Reglamento para la elección de candidaturas para las elecciones Generales de 2024 del Movimiento Victoria Ciudadana. Este, en su Sección 2.1, señala que

> las personas que se sometan al presente proceso de nominación y elección de candidaturas, **no tendrán que cumplir con los requisitos de presentación de peticiones de endoso** para Primarias de Ley para calificar como candidata o candidato del Movimiento.[30]

---

[30] (Negrillas y énfasis suplidos). Íd., pág. 7.

Según surge de las determinaciones de hechos realizadas por el foro primario, el Secretario de la CEE emitió una Certificación en donde certificó que **"de conformidad con el Artículo 7.14(3) del Código Electoral de Puerto Rico de 2020 y el Reglamento de Radicación de Candidaturas de los Partidos Políticos y Candidaturas Independientes, aprobado por la CEE, [el MVC] cumplió con la entrega de su correspondiente reglamento"**.[31] A pesar de que este reglamento eximía del recogido de endosos, el foro primario, apoyado en las declaraciones juradas provistas por los Querellados, validó que "[n]ingún funcionario de la Comisión Estatal de Elecciones hizo señalamiento alguno respecto al Reglamento de Método Alterno" del Movimiento Victoria Ciudadana.[32] Entiéndase, durante todo el procedimiento administrativo, la CEE nunca informó de manera alguna a los Querellados que debían recoger los endosos si el método alterno se realizaba luego del 30 de diciembre de 2023.

En consecuencia, al analizar la validez de la Sección 3.1 del Reglamento para la radicación de candidaturas de los partidos políticos y candidatos independientes, no cabe duda de que esta impone el requisito de recolección de endosos en una fecha fatal no legislada a los candidatos acogidos al método alterno a pesar de que esto no se contempló en el

---

[31] (Negrillas suplidas). Sentencia [del Tribunal de Primera Instancia], pág. 6, Determinación de hecho #7.

[32] Íd., Determinación de hecho #8.

Código Electoral de 2020. Tal disposición reglamentaria está en conflicto, al mismo tiempo, con una de las garantías mínimas establecidas para los aspirantes bajo los métodos alternos, a quienes se les debe garantizar acceso a la lista de todos los electores, afiliados o delegados con al menos sesenta (60) días de anticipación a la fecha de la elección. 16 LPRA sec. 4621(c).

De acuerdo con el Art. 7.15 del Código Electoral de 2020, supra, esto es procesalmente imposible, pues la presentación de candidaturas comenzó el 1 de diciembre de 2023, lo que ocasionó que los aspirantes solo tuviesen treinta (30) días, en lugar de los sesenta (60) días estipulados como mínimo, para tener el acceso al listado de electores. En todo caso, correspondía que la Asamblea Legislativa designara una fecha anterior para este tipo de escenarios y el que fallaran en así hacerlo no puede obrar en perjuicio de los candidatos en cuestión.

En definitiva, tal proceder se inmiscuye en la deferencia exigida a los reglamentos de los partidos políticos sobre la forma en que regulan sus mecanismos internos de nominación de candidatos.[33] **Por lo cual, este**

---

[33]"La Comisión aprobará un Reglamento de Primarias y Métodos Alternos de Nominación que deberá ser uniforme para todos los Partidos Políticos en los campos electorales ocupados por esta Ley; **mostrando deferencia a los reglamentos aprobados por cada Partido para sus primarias internas y sus métodos alternos de nominación para cargos públicos electivos**; pero siempre que estos no menoscaben o vulneren las garantías, reglas y normas protegidas por esta Ley para

**Tribunal erró al no dejar sin efecto la disposición reglamentaria que requería la presentación de endosos si, a una fecha fatal, no se había informado quiénes finalmente serían los candidatos únicos del partido político.**

D. **El Presidente de la Comisión Estatal de Elecciones no podía legislar por fiat reglamentario un término fatal que, por su carácter jurisdiccional, únicamente podía ser incluído en el Código Electoral de 2020 por la Asamblea Legislativa.**

Como es consabido, reiteradamente "este Tribunal ha advertido que 'las agencias carecen de facultad para adoptar reglamentación que imponga requisitos adicionales a aquellos establecidos por los estatutos que rigen la revisión de la agencia'". <u>Vitas Health Care Corp. v. Hosp. La Fe</u>, 190 DPR 56, 67, (2014) (citando a <u>Franco v. Depto. de Educación</u>, 148 DPR 703, 712 (1999)). Por ello, si la reglamentación administrativa está en conflicto con la ley, la disposición reglamentaria debería ser declarada <u>ultra vires</u> y, como consecuencia, nula. <u>Puerto Rico Tel. Co. v. Junta Reglamentadora de Telecomunicaciones de Puerto Rico</u>, 151 DPR 269, 281 (2000).

**Hoy, este Tribunal debía resolver que el principio antes discutido se torna más significativo aún cuando la actuación administrativa establece, como en el caso de autos, una**

_____

ambos procesos de nominación". (Negrillas y énfasis suplidos). 16 LPRA sec. 4611.

**"fecha fatal" que, en todo caso, debió ser añadida en la ley por quien tiene la facultad de establecer términos jurisdiccionales: la Asamblea Legislativa.**

Por tal razón, en la vista oral celebrada enfaticé que este Tribunal reiteradamente ha resuelto que los términos jurisdiccionales tienen que ser declarados expresamente por el legislador. Además, planteé que, toda vez que la norma impugnada tiene el efecto de establecer, como lo reconoce la Mayoría, un término fatal —**o sea**, **jurisdiccional**—, tal fecha con efectos no meramente procesales, sino sustantivos por cambiar el alcance cualitativo del método alterno, no podía ser aprobada por <u>fiat</u> reglamentario.

Adviértase, también es contrario a la voluntad legislativa dado que, en todo caso, las fechas fatales para la presentación de endosos en el contexto de un candidato perteneciente a un partido que participa de primarias fueron fijadas expresamente en el Código Electoral de 2020. **¿Ello no hacía eso necesario, de por sí solo, que también constara diáfanamente tal fecha límite en el caso de los aspirantes bajo un método alterno? <u>Desde luego que sí</u>.**

Fíjese que en la Sección 2.2, intitulada como Calendario (Fechas Límites) en el <u>Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes</u>, se recogen todas las fechas fatales instituidas en el Código Electoral de 2020. A esos efectos, la tabla, en lo pertinente, dispone lo siguiente:

| **[A]** viernes, 1 de diciembre al sábado, 30 de diciembre de 2023 | Período para la radicación de candidaturas para los aspirantes de los partidos políticos y candidatos independientes. La hora límite será a las 12:00 del mediodía del sábado, 30 de diciembre de 2023. |
|---|---|
| **viernes, 1 de diciembre de 2023** | **A partir de esta fecha comienza el período para la presentación de peticiones de endosos para <u>aspirantes primaristas</u> y candidatos independientes** a cargos públicos electivos que hayan radicado su expediente en la Oficina de Radicaciones de la Secretaría. |
| **[B]** lunes, 29 de enero de 2024 | Fecha límite para que los aspirantes a candidatos, que entregaron evidencia de haber solicitado los documentos necesarios para formalizar su aspiración, entreguen a la Comisión las copias y certificaciones requeridas. |
| **[C]** miércoles, 31 de enero de 2024 | Fecha límite para presentar el 50% de las peticiones de endoso para primarias de todos los aspirantes de los partidos políticos y candidaturas independientes. |
| **[D]** jueves, 15 de febrero de 2024 | Fecha límite para la presentación del 100% de las peticiones de endoso para primarias de todos los aspirantes de los partidos políticos y candidaturas independiente.[34] |

Discutiré punto por punto cada una de las fechas límites aquí incluídas.

**[A]**: La primera es cónsona con el Art. 7.14 (1) del Código Electoral de 2020, <u>supra</u>, el cual dicta que "[l]a Comisión y los Partidos Políticos abrirán el proceso de presentación de candidaturas el día 1ro. y hasta 30 de diciembre del año anterior al que deba realizarse la próxima Elección General".

---

[34] (Negrillas y énfasis suplidos). Sección 2.2 del <u>Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes</u>, pág. 13.

**[B]**: La segunda coincide con el Art. 7.2 (5)(e) del Código Electoral de 2020, _supra_, en la medida que establece que

> [e]n caso de que el Aspirante o Candidato solicitante de los documentos y las certificaciones requeridas en este Artículo no las reciba al momento de la presentación de su intención como Aspirante o Candidato, deberá presentar evidencia expedida por las agencias correspondientes de que las certificaciones han sido debidamente solicitadas antes de las fechas límites dispuestas por la Comisión para su entrega. No obstante, la persona tendrá que presentar las copias y las certificaciones requeridas en o antes de los treinta (30) días posteriores al cierre de candidaturas.

**[C]**: La tercera coincide con el Art. 7.15 (5) del Código Electoral del 2020, _supra_, el cual fija que "[d]urante los últimos quince (15) días del periodo de presentación de peticiones de endosos, nadie podrá presentar más del cincuenta por ciento (50%) del total de las peticiones requeridas para su aspiración o candidatura".

**[D]**: La cuarta se alínea con el Art. 7.15 (5) del Código Electoral del 2020, _supra_, al disponerse que "[l]os endosos requeridos por esta Ley deberán ser recibidos y remitidos a la Comisión desde la certificación de la candidatura por el partido político o desde que se solicita una candidatura independiente hasta el 15 de febrero del año de las Elecciones Generales".

Vemos, entonces, que una lectura de las fechas límites recogidas en la Sección 2.2 del _Reglamento para la radicación_

de candidaturas de los partidos políticos y candidaturas independientes, está respaldada por el propio Código Electoral de 2020. Lo que es más, al hacer referencia a la fecha del viernes 1 de diciembre de 2023 como el punto de partida para el recogido de endosos, se preceptúa que esto le aplica únicamente a los aspirantes primaristas y a los candidatos independientes. Ello queda demostrado por el lenguaje siguiente: "**A partir de esta fecha comienza el período para la presentación de peticiones de endosos para aspirantes primaristas y candidatos independientes** a cargos públicos electivos que hayan radicado su expediente en la Oficina de Radicaciones de la Secretaría". Íd. En todo caso, esto es cónsono con el Art. 7.15 del Código Electoral del 2020, supra, el cual, según fue analizado, exige la recolección de endosos solamente para los "**Aspirantes Primaristas** y **Candidatos Independientes**".[35]

Para concluir, toda vez que lo añadido unilateralmente en la Sección 3.1 por la CEE atenta contra lo establecido por la Asamblea Legislativa en el Código Electoral de 2020, es ultra vires y, por consiguiente, nulo. **Queda claro que la inclusión vía fiat reglamentario de una fecha que no encuentra apoyo alguno en la ley electoral es un acto autocrático de la CEE que excede los poderes que se le delegaron e innecesariamente lacera garantías a los**

---

[35]Véase discusión al respecto en esta Opinión disidente, págs. 33-36.

**candidatos descalificados, los delegados que votaron por ellos en un método alterno válido y a los partidos políticos afectados. Este Tribunal fracasa en su labor al no reconocerlo, máxime cuando se desconecta de la realidad de que las primarias de ley del 2 de junio de 2024 transcurrieron y nadie perteneciente al Movimiento Victoria Ciudadana ni Proyecto Dignidad solicitó primarias. <u>Por tanto, no hay un interés público en controversia que amerite un dictamen tan drástico</u>.**

### IV

Más allá del accionar equívoco en la interpretación del Código Electoral de 2020, este Tribunal pasó por alto las implicaciones constitucionales que acarreaba su determinación. Y es que, aun si partiéramos de la premisa de que de la ley electoral actual se dedujera que era indispensable que los Querellados recogieran endosos, la validez de la norma reglamentaria debía evaluarse a la luz de las protecciones constitucionales de la Carta Magna de Puerto Rico. Ello teniendo como norte la máxima de que las leyes deben interpretarse de manera que se evite, en lo posible, la declaración de su inconstitucionalidad.[36]

---

[36]Véanse, <u>Pueblo v. Yip Berríos</u>, 142 DPR 386, 421 (1997) <u>Domínguez Maldonado v. E.L.A.</u>, 137 DPR 954(1995); <u>Molina v. C.R.U.V.</u>, 114 DPR 295, 297 (1983) <u>P.P.D. v. Admor. Gen. de Elecciones</u>, 111 DPR 199, 243 (1981); <u>E.L.A. v. Aguayo</u>, 80 DPR 552, 596 (1958).

## A. **<u>Derecho al voto</u>**

Como es consabido, la Constitución de Puerto Rico establece que el "poder político emana del pueblo y se ejercerá con arreglo a su voluntad […]". Art. I, Sec. 1, Const. PR, LPRA Tomo 1. Dado que es mediante el voto que se concretiza tal voluntad democrática, nuestra Carta Magna exige que la promulgación de las leyes electorales **<u>"garanti[cen] […] el sufragio universal, igual, directo y secreto, y [que] prote[jan] al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral</u>**". Art. II, Sec. 2, Const. PR, <u>supra</u>. De lo anterior se desprende de manera prístina que al Estado se le impone una responsabilidad dual: la de abstenerse, por un lado, de interferir con el ejercicio del derecho al voto; por otro, la de proteger al ciudadano en el ejercicio de esta prerrogativa electoral.[37]

Dentro de la facultad que posee la Asamblea Legislativa para regular el proceso eleccionario, hemos reconocido la validez del establecimiento de normas y reglas uniformes que propicien la estabilidad, confianza y certeza en la democracia, siempre y cuando estas no obstaculicen

---

[37]Complementan este mandato las disposiciones sobre igual protección de las leyes, la prohibición contra discrimen político y la facultad que posee la Asamblea Legislativa para regular por ley todo lo concerniente al proceso eleccionario. Art. VI, Sec. 4, Const. PR, <u>supra</u>.

innecesariamente el voto y propendan a la realización de un esquema electoral justo, honesto e íntegro.[38] Esto es así, pues, **"[n]i la potestad legislativa de reglamentar como tampoco el derecho al sufragio pueden operar bajo un esquema de disposiciones legislativas arbitrarias o en irrestringidos reclamos de electores; [ambos] no son valores que se implementan en términos absolutos"**.[39]

Naturalmente, la delegación sobre la Asamblea Legislativa del deber de disponer todo lo concerniente al proceso eleccionario está subordinada a las garantías constitucionales en protección al sufragio. Corresponde a los tribunales la delicada labor de asegurar que los estatutos aprobados por la Asamblea Legislativa cumplan con el mandato del Art. II, Sec. 2 de la Constitución de Puerto Rico, supra.

En esa tarea de conciliar ambos aspectos de nuestra democracia, este Tribunal ha determinado que cuando se cuestiona un estatuto que impacta los derechos al voto y a la libertad de asociación, corresponde a los foros judiciales realizar un análisis de dos (2) pasos para determinar cuál será el escrutinio aplicable: **(1)** primero, debe determinarse la naturaleza y la magnitud de la carga

---

[38] P.S.P. v. Com. Estatal de Elecciones, 110 DPR 400, 405-406 (1980).

[39] (Negrilla suplida). Íd., pág. 406 (1980).

que la ley impugnada impone sobre los derechos constitucionales y, **(2)** segundo, aplicarse el nivel de escrutinio correspondiente a esa carga. <u>Sánchez y Colón v. E.L.A. II</u>, 134 DPR 503, 509 (1993).

En aquellos casos en que la restricción impuesta cuestionada es **razonable y no discriminatoria**, se aplica el **estándar de balance de intereses**. En este escenario, lo crucial es sopesar la envergadura de la restricción constitucional frente a los intereses legítimos y justificantes aducidos por el Estado. Luego, debe determinarse si la carga impuesta justifica la imposición de la reglamentación impugnada. <u>P.A.C. v. E.L.A. I</u>, 150 DPR 359, 388-389 (2000) (citando a <u>Burdick v. Takushi</u>, 504 US 428 (1992) y <u>Anderson v. Celebrezze</u>, 460 US 780 (1983)).

No obstante, si la restricción en cuestión conlleva una **carga severa, irrazonable o discriminatoria**, la reglamentación debe evaluarse bajo el tradicional **escrutinio estricto**. <u>P.A.C. v. E.L.A. I</u>, supra, págs. 388-389. A tenor con la doctrina de acceso a la papeleta, generalmente se entiende que "es severa aquella restricción que tiene el efecto de hacer imposible que todo nuevo candidato o asociación política pueda tener acceso a la papeleta electoral. **La pregunta que debe contestarse es si un candidato que ejerce una diligencia razonable puede satisfacer los requisitos impuestos por el Estado**". (Negrillas y énfasis suplidos). Íd., pág. 389.

Es ampliamente reconocido que el crisol del escrutinio estricto exige que, para que se sostenga su validez, el Estado demuestre que la afronta a los derechos afectados responde a un interés apremiante y que no existe un medio menos oneroso para cumplirlo. Íd.

Por su estrecha relación con el derecho al sufragio, conviene repasar la preeminencia del derecho a la libre asociación en Puerto Rico.

### B. **Derecho a la libre asociación**

En la Carta de Derechos de la Constitución de Puerto Rico se establece expresamente que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. PR, <u>supra</u>.[40]

En armonía con esta protección constitucional, "hemos expresado que la libertad de asociación es un derecho fundamental que **conlleva el derecho a formar agrupaciones y proponer candidatos de su predilección para participar en el proceso electoral**".[41] En concordancia, el derecho

---

[40]A pesar de que esta garantía se plasmó en nuestra Carta Magna en su vertiente positiva, no cabe duda de que de esta se deriva su sentido negativo —esto es, el derecho a no asociarce—. <u>Colegio de Abogados de P.R. v. Schneider</u>, 112 DPR 540, 549 (1982). No obstante, el escrutinio aplicable no varía en consideración a su acepción.

[41](Negrillas y énfasis suplidos). <u>P.N.P. v. De Castro Font II</u>, 172 DPR 883, 892 (2007) (citando a <u>P.S.P. v. Com. Estatal de Elecciones</u>, supra; <u>García Passalacqua v. Tribunal Electoral</u>, 105 DPR 49 (1976)).

constitucional a asociarse y organizarse a su discreción que gozan los partidos políticos parte de la premisa de que estos constituyen un elemento integral de nuestro ordenamiento constitucional democrático.[42]

La importancia de los partidos políticos estriba en que son estas asociaciones las "que, [como norma general], dirigen el debate sobre los asuntos públicos frente a las contiendas electorales, presentando sus respectivos programas de gobierno **y nominando candidatos para ocupar los cargos públicos principales que ofrecen gobernar en consonancia con esos programas**".[43] Dado lo anterior, "el derecho a formar asociaciones políticas para propósitos electorales [es un] derech[o] de carácter fundamental".[44]

Según expuse, al igual que el derecho al voto, el derecho a la libertad de asociación no es absoluto, por lo que el Estado puede actuar o regularlo en determinadas

---

[42]P.N.P. v. De Castro Font II, supra, pág. 892. Para un examen prima facie de la función protagónica que les brinda la Constitución de Puerto Rico a los partidos políticos en nuestro sistema electoral, véase, Art. III, Secs. 4, 7 y 8; Art. V, Sec. 12, y Art. VI, Sec. 4, Const. PR, supra.

[43](Negrilla suplida). P.N.P. v. De Castro Font II, supra, pág. 892 (citando a McClintock v. Rivera Schatz, 171 DPR 584, 605 (2007); P.A.C. v. P.I.P., 169 DPR 775 (2006); P.R.P. v. E.L.A., 115 DPR 631, 638 (1984); Fuster v. Busó, 102 DPR 327, 347 (1974)).

[44]P.N.P. v. De Castro Font II, supra, pág. 893.

circunstancias.[45] Previo a discutir cuál es el estándar aplicable al evaluar la intervención con esta garantía, destaco que un examen del proceso de redacción de nuestra Carta Magna denota que la intención de la delegada y los delegados de la Convención Constituyente fue reconocer el derecho a la libre asociación como uno de gran preeminencia, distinto y de mayor amplitud que el contemplado bajo la Constitución federal.[46]

A esos efectos, el delegado Jaime Benitez puntualizó que el derecho de asociación y libre organización adoptado "pasa[ba] a incorporar un nuevo aspecto del derecho y de la libertad […] que no aparece tradicionalmente en las constituciones clásicas […]".[47] Así pues, su inclusión expresa en la Constitución local es una muestra de que "**la garantía de ese derecho era un principio de la libertad**

---

[45]*P.A.C. v. E.L.A. I*, supra, pág. 372; *P.N.P. v. De Castro Font II*, supra, págs. 893-894.

[46]Téngase en cuenta que el derecho a la libertad de asociación no fue incluido expresamente en la Constitución federal, sino que este se deriva del derecho a la libertad de expresión. Rotunda & Nowak, *Treatise on Constitutional Law. Substance and Procedure*, Sec. 20.41(a) (5ta ed. 2013), págs. 403-404 (citas omitidas).

[47]Diario de Sesiones de la Convención Constituyente de Puerto Rico 1343 (versión digital, https://www.oslpr.org/ files/ugd/5be21a c86b5a049e3a489fb5 3e44cdeb4734d2.pdf (última visita, 10 de junio de 2024).

**humana, y por lo tanto inherente a la democracia […]
puertorriqueña".**[48]

Fue precisamente esta factura más ancha lo que conllevó
que en Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791
(2014), una controversia en la que se abolió la colegiación
compulsoria de la abogacía por infringir sobre nuestro poder
inherente para regular la profesión,[49] este Tribunal, además,
concluyera que una intervención sustancial con el derecho
a la libre asociación consagrado en la Constitución de
Puerto Rico debe evaluarse bajo el estándar de **escrutinio
estricto**.

Por tanto, bajo la Constitución de Puerto Rico, cuando
se interfiere con el derecho fundamental a la libre
asociación, deberá superarse un escrutinio constitucional
estricto. Ello presupone que la medida impugnada es
inconstitucional y, para que sobreviva, le corresponde al
Estado establecer cuál es el interés apremiante que se
persigue y que no existe un medio menos oneroso para
lograrlo. Rodríguez Casillas v. Colegio de Técnicos y

---

[48] (Negrilla suplida). Escuela de Administración Pública
de la Universidad de Puerto Rico, La nueva Constitución de
Puerto Rico, Río Piedras, EDUPR, 1954, págs. 224-225.

[49] Véase, Rivera Schatz v. ELA y C. Abo. PR II, supra,
pág. 824 (Opinión disidente emitida por el Juez Asociado
Señor Estrella Martínez).

Mecánicos Automotrices de Puerto Rico, 202 DPR 428, 449-450 (2019).[50]

Fíjese que el estándar del escrutinio estricto ha sido empleado consecuentemente por este Tribunal al analizar controversias sobre el derecho a la libre asociación. Refiérase a, Román Negrón y otros v. Colegio de Contadores Públicos Autorizados y otros, 212 DPR 509 (2023); Vélez Colón v. Colegio de Optómetras de P.R., 212 DPR 293 (2023); Reyes Sorto y otros v. ELA, 212 DPR 109 (2023) (Sentencia); Colegio de Médicos Veterinarios de Puerto Rico v. Veterinario Express y otros, 210 DPR 527 (2022) (Sentencia). Y es que es únicamente de acuerdo con el análisis exigido por el escrutinio estricto que se protege cabalmente un derecho fundamental tan trascendental como el de la libertad de asociación y se respeta la preeminencia que los constituyentes le impartieron al incluirlo expresamente en nuestra Constitución.

Por otro lado, recuérdese que la validez de la reglamentación del proceso electoral también se rige por el axioma de igualdad inmerso en nuestra Constitución.[51] El axioma constitucional de igualdad electoral tiene como fin

---

[50]Sobre el particular, véase, Rodríguez Casillas v. Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico, supra, págs.. 456-457 (Expresión concurrente emitida por el Juez Asociado Señor Estrella Martínez).

[51]P.P.D. v. Gobernador I, 139 DPR 643, 670 (1995). Este principio es de carácter continuo y, por su naturaleza dinámica, es susceptible que se manifieste en una

> **disuadir que en determinada época un partido**, que controla mayoritariamente los poderes ejecutivo o legislativo, o lo comparta con otro —**mediante anuencia o consenso**— […] agrave la situación de los partidos de oposición existentes, o **introduzca cambios de cualesquiera forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja de determinado partido, en perjuicio de aquellos existentes** o por inscribirse.[52]

En este contexto, hemos establecido como principio general que "son susceptibles de impugnación constitucional las actuaciones que hacen onerosa o afectan negativa y sustancialmente el potencial de los partidos contrarios minoritarios o nuevos, así como cuando se crean situaciones que los colocan en una posición de inferioridad".[53] Si tomamos en cuenta que "el derecho al voto, al igual que la libertad de asociación, comprende el derecho a formar y a afiliarse a agrupaciones políticas con la intención de participar en el proceso electoral", resulta imprescindible la protección de ese principio igualitario entre los partidos políticos.[54]

---

multiplicidad de dimensiones. Véase, además, P.R.P. v. E.L.A., supra, pág. 633.

[52](Negrilla y énfasis suplidos). P.R.P. v. E.L.A., págs. 637-638.

[53]P.P.D. v. Gobernador I, supra, pág. 667 (citando a P.R.P. v. E.L.A, supra, pág. 638).

[54]P.N.P. v. De Castro Font II, supra, pág. 893.

**Al escudriñar la Opinión de este Tribunal, enfatizo que su dictamen pasó por alto la preeminencia del derecho fundamental al voto y a la libre asociación, así como el axioma de igualdad electoral.**

Ello se recrudece ante el hecho de que el Movimiento Victoria Ciudadana seleccionó sus candidatos mediante asambleas distritales llevadas a cabo el 10 de marzo de 2024 y en virtud de una asamblea nacional celebrada el 16 de marzo de 2024.[55] En específico, los electores de tal colectividad seleccionaron a la Hon. Ana Irma Rivera Lassén para la candidatura de Comisionada Residente; a la Hon. Mariana Nogales Mollinelli y a la Sra. Gladys Myrna Conty para los escaños de Representantes por Acumulación; el Hon. Rafael Bernabe Riefkohl y el Sr. Alejandro Santiago Calderón para Senadores por Acumulación.

**No reconocer la validez de ese método alterno violenta el derecho al voto y a la libre asociación de las y los electores que participaron de la asamblea nacional y las de distrito, imponiendo sobre tales garantías una carga**

---

[55]Es pertinente señalar que en **ninguna** de estas fechas en las que sus afiliados escogieron a quiénes serán sus representantes en la papeleta del 2024, la CEE objetó incumplimiento alguno con el Código Electoral de 2020 o los reglamentos internos e la colectividad.

**sustancial sin que se haya precisado cuál es el interés apremiante del Estado que así lo justifica.**[56]

Debido a que el derecho al voto y a la libertad de asociación son parte de la médula de la democracia electoral, no debemos perder de perspectiva que aunque el Estado tiene un interés legítimo en la regulación de las elecciones, este no es un ente completamente independiente o neutral. En cambio, es controlado por la partidocracia de las organizaciones políticas incumbentes que presumiblemente tienen un interés particular en moldear los estatutos electorales para su propio beneficio. Por tanto, no es un misterio el motivo subyacente pretendido con el requerimiento de endosos en cuestión. Según adelantado, hoy la igualdad electoral **real** se vio reducida por el filo de una igualdad **artificialmente creada** para paradójicamente instaurar un trato desigual.

---

[56]Destáquese que, entre los derechos y las prerrogativas de los electores, se encuentra; (1) "[e]l derecho a la libre emisión del voto y a que este se cuente y se adjudique conforme a la intención del Elector al emitirlo"; "[e]l derecho del Elector a que el sistema y los procedimientos electorales estén fundamentados en su más amplia participación y accesibilidad, tomando en consideración su dignidad y su credibilidad personal, y no en la desconfianza de los Partidos Políticos"; "[e]l derecho fundamental del Elector a la libertad de asociación mediante la inscripción de Partidos Políticos, así como el derecho de afiliarse al Partido de su preferencia y a endosar las candidaturas de aspirantes apelantes a cargos electivos por su Partido, conforme se define en esta Ley". 16 LPRA sec. 4561 (1), (5), (11).

El Poder Judicial no puede operar en abstracción de esa realidad fáctica, especialmente cuando las restricciones promulgadas en las leyes electorales y sus reglamentos son tan severas que tienen el efecto de crear muros infranqueables a la competencia electoral en detrimento del axioma de la igualdad electoral. En tales casos, la utilización de un escrutinio estricto ayuda a garantizar que esas limitaciones estén verdaderamente justificadas y que los intereses del Estado, si algunos, no sean simplemente pretextos para lograr colar restricciones que promueven una competencia discriminatoria e inconstitucional en detrimento de las garantías de la Constitución de Puerto Rico.[57]

Lamentablemente, el Poder Judicial ignoró esa realidad. Ante ello, a lo menos, resultaba imprescindible rechazar cualquier interpretación de la ley que tuviera el efecto de violentar el acceso a la papeleta, la libre selección y el voto de un elector. Así como nada en la ley exige el recogido de endosos bajo un método alterno, pues ni tan siquiera establece tal requerimiento, no existe impedimento alguno para la concesión de una prórroga para la subsanación del requerimiento ahora pretendido. Es más, todo lo contrario, pues incluso otras disposiciones del Código Electoral de 2020 exigen que la Comisión Estatal de Elecciones establezca "procedimientos para subsanar o corregir, de la manera más

---

[57]Clingman v. Beaver, 544 US 581, 603 (2005) (Opinión concurrente de Justice O'Connor).

expedita y sencilla posible para los electores, cualquier error, omisión o discrepancia que surja en todo tipo de transacción electoral". 16 LPRA sec. 4575.

Como agravante, recuérdese que la Comisión Estatal de Elecciones le notificó y representó a los aspirantes que

> **[S]i su partido ha sido acogido por método alterno de selección según el Código Electoral de Puerto Rico de 2020 no es requisito presentar peticiones de endosos**.

Esta notificación **nunca** fue rebatida de modo alguno durante los procedimientos administrativos ni ante el foro primario, pues hasta el foro primario la acogió en múltiples de sus determinaciones de hechos.[58] Adviértase que todas estas representaciones fueron realizadas mediante la plataforma de SIEN, la que, tal y como recoge la determinación de hecho #9 del Tribunal de Primera Instancia, es "[l]a Comisión Estatal de Elecciones [quien] maneja la presentación de candidaturas mediante el Sistema de Notificación de Intención de Aspirar a una Candidatura y Sistema de Endosos (SIEN)".[59]

Al pretender validar la exigencia de presentación de los endosos luego de que la CEE le representara a los candidatos seleccionados bajo el método alterno durante todo

---

[58]Véanse las Determinaciones de Hecho #10-17 y #31 en la Sentencia del TPI.

[59]Íd., pág. 9. Véanse además los Art. 3.13(3), Art. 6.4 (a) y (e), Art. 7.15(2), Art. 7.16 del Código Electoral de 2020.

el procedimiento administrativo que ello no era necesario, exigía, como mínimo, la oportunidad de subsanar o pautar prospectivamente.[60] **Sin embargo, una mayoría de este Tribunal rechaza múltiples opciones razonables y no lesivas a garantías constitucionales, acudiendo a la alternativa más drástica, lo cual rechazo tajantemente.**

V

En definitiva, ninguna disposición del Código Electoral de 2020 exige que un aspirante que pertenece a un partido político que se acogió al método alterno interno presente los endosos que son exigidos en los casos de primarias de ley. Tampoco la intención legislativa de la ley electoral actual es que estas y estos presenten endosos como condición para la candidatura a un escaño político. La única disposición que exige tal requerimiento a una fecha fatal es el <u>Reglamento para la radicación de candidaturas de los partidos políticos y candidatos independientes</u>, el cual, según demostrado, es <u>ultra vires</u> y nulo porque no complementa el Código Electoral de 2020, sino que lo contradice al desnaturalizar lo **alterno** de un método que es **distinto** a una primaria.

---

[60]Nótese que la única intervención que tuvo la CEE ante el foro primario fue relacionada a la presentación de una moción asumiendo representación legal. **<u>Si alguna omisión debe tener gran peso y generar suspicacia es el silencio de la CEE luego de que les notificara a los aspirantes que no era necesario el recogido de los endosos ahora pretendido</u>**.

Más allá de que erróneamente se concluyó que era necesaria la recolección de endosos, este Tribunal prescindió de auscultar la validez de ese requerimiento a partir de las garantías constitucionales aplicables. Lo anterior, a pesar de que el derecho constitucional a la libre asociación para la elección de candidatos, el cual cobra eficacia en virtud del derecho al sufragio, es fundamental para la operación de nuestro sistema político electoral.

Para justificar su determinación, la Mayoría, además, echa mano a la "navaja de Ockham".[61]  Al no profundizar en lo que realmente planteaba Ockham, se quedan en el análisis superficial de que, ante dos (2) posibles soluciones, debe optarse por la más simple. Indistintamente, la controversia compleja y de alto interés público ante nuestra consideración no se resuelve con alguna de las variantes interpretativas de la "navaja de Ockham", sino con el Derecho Electoral, el Derecho Constitucional puertorriqueño, los postulados básicos del Derecho Administrativo y las normas de hermenéutica que rigen en nuestro ordenamiento jurídico electoral.[62] Una aplicación correcta del Derecho nos conduce

---

[61]Véase, Opinión mayoritaria, pág. 54.

[62]La navaja de Ockham no es una recomendación de que la teoría más simple sea la más válida, sino que en, **igualdad de condiciones**, sean preferidas las teorías más simples. La improcedencia de utilizarla en esta controversia estriba, precisamente, en que no todo tipo de acceso a la papeleta es igual. Existen diversas variantes válidamente democráticas y quitarle lo "alterno" al método alterno va dirigido a equipararlo indebidamente a la rigurosidad de una primaria de ley.

a reconocer que, ante las opciones provistas por las partes, resulta inaceptable optar por la **más drástica** —en este caso, la exclusión de los candidatos impugnados—, tal y como lo ha hecho la Mayoría.

Las garantías constitucionales que protegen a los electores, partidos políticos y candidatos electos en métodos alternos obligan a reconocer que sacar a opositores de la papeleta no es la opción que promueve el mejor balance de los intereses públicos. **La medida drástica promovida por una Mayoría, y respaldada ante este Tribunal por una Comisión Estatal de Elecciones que cada vez más destila menos confianza en la ciudadanía, simple y sencillamente se asemeja a las determinaciones de inhabilitación de opositores avaladas por foros judiciales de jurisdicciones extranjeras, lo cual ha sido objeto de un contundente rechazo por parte de la comunidad internacional.**

Cualquier acción del Estado que pretenda lacerar cualesquiera de los derechos constitucionales aquí implicados tiene que cumplir con la pesada carga del escrutinio estricto para que se justifique su validez. Esto, máxime, cuando este Tribunal ha sentenciado que "el derecho al voto no tan sólo comprende el derecho del elector a votar en las elecciones, <u>sino que abarca el derecho a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas contemporáneas del elector</u>".[63] **Empero,**

---

[63]<u>P.N.P. v. De Castro Font II</u>, supra, pág. 893.

**hoy, la posibilidad de que la papeleta electoral de los próximos comicios electorales refleje esas corrientes modernas fue drásticamente cercenada.**

Ante ese cuadro, al brindársele una deferencia indebida a una determinación que pasó por alto argumentos jurídicos trascendentales, se laceran insosteniblemente los derechos fundamentales al sufragio y a la libertad de asociación garantizados expresamente en la Constitución de Puerto Rico. La mayoría de este Tribunal comete un gran error histórico al vetar judicialmente la aparición de candidatos que no tienen impedimento legal para figurar en la papeleta de las elecciones generales del 2024. **DISIENTO.**

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Hon. Jorge Alfredo Rivera Segarra y otros | | |
|---|---|---|
| Recurridos | | |
| v. | CC-2024-0266 cons. con CC-2024-0267 | *Certiorari* |
| Hon. Ana Irma Rivera Lassen, y otros | | |
| Recurridos | | |
| Hon. José "Pichy" Torres Zamora, y otros | | |
| Peticionarios | | |

Opinión Disidente emitida por el Juez Asociado SEÑOR COLÓN PÉREZ.

En San Juan, Puerto Rico, a 10 de junio de 2024.

> ***Nosotros, el pueblo de Puerto Rico,*** *a fin de organizarnos políticamente sobre una base plenamente democrática, promover el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos, puesta nuestra confianza en Dios Todopoderoso, ordenamos y establecemos esta Constitución para el Estado Libre Asociado que en el ejercicio de nuestro derecho natural ahora creamos dentro de nuestra unión con los Estados Unidos de América.*
>
> *Al así hacerlo declaramos:*
>
> *Que el sistema democrático es fundamental para la vida de la comunidad puertorriqueña;*
>
> *Que **entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público,** donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas;*
>
> *[...]*
>
> *Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico.* (Énfasis suplido).

**Le toca ahora al Pueblo, -- con su voto, en las urnas de la democracia --, silenciar a quienes le han silenciado. No queda más.**

Y es que hoy, en lo que puede catalogarse como una lamentable página en la historia de este Alto Foro, una mayoría de mis compañeros y compañera de estrado, de golpe y porrazo, y con solo una contada excepción, han dejado fuera del espectro político del País a una colectividad que, -- a través del voto igual, directo, secreto y libre emitido por miles de puertorriqueños y puertorriqueñas en las elecciones generales de 2020 --, ya se había ganado su espacio en el referido entorno. Al así proceder, una mayoría de este Tribunal le limita a los puertorriqueños y a las puertorriqueñas el derecho fundamental de decidir quiénes son las personas llamadas a formar gobierno.

La voluntad del Pueblo como fuente del poder público, principio que se recoge con meridiana claridad en el preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico, ha quedado a un lado. Olvida una mayoría de mis compañeros y compañera de estrado que en ese preámbulo constitucional se embarcan los objetivos del pacto de organización política que se dio en nuestro País allá para el año 1952; objetivos que son guía obligatoria para los órganos del Estado, y que van por encima de cualquier ley, reglamento u ordenanza que aquí se apruebe. Máxime, cuando se trata de una disposición legal tan cuestionada como lo

ha sido, -- desde su aprobación --, el Código Electoral de 2020, *infra*.

Si bien reconocemos que, en lo que respecta a la causa de epígrafe, una mayoría de este Tribunal, a grandes rasgos, pudo haber hecho un acercamiento correcto en derecho a la controversia que tenía ante su consideración, el remedio concedido en este caso, -- entiéndase, descalificar a ciertos candidatos y candidatas a puestos electivos, bajo la bandera del Movimiento Victoria Ciudadana --, se aparta de esas nociones más básicas de la vida en democracia que hemos reseñado. Por ello, disentimos.

Al disentir destacamos que, con tan solo adentramos en un estudio, cuidadoso y desapasionado, de los hechos que dieron margen al presente litigio, de inmediato notamos que las continuas representaciones hechas al Movimiento Victoria Ciudadana por parte de la Comisión Estatal de Elecciones, -- a los fines de que ésta organización política no tenía que recoger endosos si optaba por el método alterno de selección de sus candidatos y candidatas para las elecciones generales del año 2024 --, eran razón suficiente para que aplicase aquí la doctrina de actos propios y, en consecuencia, se concediese un remedio en equidad. Remedio que no fuese uno tan severo como la descalificación de determinados candidatos y candidatas a puestos electivos, como erróneamente hizo una mayoría de mis compañeros y compañera de estrado. El Art. 7.5 del

Código Electoral de 2020, *infra*, -- al solo sugerir una autorización para descalificar en situaciones como éstas, sin la obligación de llevar a cabo dicha acción --, así lo permitía.[1]

**Ordenar el recogido de endosos, y, posteriormente, el que se pase a la selección de candidatos o candidatas mediante el método que se elija en el referido partido político, era el remedio en equidad para un caso como el de marras, donde está envuelto el derecho fundamental al voto.[2] Los otros remedios sobre la mesa, que hoy, y con solo una contada excepción, avala una mayoría de este Tribunal, constituyen, -- extrapolando terminología de otras áreas del derecho, solo para fines ilustrativos --, un castigo cruel e inusitado a la democracia y a la voluntad política del Pueblo de Puerto Rico.** Veamos.

I.

El pasado 1 de febrero de 2024, el Hon. Jorge A. Rivera Segarra, miembro de la Cámara de Representantes de Puerto Rico por el Distrito 22, -- el cual agrupa los pueblos de Lares, Utuado, Adjuntas y Jayuya --, bajo la insignia del

---

[1] Dicho artículo dispone, en lo pertinente, que: "Cualquier Aspirante o Candidato nominado **podrá** ser descalificado como tal, por el Tribunal de Primera Instancia, cuando medie querella porque no cumple con los requisitos impuestos por la Constitución o la ley, o cuando se demostrare que ha violado cualesquiera de las disposiciones de esta Ley o de sus reglamentos.". (Énfasis suplido). Art. 7.5 del Código Electoral de 2020, *infra*, 16 LPRA sec. 4615.

[2] **Recordemos que este partido político ya celebró una Asamblea General, válida en ley, donde tuvo la oportunidad de seleccionar los candidatos y candidatas a los puestos electivos aquí en controversia, por lo que bien, luego del recogido de endosos de rigor, pudiesen ratificarse los mismos.**

Partido Popular Democrático (en adelante, "PPD") y otros[3] (en adelante y en conjunto, "los querellantes"), presentaron ante el Tribunal de Primera Instancia una *Querella*, de conformidad con el Art. 7.5 de la Ley Núm. 58-2020, también conocida como el Código Electoral de Puerto Rico de 2020 (en adelante, "Código Electoral de 2020"), *infra*, en contra de la Hon. Ana Irma Rivera Lassen, Senadora por Acumulación y aspirante a Comisionada Residente por el Movimiento Victoria Ciudadana (en adelante, "MVC") y otros[4] (en adelante y en conjunto, "los querellados"). En la mencionada *Querella*, los querellantes explicaron que, -- de cara a las elecciones generales de 2024 --, tanto el MVC, como Proyecto Dignidad, habían optado por acogerse al proceso de método alterno para la selección de sus

---

[3] Específicamente, el Hon. Héctor L. Santiago Torres, Senador del Distrito de Guayama por el PPD; la Lcda. Yulixa Paredes Albarrán, aspirante a Representante del Distrito 13 por el PPD; y el Sr. Jorge Quiles Gordillo, aspirante a Representante por Acumulación por el PPD.

[4] En particular, el Sr. Edgardo Cruz Vélez, aspirante a Comisionado Residente por el MVC; el Sr. Alejandro Santiago Calderón, aspirante a Senador por Acumulación por el MVC; el Sr. Edwin Marrero Martínez, aspirante a Senador por Acumulación por el MVC; la Hon. Mariana Nogales Molinelli, Representante por Acumulación y aspirante a dicho puesto por el MVC; el Lcdo. Olvin Valentín Rivera, aspirante a Representante por Acumulación por el MVC; la Sra. Gladys Myrna Conty Hernández, aspirante a Representante por Acumulación por el MVC; el Sr. Anthony Sánchez Aponte, aspirante a Representante por el Distrito 38 por Proyecto Dignidad; el Sr. Stephen D. Gil Álamo, aspirante a Representante por el Distrito 38 por Proyecto Dignidad; y el Sr. Wilfredo Pérez Torres, aspirante a Representante por el Distrito 38 de Proyecto Dignidad.

La *Querella* también se presentó en contra de la Hon. Jessika Padilla Rivera, Presidenta Interina de la Comisión Estatal de Elecciones; la Lcda. Lilliam Aponte Dones, Comisionada Electoral del MVC; la Lcda. Vanessa Santo Domingo Cruz, Comisionada Electoral del Partido Nuevo Progresista; la Lcda. Karla Angleró, Comisionada Electoral del PPD; el Sr. Roberto Iván Aponte, Comisionado Electoral del Partido Independentista Puertorriqueño; y el Lcdo. Nelson Rosario Rodríguez, Comisionado Electoral de Proyecto Dignidad. Eventualmente, los querellantes incluyeron en el pleito al MVC, como partido político, al Sr. Ramón Cruz Díaz, aspirante a Senador por el MVC y al Hon. Rafael Bernabe Riefkohl, Senador por Acumulación y aspirante al mismo puesto por el MVC.

candidatos. Asimismo, indicaron que ninguno de estos partidos políticos presentó ante la Comisión Estatal de Elecciones (en adelante, "CEE"), en o antes del 30 de diciembre de 2023 a las 12:00 del mediodía, los expedientes y demás documentos requeridos por ley de los candidatos y candidatas que habían sido escogidos como candidatos únicos, bajo el antes mencionado método de selección.

En consecuencia, arguyeron que los querellados, -- de conformidad con lo dispuesto en el *Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes*, *infra*, de dicha agencia gubernamental --, venían obligados a recoger, dentro del término previsto por ley para realizar tal actuación, las correspondientes peticiones de endosos para poder participar de las próximas elecciones. Al no hacerlo así, sostuvieron que estos debían ser descalificados como aspirantes a cargos electivos en las próximas elecciones generales.

Presentada la referida *Querella*, el foro primario emitió una *Orden de señalamiento de vista* para el 12 de febrero de 2024. En igual fecha, -- entiéndase, el 12 de febrero de 2024 --, el Hon. José Torres Zamora, Representante por Acumulación por el Partido Nuevo Progresista (en adelante, "PNP") y otros[5] (en adelante y en

---

[5] A saber, la Hon. Keren L. Riquelme Cabrera, Senadora por Acumulación por el PNP; la Sra. Leyda Cruz Berríos, aspirante a Senadora por Acumulación por el PNP; y la Hon. Wanda del Valle Correa, Representante del Distrito 38 por el PNP.

conjunto, "partes interventoras") presentaron una *Demanda de intervención* ante el Tribunal de Primera Instancia. En su escrito, y en esencia, estos alegaron que la resolución del pleito sin su presencia les afectaría, pues los querellados compiten por los mismos puestos a los que estos aspiran en las elecciones generales, y que, distinto a ellos, estos últimos no habían cumplido con el requisito de entrega de peticiones de endosos impuesto por ley.

Así las cosas, en la vista pautada para el 12 de febrero de 2024, todas las partes en el litigio argumentaron sobre la procedencia de la referida *Demanda de intervención* y otros asuntos de naturaleza procesal. De igual forma, el foro primario emitió varias órdenes con miras a agilizar la resolución del caso. Eventualmente, se señaló una vista argumentativa para el 8 de marzo de 2024.

Por su parte, el 16 de febrero de 2024 la Dra. Marigdalia Ramírez Fort (en adelante, "doctora Ramírez Fort"), -- quien fue aspirante a Comisionada Residente por el PNP hasta el 31 de enero de 2024, cuando fue descalificada por no cumplir con el requisito de las peticiones de endosos --, presentó una *Demanda de intervención* ante el Tribunal de Primera Instancia. En ésta, alegó que una determinación favorable para los querellados tendría implicaciones directas en su persona, pues, a su entender, ello significaría exceptuar del requerimiento legal de las peticiones de endosos a determinados competidores.

Enterados de lo anterior, y, en respuesta, varios de los querellados se opusieron a la *Demanda de intervención* de la doctora Ramírez Fort. No obstante, el 20 de febrero de 2024 el foro primario autorizó la intervención de ésta en el pleito.

Así pues, el 20 de febrero de 2024 los querellados, -- algunos por su cuenta y otros en conjunto --, presentaron sus respectivas alegaciones responsivas ante el Tribunal de Primera Instancia. Entre éstas, presentaron varias mociones solicitando la desestimación del pleito y/o su resolución sumaria.

En esencia, los querellados del MVC sostuvieron que, para la fecha en que cerró el proceso de presentación de candidaturas ante la CEE, estos habían cumplido con la entrega oportuna de los documentos requeridos para figurar como aspirantes. A su vez, arguyeron que la posición del MVC, -- y de la propia CEE --, era que estos no tenían que recoger peticiones de endosos, toda vez que dicho partido se había acogido al método alterno para la selección de candidaturas.

Para sustentar sus planteamientos, expusieron que el MVC había aprobado su *Reglamento para la elección de candidaturas para las elecciones generales de 2024 del MVC*, el cual establecía, entre otras cosas, que las personas que se sometiesen al proceso de nominación y elección dispuesto en éste no tendrían que cumplir con los requisitos de presentación de peticiones de endosos para calificar como

candidatas o candidatos del partido. Enfatizaron que dicho reglamento había sido evaluado por la CEE y que la mencionada entidad no había realizado señalamiento alguno al respecto.

De igual forma, argumentaron que la CEE no le advirtió o comunicó al MVC, ni a sus aspirantes, sobre la necesidad de recoger las peticiones de endosos en caso de que el método alterno no se celebrara antes del 30 de diciembre de 2023. Además, señalaron que, al someter a la CEE, -- mediante el Sistema de Notificación de Intención de Aspirar a una Candidatura y Sistema de Endosos (en adelante, "SIEN")[6] --, los documentos requeridos para figurar como aspirantes a determinados cargos electivos, recibieron el siguiente mensaje: "***Si su partido ha sido acogido por método alterno de selección según el Código Electoral de Puerto Rico de 2020 no es requisito presentar peticiones de endosos***".[7]

Asimismo, al evaluar la legislación y reglamentación pertinente, los querellados del MVC señalaron que, en virtud de las reglas de hermenéutica legal, era forzoso concluir que el método alterno de selección de candidatos estaba exento de cumplir con el requisito de presentación de peticiones de endosos. Esto pues, a su entender, el

---

[6] Según el Código Electoral de 2020, *infra*, SIEN es "un sistema informático y con acceso cibernético para el acopio, presentación, evaluación y validación o rechazo de toda petición de endoso requerida por [dicho estatuto]". Art. 3.13, 16 LPRA sec. 4523.

[7] (Énfasis suplido). Véase Determinaciones de hechos núms. 10-17 de la *Sentencia* del Tribunal de Primera Instancia, págs. 6-8.

Código Electoral de 2020, *infra*, no le imponía tal requisito a aspirantes de un partido político acogido a un método alterno de selección, ni tampoco autorizaba a la CEE a así hacerlo.

El MVC, como partido político, por su parte, argumentó ante el foro primario que el Código Electoral de 2020, *infra*, no permitía la descalificación de un aspirante por no entregar las peticiones de endosos correspondientes cuando su partido había optado por acogerse al método alterno de selección de candidaturas. En ese sentido, enfatizó que el diseño de un método alterno le correspondía exclusivamente al partido y no a la CEE. Además, arguyó que el recogido de peticiones de endosos era obligatorio para las primarias, pero optativo en el método alterno.

Evaluados los anteriores documentos, el 21 de febrero de 2024 el Tribunal de Primera Instancia ordenó a los querellantes a replicar en conjunto los escritos presentados por los querellados. De igual forma, le ordenó a las partes interventoras a replicar las mociones dispositivas presentadas.

En cumplimiento con lo anterior, el 23 de febrero de 2024 las partes interventoras presentaron una *Oposición a sentencia sumaria y moción de desestimación solicitud de determinación ante falta de controversia sobre hechos materiales y pertinentes*. Asimismo, el 24 de febrero de 2024 los querellantes presentaron una *Moción en cumplimiento de orden y oposición a solicitudes de*

*desestimación y solicitudes de sentencia sumaria y solicitud para que se conceda remedio por no existir controversia de hechos materiales*. De igual forma, y para esa misma fecha, la doctora Ramírez Fort presentó una *Moción en cumplimiento de orden*.

Luego de presentadas otras mociones en respuesta a los escritos aludidos en el párrafo anterior, el 28 de febrero de 2024 el foro primario notificó a todas las partes que no se aceptarían más escritos. Así pues, el caso quedó sometido y se realizó la correspondiente vista de argumentación el 8 de marzo de 2024.

**Celebrada la vista argumentativa de rigor, en la cual el Tribunal de Primera Instancia tuvo la oportunidad de examinar los argumentos de todas las partes con interés en el pleito, el 21 de marzo de 2024 dictó *Sentencia*. Al así hacerlo, declaró no ha lugar a las mociones de desestimación presentadas por los querellados y ha lugar a la *Querella* instada por los querellantes. En consecuencia, luego de concluir que, -- pasado el 30 de diciembre de 2023 --, los aquí querellados debían recoger peticiones de endosos como condición para participar del proceso eleccionario que se avecina, descalificó a estos de poder competir en los comicios a celebrarse en noviembre de 2024.**

Inconforme con la determinación del foro primario, el 1 de abril de 2024 los querellados presentaron ante el

Tribunal de Apelaciones una *Apelación civil*.[8] En ésta, sostuvieron, entre otras cosas, que: (1) las partes que incoaron el presente litigio no poseen legitimación activa para instar el mismo; (2) el Código Electoral de 2020, *infra*, no requiere el recogido de peticiones de endosos para los aspirantes de partidos políticos que se acogen a un método alterno de nominación; (3) la precitada disposición legal no faculta a la CEE a adoptar reglas para los métodos alternos como sí lo está para hacerlo en el contexto de primarias; (4) dicho estatuto de naturaleza electoral tampoco establece fecha cierta o final para celebrar los métodos alternos de nominación; y que (5) la imposición de un deber de presentar peticiones de endosos, como paso previo a presentarse en un evento eleccionario, vulneraría los derechos a la libertad de asociación y al voto de los querellados.

A dicha solicitud, el 1 de abril de 2024 los querellantes se opusieron bajo fundamentos similares a los expuestos ante el Tribunal de Primera Instancia.[9]

**Así las cosas, el 30 de abril de 2024 el foro apelativo intermedio (panel compuesto por el Juez Figueroa Cabán, el Juez Bonilla Ortiz, la Jueza Mateu Meléndez y la Jueza**

---

[8] Es importante mencionar que los querellados Edwin Marrero Martínez, Olvin M. Valentín Rivera y Ramón Cruz Díaz no apelaron la determinación del Tribunal de Primera Instancia al Tribunal de Apelaciones.

[9] Conviene señalar que el Tribunal de Apelaciones celebró una vista oral para evaluar los argumentos de las partes el pasado 24 de abril de 2024.

**Prats Palerm)[10] emitió una *Sentencia* mediante la cual revocó la determinación del foro primario.[11] En particular, el Tribunal de Apelaciones concluyó que los querellantes y partes interventoras carecían de legitimación activa, pues, según su análisis, estos no pudieron demostrar haber sufrido un daño claro y palpable.**

Inconformes con dicha determinación, el 2 de mayo de 2024 los querellados presentaron una *Petición de certiorari* ante este Tribunal. En ésta, y, en síntesis, sostienen que el foro apelativo intermedio erró al determinar que estos carecían de legitimación activa para instar el presente litigio, ignorando, a su entender, la legitimación estatutaria que confiere a todo elector el Art. 5.1 del Código Electoral de 2020, *infra*.

Por su parte, para esa misma fecha, las partes interventoras presentaron ante esta Curia un *Recurso de certiorari.* En éste, también argumentan que les es de aplicación la legitimación estatutaria del referido Art. 5.1 del Código Electoral de 2020, *infra*. En la alternativa, arguyen que cumplen con los requisitos generales de legitimación activa, toda vez que el hecho de que los querellados puedan figurar en las próximas elecciones como candidatos, sin cumplir con el requisito reglamentario

---

[10] El Juez Figueroa Cabán, por su parte, emitió un voto conforme en cuanto al caso KLAN202400359, pero un voto disidente con opinión escrita en el caso KLAN202400304.

[11] Es menester indicar que el Tribunal de Apelaciones desestimó el recurso de los aspirantes por el Proyecto Dignidad por falta de jurisdicción al entender que estos recurrieron ante dicho foro a destiempo.

cuestionado, implica un daño claro y palpable para éstos y éstas.

Trabada así la controversia, -- y en lo que, sin lugar a duda, representa un peligroso precedente para nuestro País --, una mayoría de este Tribunal, al revocar al Tribunal de Apelaciones, mediante el más severo de los remedios, y salvo una contada excepción, despoja a los querellados de la oportunidad de poder participar del proceso eleccionario a celebrarse en el País el próximo 5 de noviembre de 2024. Ello, sin tomar en consideración las lagunas en la ley respecto al requisito cuestionado, -- objeto de estudio en el presente litigio --, y las representaciones hechas por la CEE que, evidentemente, indujeron a error a estos últimos.

Con esta determinación, como ya mencionamos, este Alto Foro violenta los derechos constitucionales más básicos que le asisten a los querellados, pero aún más preocupante, transgrede el derecho del Pueblo a votar por aquellas personas que considera representan sus intereses. Ante tal escenario, no nos queda más remedio que disentir energéticamente. Explicamos por qué.[12]

---

[12] Cabe mencionar que la doctrina de justiciabilidad es una norma de autolimitación judicial que "busca evitar la obtención de un fallo sobre una controversia que en verdad no existe, una determinación sobre un derecho que no ha sido reclamado, o una sentencia que, en el momento en que se dicta, no podrá tener efectos prácticos sobre una controversia". *Ramos, Méndez v. García García*, 203 DPR 379, 435 (2019) (Colón Pérez, opinión disidente). En ese sentido, -- y como parte de las vertientes de la referida doctrina --, el concepto de legitimación activa requiere que la persona que inste una acción judicial demuestre que: (1) ha sufrido un daño claro y palpable; (2) el daño en cuestión sea real, inmediato y preciso, no abstracto ni hipotético; (3) existe una relación causal razonable entre la acción ejercitada y el daño alegado; y que (4) la causa de acción instada surja al amparo de la Constitución o de

II.

A.

Como es sabido, -- a diferencia de la Constitución de los Estados Unidos de América --, la Constitución del Estado Libre Asociado de Puerto Rico, en su Art. II, Sec. 2, le garantiza, a toda persona que aquí habita, el derecho fundamental al voto. Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1. En específico, el texto de la precitada cláusula constitucional sostiene que "[nuestras] leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". *Íd.*

Así pues, y como se puede apreciar, del Art. II, Sec. II de nuestra Carta Magna, emana la responsabilidad dual que, en cuanto a este asunto, tiene el Estado. En primer lugar, nuestro órgano gubernamental tiene el deber de abstenerse de interferir con el libre ejercicio del voto por parte de las ciudadanas y los ciudadanos de Puerto Rico. *Com. CNP v. C.E.E.*, 197 DPR 914, 985 (2017) (Colón

---

alguna ley. *Hernández, Santa v. Srio. De Hacienda*, 208 DPR 727, 739 (2022); *Lozada Sánchez et al. v. JCA*, 184 DPR 898, 917 (2012); *Fund. Surfrider y otros v. A.R.Pe.*, 178 DPR 563, 572 (2010). Si un tribunal, al emplear el análisis anterior, determina que la persona que reclama ante sí un remedio no posee legitimación activa, deberá rehusar adentrarse a considerar el asunto y desestimar el pleito.

En el caso de autos, basta con señalar que, contrario a lo sentenciado por el Tribunal de Apelaciones, somos del criterio de que los aquí peticionarios sí tenían legitimación activa para instar la *Querella* en cuestión. Ello, pues estos sufrirían un daño claro y palpable al verse obligados a competir para los mismos puestos electivos con personas que, distinto a ellos, no cumplieron con el requisito de presentar las peticiones de endosos.

Pérez, opinión disidente); *P.P.D. v. Gobernador I*, 139 DPR 643, 670 (1995). Véase también, *Sánchez y Colón v. E.L.A. I*, 134 DPR 445, 449-450 (1993). En segundo lugar, tiene el deber afirmativo de proteger a estos últimos, entiéndase nuestros ciudadanos y ciudadanas, contra cualquier coacción que pretenda interferir con el ejercicio de su prerrogativa electoral. *Íd.*

Sobre el particular, y según se desprende del *Diario de Sesiones de la Convención Constituyente*, los forjadores y las forjadoras de la Constitución del Estado Libre Asociado de Puerto Rico consideraron imprescindible otorgarle rango constitucional al derecho al voto y revestirlo de la mayor protección. *Ramírez de Ferrer v. Mari Brás*, 144 DPR 141, 173 (1997). Véase también, *Diario de Sesiones de la Convención Constituyente*, págs. 1739-1740, 2960 (1952) (versión digital). Todo esto, con la finalidad de "asegurar que las decisiones colectivas y el poder público en Puerto Rico respondiesen a cabalidad a la voluntad del [P]ueblo". *Ramírez de Ferrer v. Mari Brás*, *supra*, pág. 173.

Cónsono con ello, en innumerables ocasiones, este Tribunal ha sentenciado que, en nuestro ordenamiento jurídico, el derecho al voto se considera una de las prerrogativas más importantes del Pueblo. *Pierluisi et al. v. C.E.E. et al.*, 204 DPR 841, 854 (2020); *Ramírez de Ferrer v. Mari Brás*, *supra*, pág. 173; *P.P.D. v. Admor. Gen. De Elecciones*, 111 DPR 199, 207 (1981). Lo anterior, pues el

voto representa el mecanismo principal mediante el cual nuestras ciudadanas y ciudadanos ejercen su poder soberano y expresan su voluntad. *Íd.*

B.

Establecido lo anterior, y por considerarlo en extremo importante para la correcta disposición de las controversias ante nuestra consideración, conviene mencionar también que el derecho al voto está directamente ligado a otros derechos constitucionales fundamentales que el Pueblo se reservó frente al Estado, tales como el derecho a la libertad de expresión y a la libertad de asociación. En específico, el voto se considera uno de los instrumentos en virtud de los cuales se garantiza la expresión libre de la voluntad ciudadana. Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1. Véase, *Suárez Cáceres v. Com. Estatal de Elecciones*, 176 DPR 31, 70-71 (2009); *Ramírez de Ferrer v. Mari Brás*, *supra*, pág. 221 (Negrón García, opinión concurrente).

En esa dirección, en el pasado, hemos señalado que el derecho al sufragio, como instrumento de la libertad de expresión, comprende "la prerrogativa del ciudadano de votar por el candidato o las opciones de su predilección". *Suárez Cáceres v. Com. Estatal de Elecciones*, *supra*, pág. 71. Y, por ser una garantía tan abarcadora y fundamental, comprende también "el derecho a acudir a las urnas y depositar la papeleta en blanco o dañarla, si ese es su deseo o empeño". *Íd.*

De otra parte, y en cuanto a su relación con el derecho a la libertad de asociación, este Tribunal ha sostenido que el derecho al voto incluye el derecho a formar agrupaciones políticas para participar en los eventos electorales. *McClintock v. Rivera Schatz*, 171 DPR 584, 597 (2007); *P.N.P. v. De Castro Font II*, 172 DPR 883, 893 (2007); *P.A.C. v. E.L.A*, 150 DPR 359, 372 (2000). Tal es el caso de los partidos políticos.

Como corolario de lo anterior, hemos enfatizado que los partidos políticos constituyen un agente fundamental de la democracia moderna, pues funcionan como vías para canalizar las distintas tendencias políticas de la sociedad. *McClintock v. Rivera Schatz*, *supra*, pág. 597; *P.R.P. v. E.L.A.*, 115 DPR 631, 638 (1984); *P.S.P. v. E.L.A.*, 107 DPR 590, 610 (1978). En ese sentido, el derecho al voto comprende la garantía de que se incluyan en las papeletas que se utilizan el día del evento eleccionario las opciones que reflejan las corrientes políticas contemporáneas del elector. *McClintok v. Rivera Schatz*, *supra*, pág. 605; *P.N.P. v. De Castro Font* II, *supra*, pág. 893; *P.A.C. v. E.L.A. I*, *supra*, pág. 372. Esto, pues, "[p]ara que la democracia funcione y alcance su más alto potencial es menester que los electores puedan considerar y deliberar todas sus opciones en un espíritu de libertad de conciencia, de pensamiento y de expresión [...][n]o puede haber consentimiento democrático cuando no se pueden expresar opiniones contrarias, disidentes o heterodoxas."

*Ramírez de Ferrer v. Mari Brás*, *supra*, págs. 222-223 (Negrón García, opinión concurrente).

Dicho ello, con este marco constitucional en mente, pasemos ahora a evaluar aquellas disposiciones del Código Electoral de 2020, *infra*, y la reglamentación que de ellas emana, que son de particular importancia para comprender la naturaleza y el alcance de las interrogantes que estamos llamados a responder.

### III.

### A.

Sobre este extremo, de entrada, cabe mencionar que, de conformidad con lo dispuesto en nuestra Carta Magna, es la Asamblea Legislativa del País la llamada a regular "todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Art. VI, Sec. 4, Const. ELA, LPRA, Tomo 1. Sin embargo, aunque la referida rama de gobierno tiene amplia facultad para reglamentar los procesos electorales, le corresponde a los tribunales, en última instancia, asegurar que la legislación promulgada a esos fines cumpla con las garantías constitucionales establecidas en la Constitución del Estado Libre Asociado de Puerto Rico. *Aponte Rosario v. Pres. CEE II*, 205 DPR 400, 475-476 (2020) (Colón Pérez, opinión disidente); *Sánchez y Colón v. ELA II*, 134 DPR 503, 530 (1993) (Hernández Denton, opinión de conformidad); *P.P.D. v. Admor. Gen. De Elecciones*, *supra*, pág. 221.

Al respecto, y para adentrarse en la anterior tarea, según ha sido previamente señalado por este Tribunal, es necesario que nuestros jueces y juezas realicen "[u]n delicado balance entre el derecho fundamental al sufragio y el interés del Estado en reglamentar su ejercicio para que el proceso se conduzca ordenadamente con la mayor participación de electores en igualdad de condiciones". *Sánchez y Colón v. E.L.A. I*, *supra*, págs. 449-450. Véase, además, *Com. PNP v. CEE et al.*, 197 DPR 914, 986 (2017) (Colón Pérez, opinión disidente). Esto, pues, "[e]l Derecho Electoral concierne los derechos básicos de una democracia y la legitimidad de sus elecciones, lo cual requiere un especial celo en actuar con el mayor cuidado y estudio". H. L. Acevedo, *La democracia puertorriqueña y su sistema electoral*, en *Puerto Rico y su gobierno: estructura, retos y dinámicas*, Puerto Rico, Ed. SM, 2016, pág. 297. En ese sentido, ante cualquier posible vaguedad o laguna en las disposiciones estatutarias o reglamentarias que regulan el ejercicio del voto, la interpretación adoptada debe dar primacía a la máxima protección de la expresión electoral. *Guadalupe v. CEE*, 165 DPR 106, 117 (2005); *Suárez v. CEE V*, 163 DPR 541, 542 (2004); *Suárez v. CEE I*, 163 DPR 347, 355 (2004).

B.

Así pues, y de conformidad con el mandato constitucional antes reseñado -- entiéndase, el de regular todo lo relacionado a los eventos electorales --, la

Asamblea Legislativa aprobó el Código Electoral de 2020, 16 LPRA sec. 4501 *et seq.*, estatuto legal hoy aquí en disputa. Es, precisamente, esa disposición estatutaria de naturaleza electoral la que procederemos a analizar con detenimiento.

Como cuestión de umbral, y en lo relacionado a las controversias ante nuestra consideración, debemos tener presentes que, de conformidad con lo dispuesto en el Código Electoral de 2020, *supra*, en nuestra jurisdicción existen dos mecanismos o procedimientos mediante los cuales un partido político puede seleccionar a sus candidatos o candidatas. El primero de estos, y tal vez el más conocido por la ciudadanía en general, es el de *primarias*. La precitada disposición legal define el concepto de *primarias* como el proceso de votación a través del cual se seleccionan a los candidatos a cargos públicos electivos con arreglo a dicha ley, y a las reglas que adopte la CEE y el organismo directivo del partido político en cuestión. Art. 2.3(92) del Código Electoral de 2020, 16 LPRA sec. 4503.

El segundo mecanismo disponible para la selección de candidatas o candidatos a participar de un evento eleccionario se denomina *método alterno*. Éste se define en el Código Electoral de 2020, *supra*, como el procedimiento alternativo para la elección de candidatos a cargos públicos que sustituye una primaria o elección especial. Art. 2.3(60) del Código Electoral de 2020, 16 LPRA sec. 4503. Dicho método alterno tiene que: (1) ser aprobado por

el organismo central del partido político en cuestión, y (2) cumplir, procesalmente, con las garantías dispuestas en la normativa electoral puertorriqueña. *Íd.*

De igual forma, el Código Electoral de 2020, *supra*, define el término de *aspirante* o *aspirante primarista* como toda persona natural que participe en los procesos de primarias internas o en los métodos alternos de nominación de un partido político de Puerto Rico, o que realice actividades, recaudaciones o eventos, con la intención o dirección de ocupar cualquier cargo interno u obtener una candidatura a un cargo público electivo. Art. 2.3(8) del Código Electoral de 2020, 16 LPRA sec. 4503. En otras palabras, el concepto de *aspirante* o *aspirante primarista* se refiere a toda persona natural que: (1) participe de primarias; (2) participe de un método alterno de nominación; o (3) que realice actividades, recaudaciones o eventos dirigidos a ocupar cualquier cargo interno u obtener una candidatura a cargo público electivo.

### C.

Aclarada la anterior terminología, pasemos, pues, a evaluar las disposiciones del Código Electoral de 2020, *supra*, pertinentes a los asuntos aquí bajo estudio. Al realizar ese ejercicio, prestaremos particular atención a aquellos articulados de nuestra normativa electoral que regulan tanto la selección de candidatos mediante los procesos de primarias, como a través de los métodos alternos.

Habiendo delimitado las coordenadas de los asuntos a atender, comenzamos señalando que es el Capítulo VII del Código Electoral de 2020, *supra*, el que regula todo lo concerniente a las candidaturas a cargos electivos en las elecciones generales y al proceso de primarias. Arts. 7.1-7.23 del Código Electoral de 2020, 16 LPRA sec. 4611-4633. En el mismo, y para trabajar en lo anterior, se dispone la creación de una Comisión de Primarias para cada partido político, compuesta por la o el Presidente de la CEE y por la o el Comisionado Electoral del partido político en cuestión. *Íd.* Esta Comisión, -- la cual estará encargada de dirigir el evento primarista si un partido político decide acogerse a dicho proceso --, no será un organismo de operación continua, sino que quedará activada de forma automática una vez se determine que el partido político debe realizar primarias y hasta que se certifiquen los resultados finales de dicho proceso en escrutinio general o recuento. *Íd.*

Constituida la referida Comisión, el Código Electoral de 2020, *supra*, mandata que cada partido político presente a su respectiva Comisión de Primarias copia de su reglamento de primarias, debidamente certificado por la o el Presidente y la o el Secretario del partido. *Íd.* Dicho reglamento, claro está, no podrá confligir con las disposiciones del Código Electoral de 2020, *supra*. *Íd.*

Ya más en lo relacionado al proceso primarista en sí, si bien un partido político tiene derecho a nominar a

determinada cantidad de candidatos para cada cargo público electivo objeto de votación en una elección general, Art. 7.9 del Código Electoral de 2020, 16 LPRA sec. 4619,[13] en aquellos casos en que surja una cantidad de aspirantes mayor a la permitida, el referido partido, como regla general, tendrá la obligación de realizar primarias. Art. 7.10 del Código Electoral de 2020, 16 LPRA sec. 4620. En el caso de las candidatas o los candidatos únicos, la o el Presidente de la Comisión de Primarias del partido político certificará como candidatos únicos a los aspirantes a los puestos que cumplan con todos los requisitos legales y reglamentarios de sus respectivos partidos políticos para participar en primarias, sin necesidad de celebrar dicho proceso. *Íd.*

Ahora bien, no empece a la existencia de los procesos primaristas, el Código Electoral de 2020, *supra*, también permite que un partido político, en lugar de realizar dicho proceso, se acoja a un método alterno para la nominación de sus candidatos. Art. 7.11 del Código Electoral de 2020, 16 LPRA sec. 4621. Para ello, es necesario que el organismo directivo central del partido en cuestión así lo determine y que se cumplan con ciertas garantías mínimas que

---

[13] A saber, una cantidad igual o menor que once (11) para senadores o representantes por acumulación. En los casos de senadores por distrito, una cantidad igual o menor que dos (2). En los casos de gobernador, comisionado residente en Washington D.C., representantes por distrito y alcaldes, la cantidad de aspirantes por cada partido político tiene que ser igual o menor que uno (1) en la demarcación geoelectoral que correspondan. En los casos de legisladores municipales, la cantidad de aspirantes debe ser igual o menor a la cantidad máxima de estas candidaturas en cada municipio. Art. 7.10(3)(a)(ii) del Código Electoral de 2020, 16 LPRA sec. 4620.

establece la precitada disposición legal. Art. 7.11(1) del Código Electoral de 2020, 16 LPRA sec. 4621. Sin embargo, es importante señalar que ningún proceso o método alterno de nominación de candidatos impedirá que otro miembro afiliado del partido, que no participó como aspirante en dicho proceso, pueda reclamar su derecho a primarias para ese mismo cargo público electivo dentro de los términos que el Código Electoral de 2020, *supra*, y el reglamento de primarias del partido político correspondiente disponen. Art. 7.11(4) del Código Electoral de 2020, 16 LPRA sec. 4621.

D.

Por otra parte, pero también en lo relacionado a los procesos primaristas aquí bajo estudio, es menester llamar la atención a lo dispuesto en el Art. 7.15 del Código Electoral de 2020, *supra*, articulado que regula lo concerniente a las peticiones de endosos. 16 LPRA sec. 4625. Según contemplado en el Art. 7.15 del Código Electoral de 2020, *supra*, las peticiones de endosos se le requerirán a **aspirantes primaristas** y a **candidatos independientes**. Art. 7.15(1) del Código Electoral de 2020, 16 LPRA sec. 4625.

De igual forma, el mencionado articulado faculta a la CEE a reglamentar todo asunto relacionado a este proceso. *Íd.* A su vez, establece que la fecha y hora límite para someter las referidas peticiones será el 15 de febrero del

año de elecciones generales. *Íd.* Dicho término es catalogado como fatal. *Íd.*

**Así pues, notemos que estas disposiciones legales nada establecen sobre el requisito de las peticiones de endosos en lo relacionado a las personas que participarán de los métodos alternos de selección de candidatos o candidatas.** Más bien, el articulado hace referencia únicamente a los aspirantes primaristas y a los candidatos independientes.

Sin embargo, el inciso 3 del Art. 7.15 del Código Electoral de 2020, *supra*, establece lo siguiente: "[c]ualquier Elector que desee concursar en unas primarias, como **aspirante** o como candidato independiente, además de cumplir con los requisitos de esta Ley y los reglamentos de su Partido y la Comisión, deberá presentar ante la Comisión la cantidad de peticiones de endoso requerida por esta Ley para el cargo público electivo al que interese aspirar.". (Énfasis suplido). 16 LPRA sec. 4625. A pesar de que en este inciso tampoco se hace referencia expresamente a los aspirantes que participarán de un método alterno de selección, su lenguaje confuso, -- al añadir el término **aspirante** --, posibilita el que se pudiese interpretar que éstos están incluidos en el término en cuestión.

En esa dirección, y entre otras consideraciones que también nos pudiesen mover a concluir que nuestra Asamblea Legislativa no excluyó, del todo, a estos últimos aspirantes del requisito de recoger peticiones de endosos

como paso previo a participar de un evento electoral, se encuentra un análisis exhaustivo que, -- sobre el mismo tema --, realizamos de lo dispuesto en el Código Electoral para el Siglo XXI, *infra*, estatuto que, previo a la aprobación del Código Electoral de 2020, *supra*, regulaba en nuestra jurisdicción los procesos eleccionarios.

En lo pertinente, el Art. 8.007 del Código Electoral para el Siglo XXI, en cuanto a los métodos alternos de selección, establecía, de forma expresa, que las personas seleccionadas de conformidad con dicho procedimiento no tenían que cumplir con los requisitos de presentación de peticiones de endosos para primarias para calificar como candidatos. 16 LPRA sec. 4117 (derogada). Dicha disposición fue eliminada del Código Electoral de 2020, *supra*, por lo que se pudiese inferir que fue la voluntad del legislador permitir la posibilidad de requerir a las personas participantes de un método alterno de selección la presentación de peticiones de endosos.

En fin, los cambios a la normativa electoral antes relacionada pudiesen sugerir que los aspirantes que se sometan a un método alterno de selección pueden, en ciertas circunstancias, verse obligados a tener que presentar peticiones de endosos. Veamos, entonces, qué disponen los reglamentos aplicables en cuanto a este asunto.

E.

En primera instancia, es importante señalar que el Código Electoral de 2020, *supra*, faculta a la CEE a aprobar

un reglamento de primarias y métodos alternos de nominación que sea uniforme para todos los partidos políticos en los campos electorales ocupados por el referido estatuto. Art. 7.1 del Código Electoral de 2020, 16 LPRA sec. 4611. A su vez, la mencionada disposición legal requiere que dicho reglamento muestre deferencia a los reglamentos aprobados por cada partido político para sus primarias y métodos alternos de nominación, siempre que estos no menoscaben o vulneren las garantías, reglas y normas protegidas por el referido Código para ambos procesos de nominación. *Íd.*

Así pues, y de conformidad con lo anterior, la CEE aprobó dos reglamentos que son importantes aquí examinar. En específico, dicha entidad aprobó el *Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes*,[14] y el *Reglamento y manual de primarias y métodos alternos de nominación 2024*.[15]

El primero de ellos, el *Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes*, por una parte, establece en su Título III, todo lo relacionado a los métodos alternos de nominación para la selección de candidatos o candidatas a cargos

---

[14] Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes, CEE, 15 de junio de 2023, disponible en: https://ww2.ceepur.org/sites/ComisionEE/es-pr/Secretaria/Documents/20230615-Reglamento-para-la-radicacion-de-candidaturas-de-los-partidos-politicos-y-candidaturas-independientes.pdf.

[15] Reglamento y manual de primarias y métodos alternos de nominación 2024, CEE, 24 de agosto de 2023, https://ww2.ceepur.org/sites/ComisionEE/es-pr/Secretaria/Documents/20230824-Reglamento-y-manual-de-Primarias-y-metodos-alternos-de-nominacion-2024.pdf.

electivos. Sec. 3.1, pág. 17. En lo aquí pertinente, se dispone que los partidos políticos podrán establecer, de forma interna, métodos alternos de selección para la nominación de sus candidatos o candidatas a cargos electivos, siempre que así lo apruebe su organismo directivo central. *Íd.* De igual forma, se establece que la CEE deberá aprobar un reglamento de primarias y métodos alternos uniforme para todos los partidos políticos, mostrando deferencia a los reglamentos aprobados por cada partido. *Íd.*

**En cuanto a la presentación de peticiones de endosos para los aspirantes a cargos electivos a seleccionarse mediante un proceso de método alterno, -- asunto aquí bajo estudio --, el referido reglamento establece que estos no tendrán que cumplir con tal requisito, siempre y cuando sean escogidos y su expediente, con los documentos requeridos, sea radicado por su partido político como candidato único en la CEE, en o antes de las 12:00 del mediodía del 30 de diciembre de 2023. *Íd.* Es decir, y conforme a este reglamento, pasada dicha fecha y horario sin celebrarse el método de selección alterno, -- y, por consiguiente, sin seleccionarse a los candidatos únicos --, los aspirantes a participar del mismo vienen obligados a presentar las correspondientes peticiones de endosos.**

Nótese que, con la aprobación de este reglamento, la CEE aclaró que los aspirantes a cargos electivos a seleccionarse mediante un método alterno de selección no

estaban necesariamente excluidos del recogido y presentación de peticiones de endosos. Más bien, lo determinante para requerirle a estos cumplir con dicho requisito es el periodo dentro del cual se lleva a cabo el método alterno de selección.

Por otra parte, y como adelantamos, la CEE también aprobó el *Reglamento y manual de primarias y métodos alternos de nominación 2024*. El Título VI de dicho reglamento regula lo concerniente a los métodos alternos de nominación. En particular, en el mismo se repite la normativa esbozada en el Art. 7.11 del Código Electoral de 2020, *supra*. Sec. 6.1, págs. 46-48.

F.

Para finalizar el análisis de las disposiciones del Código Electoral de 2020, *supra*, que guardan estrecha relación con las controversias ante nuestra consideración, es menester destacar, -- por ser particularmente importante para la correcta, adecuada y justa disposición de los asuntos que hoy nos ocupan --, que el Art. 7.5 de dicha ley establece que "cualquier [a]spirante o [c]andidato nominado **podrá** ser descalificado como tal, por el Tribunal de Primera Instancia". (Énfasis suplido). 16 LPRA sec. 4615. Esto, cuando medie querella por razón de que el aspirante o candidato no cumple con los requisitos impuestos por la Constitución o la ley, o cuando se demostrare que ha violado

cualesquiera de las disposiciones del referido Código o de sus reglamentos.[16] *Íd.*

Sobre esta facultad de descalificar, llamamos la atención del lector o lectora al uso de la palabra podrá como palabra que antecede a la acción. Según los cánones de interpretación jurídica, dicho término "sugiere autorización para actuar, **sin obligación de llevar a cabo dicha acción**". (Énfasis suplido). J. Farinacci Fernós, *Hermenéutica Puertorriqueña: Cánones de Interpretación Jurídica*, San Juan, Editorial InterJuris, 2020, pág. 133. Es decir, su uso sugiere, de ordinario, que se trata de un asunto dejado a la discreción de la persona o entidad en cuestión, en este caso, el Tribunal de Primera Instancia.[17] *Íd.*

---

[16] Cabe mencionar que la Sec. 4.2 del *Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes* de la CEE detalla que la querella deberá ser contestada bajo juramento, dentro de los diez (10) días siguientes de haber sido notificada. Sec. 4.2, pág. 22. De igual forma, se dispone que, si el Tribunal de Primera Instancia encontrare que de las alegaciones surge una controversia real, deberá citar a vista pública a ser celebrada dentro de los diez (10) días a partir de que la persona querellada haya presentado su contestación. *Íd.* Dicho término podrá ser reducido por el foro primario, si lo requieren las circunstancias del caso. *Íd.*

[17] Una mayoría de este Tribunal, -- con pretensiones lingüísticas totalmente acomodaticias --, intentan hacer creer que la utilización del término "podrá" está anclada en la ocurrencia de un evento y no en la otorgación de una facultad discrecional al Tribunal de Primera Instancia. Argumentan que, dada la sintaxis de la oración, dicho término está atado al aspirante o candidato nominado, y no al referido foro judicial. En específico, expresan que "el 'podrá' […] va dirigido a los aspirantes o candidatos contra quienes se presente una solicitud de descalificación. Es decir, ninguno de ellos viene obligados a solicitar la descalificación en el tribunal, pero puede hacerlo si así lo desea". Véase pág. 58 de la *Opinión* mayoritaria. Tal razonamiento no nos persuade. De una lectura literal de la oración en cuestión se desprende inequívocamente que la palabra "podrá" se refiere al poder, de naturaleza discrecional, que tiene el Tribunal de Primera Instancia para descalificar al aspirante o candidato nominado, de entender que ello procede. Claramente, el sentido de "ocurrencia" existe solo en cuanto a que el foro primario "podrá", en su momento, decidir si descalifica o no a los aspirantes o candidatos querellados.

**Dado el uso que se le ha dado a la palabra _podrá_, -- y ante las particularidades de este caso, donde ciertos candidatos y candidatas a diversos puestos electivos bajo la bandera del MVC al parecer fallaron en el recogido de las peticiones de endosos --, cabe preguntarnos, ¿era la descalificación de los querellados el remedio más apropiado? A nuestro juicio, y conforme al principio de equidad, es forzoso contestar dicha interrogante en la negativa. Veamos porqué.**

IV.

A.

Sabido es que la Ley Núm. 55-2020, también conocida como el Código Civil de Puerto Rico de 2020, 31 LPRA sec. 5311 _et seq._ (en adelante, "Código Civil de 2020"), identifica, como fuentes de derecho en el ordenamiento jurídico puertorriqueño, la Constitución, la ley, la costumbre y los principios generales del Derecho. Art. 2 del Código Civil de 2020, 31 LPRA sec. 5312. En lo que nos atañe, los principios generales del Derecho aplican en ausencia de ley o costumbre, y sin perjuicio de su carácter informador del ordenamiento jurídico. Art. 5 del Código Civil de 2020, 31 LPRA sec. 5315.

De igual forma, el Art. 6 del Código Civil de 2020 dispone que los tribunales tienen el deber inexcusable de resolver diligentemente los asuntos ante su consideración, ateniéndose al sistema de fuentes del ordenamiento jurídico establecido. 31 LPRA 5316. Así pues, aquel tribunal que

rehúse fallar a pretexto de silencio, obscuridad o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad. Art. 6 del Código Civil de 2020, 31 LPRA sec. 5316.

En sintonía con lo anterior, en reiteradas ocasiones este Tribunal ha resuelto que, en nuestro ordenamiento jurídico, "permean los principios de equidad, buena fe y razonabilidad". *O.E.G. v. Rivera, Cintrón*, 153 DPR 184, 193 (2001). A tales efectos, esta Curia ha sentenciado que, cuando no hay ley aplicable al caso, **-- o cuando existe una laguna en la misma --**, el tribunal viene obligado a resolver conforme a la equidad, lo cual quiere decir "que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos". *CMI Hosp. v. Depto. Salud*, 171 DPR 313, 324 (2007). Véase, también, *Asociación de Condomines v. Los Frailes, S.E.*, 154 DPR 800, 816 (2001).

**En específico, la equidad, en términos generales, se refiere a resolver "algo que es justo".** *Silva v. Comisión Indus.*, 91 DPR 891, 898 (1965). **Tal concepto nació "de la necesidad de atemperar el rigor de la norma mediante recurso a la conciencia del juzgador".** *Banco Metropolitano v. Berríos*, 110 DPR 721, 725, (1981).

B.

**Uno de los principios elementales de la equidad es la prohibición de ir contra los actos propios.** *Díaz v. Transporte*, 163 DPR 759, 772 (2005) (Rebollo López, opinión

disidente); *Mun. de Ponce v. A.C. et al.*, 153 DPR 1, 33 (2001); *Int. General Electric v. Concrete Builders*, 104 DPR 871, 878 (1976). Esta doctrina se fundamenta en el principio general de Derecho que ordena proceder de buena fe en el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones. *O.C.S. v. Universal*, 187 DPR 164, 172 (2012); *Vivoni Farage v. Ortiz Carro*, 179 DPR 990, 1010 (2010); *Int. General Electric v. Concrete Builders*, *supra*, pág. 876 esc. 4 (1976). La misma supone que a nadie le es lícito ir ni obrar contra sus propias actuaciones. *Alonso Pinero v. UNDARE, Inc.*, 199 DPR 32, 55 (2017); *O.C.S. v. Universal*, *supra*, pág. 172; *Int. General Electric v. Concrete Builders*, *supra*, pág. 876.

En ese sentido, en virtud de la doctrina de actos propios, se impide que una persona asuma una conducta contradictoria a una actuación previa que generó expectativas en quien confió en su obrar. *Domenech v. Integration Corp.*, 187 DPR 595, 621 (2013); *Santiago et al. v. Rodríguez et al.*, 181 DPR 204, 217 (2011); *Int. General Electric v. Concrete Builders*, *supra*, pág. 876. Cabe destacar que, en estos casos, el efecto se produce de forma objetiva, pues en "nada cuenta la verdadera voluntad del autor de los actos". *Int. General Electric v. Concrete Builders*, *supra*, pág. 876.

**Ahora bien, este Tribunal, en innumerables ocasiones, ha señalado que, para que sea de aplicación la referida**

**doctrina, es necesario que concurran tres (3) requisitos, a saber: (1) determinada conducta de un sujeto; (2) que dicha conducta haya engendrado una situación contraria a la realidad, susceptible de influir en la conducta de los demás; y (3) que ésta sea la base de la confianza de la otra parte que haya procedido de buena fe y que, por ello, haya obrado de manera que le causaría perjuicio si su confianza quedara defraudada.** *O.C.S. v. Universal, supra,* pág. 173-174; *Vivoni Farage v. Ortiz Carro, supra,* págs. 1010-1011; *Meléndez Piñero v. Levitt & Sons of Puerto Rico, Inc.,* 129 DPR 521, 555 (1991).

**No empece a lo anterior, hemos reiterado que la doctrina de actos propios, de ordinario, no aplica frente al Gobierno.** *Junta de Licenciamiento y Disciplina Médica v. Cabral Jiménez,* 201 DPR 157, 169 (2018); *Mendoza Aldarondo v. Asociación Empleados,* 94 DPR 564, 579 (1967); *Infante v. Tribl. Examinador Médicos,* 84 DPR 308, 316–317 (1961). En específico, la misma no es de aplicación cuando se ven lesionados el interés y la política pública del Estado. *O.C.S. v. Universal, supra,* pág. 174; *Mendoza Aldarondo v. Asociación Empleados, supra,* pág. 579; *Quiles v. Del Valle,* 167 DPR 458, 478 (2006). **Ahora bien, "en situaciones en las que no se afecte el interés público y en las que pueda ocurrir una clara injusticia, las doctrinas como la de los actos propios o 'equitable estoppel' pueden ser utilizadas contra el Estado".** *Quiles v. Del Valle, supra,* pág. 478.

Es, pues, a la luz de la normativa antes expuesta, que, -- desde la disidencia --, procedemos a disponer de la controversia ante nuestra consideración.

V.

Como mencionamos anteriormente, en el presente caso, los peticionarios plantean que el Tribunal de Apelaciones erró al revocar determinada *Sentencia* emitida por el Tribunal de Primera Instancia, mediante la cual se descalifica a ciertos candidatos y candidatas que, en las próximas elecciones generales, aspirarían bajo la bandera del MVC, por estos no haber entregado las peticiones de endosos requeridas por ley. Si bien éstos pudiesen tener la razón en lo relacionado a los argumentos que esgrimen, aun así entendemos que no procede aquí el remedio de descalificación solicitado.

Y es que, según reseñamos en la exposición del derecho aplicable, en efecto, el Código Electoral de 2020, *supra*, y, principalmente el *Reglamento para la radicación de candidaturas de los partidos políticos y candidaturas independientes*, *supra*, establece que los aspirantes a seleccionarse mediante un proceso de método alterno debían cumplir con la presentación de las peticiones de endosos cuando dicho proceso alterno, -- y, por consiguiente, la selección y notificación a la CEE de los candidatos únicos --, no fuese realizado en o antes de las 12:00 del mediodía del 30 de diciembre de 2023. En este caso, los querellados no cumplieron con dicha disposición. **No obstante, ello, en**

CC-2024-0266 cons. con CC-2024-0267                    37

**gran parte, es atribuible a las actuaciones de la propia CEE.**

Para llegar a la anterior conclusión, basta con señalar, primero, que la CEE recibió y evaluó el reglamento sometido por el MVC sobre los procesos de métodos alternos de nominación, en el cual se excluía el requisito de las peticiones de endosos para los aspirantes participantes del mismo, y nada dijo sobre el particular. Es decir, a pesar de que dicho reglamento, aparentemente, confligía con las disposiciones del Código Electoral de 2020, *supra*, la CEE no hizo señalamiento alguno al respecto.

Por otro lado, y, en segundo lugar, es menester señalar también que, en lo que respecta a la causa de epígrafe, es un hecho probado, en al menos ocho (8) determinaciones de hechos del Tribunal de Primera de Primera Instancia, que cuando los querellados presentaron los documentos requeridos para figurar como aspirantes, el SIEN, -- la plataforma digital de la CEE --, les notificaba: **"Si su partido ha sido acogido por método alterno de selección según el Código Electoral de Puerto Rico de 2020 no es requisito presentar peticiones de endosos".**[18]

Ante estas circunstancias, entendemos que, en el presente caso, concurren todos los requisitos para aplicar la doctrina de actos propios, según definida en la normativa que antecede. Cabe recalcar que la doctrina de

---

[18] (Énfasis suplido). Véase, Determinaciones de hechos núms. 10-17 de la *Sentencia* del Tribunal de Primera Instancia, págs. 6-8.

actos propios puede ser de aplicación, contra el Estado, en situaciones en las que no se afecte el interés público y en las que pueda ocurrir una clara injusticia.

No debe haber duda de que estamos ante un escenario en el concurren ambas de estas excepciones. Lo anterior, toda vez que, no aplicar esta doctrina constituiría, precisamente, una laceración al interés público del Estado de garantizar el derecho al sufragio igual, directo, secreto y libre y, a su vez, una situación claramente injusta, tanto para el Pueblo puertorriqueño, como para los hoy querellados.

Por consiguiente, la drástica sanción de la descalificación de los candidatos del MVC no era el remedio adecuado para disponer de la controversia de epígrafe. Más bien, entendemos que lo procedente aquí era ordenar el recogido de endosos, en determinado periodo de tiempo, y, posteriormente, la celebración de una votación.

**Como mencionamos, ordenar el recogido de endosos, y, posteriormente, el que se pase a la selección de candidatos o candidatas mediante el método que se elija en el referido partido político, era el remedio en equidad para un caso como el de marras, -- uno muy particular, matizado de errores de parte y parte --, donde está envuelto el derecho fundamental al voto.[19]  Los otros remedios sobre la mesa,**

---

[19] Recordemos que este partido político ya celebró una Asamblea General, válida en ley, donde tuvo la oportunidad de seleccionar los candidatos y candidatas a los puestos electivos aquí en controversia, por lo que bien, luego del recogido de endosos de rigor, pudiesen ratificarse los mismos.

**que hoy, y con solo una contada excepción, avala una mayoría de este Tribunal, constituyen, -- extrapolando terminología de otras áreas del derecho, solo para fines ilustrativos --, un castigo cruel e inusitado a la democracia y a la voluntad política del Pueblo de Puerto Rico.[20]**

VI.

Por no ser éste el curso seguido por una mayoría de este Tribunal en el día de hoy, disentimos.

Ángel Colón Pérez
Juez Asociado

---

[20] Después de todo, no podemos olvidarnos que "cuando de hacer justicia se trata, no puede haber moldes técnicos que aprisionen los remedios justos". *Sucesión Bravo v. Srio. De Hacienda*, 106 DPR 672 (1978). Lo anterior, máxime cuando el "molde técnico" al que alude la Mayoría es nada más y nada menos que el ambiguo y harto controversial Código Electoral de 2020, *supra*.